# Brewer Deposition Day 1

# EXHIBIT A

```
1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

   ALBERT BREWER,              :  NO. 13-CV-05763
3              Plaintiff      :
                               :
4           vs.               :
                               :
5  BERKS COUNTY SHERIFF, ERIC J. :
   WEAKNECHT, SHERIFF; ANTHONY   :
6  DAMORE, CHIEF; VINCENT        :
   PACIFICO, SERGEANT,          :
7              Defendants      :
8              DEPOSITION OF ALBERT BREWER
9                  Taken in the Berks Heim Nursing
10 and Rehabilitation, 1011 Berks Road, Essig's
11 Conference Room, Leesport, Pennsylvania, on Friday,
12 May 29, 2015, commencing at 10:29 a.m., before
13 Suzanne L. E. Toto, Registered Professional Reporter.
14 APPEARANCES:
15            STEPHEN V. YARNELL, ESQ.
              230 Windsor Avenue
16            Suite 207
              Narberth, PA  19072
17             -- For The Plaintiff
18
19
20
21         VERITEXT LEGAL SOLUTIONS
              MID-ATLANTIC REGION
22      1801 Market Street - Suite 1800
             Philadelphia, PA  19103
23
24
25
```

**Page 2**

```
 1  APPEARANCES: (CONTINUED)
 2      DEASEY MAHONEY & VALENTINI LTD.
        BY:  ANDREW B. ADAIR, ESQUIRE
 3      103 Chesley Drive
        Lafayette Building, Suite 101
 4      Media, PA  19063
        -- For The Defendants
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22              * * *
23
24
25
```

**Page 3**

```
 1              INDEX TO WITNESS
 2
        Albert Brewer     Mr. Adair    4
 3
 4
 5
            INDEX TO EXHIBITS
 6
 7  Brewer 1    Response to Interrogatories    50
 8  Brewer 2    Letter dated 10-16-12          65
 9  Brewer 3    Letter dated 6-1-12            75
10  Brewer 4    Acknowledgement Form              95
11  Brewer 5    Harassment Policy              97
12  Brewer 6    Letter dated 8-11-09           98
13  Brewer 7    Letter dated 1-7-11            99
14  Brewer 8    Letter dated 10-20-10         105
15  Brewer 9    Incident Report               119
16  Brewer 10   Incident Report               129
17  Brewer 11   Termination Notice            141
18  Brewer 12   Grievance                     155
19  Brewer 13   Complaint                     158
20  Brewer 14   Interview Notes               169
21  Brewer 15   Handwritten Note              193
22
23
24
25
26
```

**Page 4**

```
 1                  * * *
 2          ALBERT BREWER, having been duly
 3  sworn, was examined and testified as follows:
 4          DIRECT EXAMINATION
 5  BY MR. ADAIR:
 6  Q.    Good morning, Mr. Brewer.  My name is
 7  Drew Adair.  And as I believe you know I represent
 8  the defendants in this lawsuit that you brought
 9  against Berks County and Sheriff Weaknecht, Tony
10  Damore and Vince Pacifico.  We're here today to take
11  your deposition; and before we begin I'm going to
12  give you some instructions and some ground rules just
13  so that we're on the same page.
14          My first question to you, though, is
15  have you ever had your deposition taken before?
16  A.    No.
17  Q.    Okay.  And that's fine.  I ask you that
18  just because if you have had it taken, you may have
19  some familiarity with the process.  But since you
20  haven't, I will go into a little more detail with the
21  instructions.
22          This is a process in which I get a
23  chance to ask you questions about your claim and you
24  get to provide answers.  The first thing that I'll
25  tell you is that if you do not understand any
```

**Page 5**

```
 1  question that I ask you today, I don't want you to
 2  answer it.  I want you to ask me to either rephrase
 3  the question or, if you didn't hear me, ask me to
 4  repeat it or whatever is necessary that you
 5  understand the question because I don't want you to
 6  guess.  I don't want you to speculate.  But I do want
 7  you to understand what questions I'm asking.  Is that
 8  clear so far?
 9  A.    Yes, sir.
10  Q.    The other -- or another instruction is
11  that all answers have to be verbal.  You're doing a
12  great job so far; but that means if I ask you a
13  question that's a yes or a no question, rather than
14  nodding your head or shaking your head, you say yes
15  or no, okay?
16  A.    (Witness nodded head.)  Yes, I
17  understand.
18  Q.    And that's fine.  And there is -- look,
19  there is no --
20  A.    Waiting for him to finish.
21  Q.    That was the next instruction I was going
22  to give, and you did a wonderful job with that.
23          MR. YARNELL:  Let the record show that
24  I moved too quickly.
25  BY MR. ADAIR:
```

Page 6

1  Q.        In normal conversations people have a way
2  of speaking over top of each other by either starting
3  to answer before someone is done asking a question or
4  starting to ask a next question before someone is
5  done answering. I am going to do my absolute best to
6  let you answer your question before I ask you my next
7  question, and I'll ask that you do exactly what
8  you've been doing, waiting until I'm done asking the
9  full question before you begin to answer, okay?
10 A.       Yes, sir.
11 Q.        As I mentioned to you a little earlier
12 before we were on the record, if you need to take a
13 break for any reason, just let me know. I'm happy to
14 accommodate that. This is not an endurance test, so
15 just -- you know, for whatever reason, just say you
16 need to take a break, okay?
17 A.       Yes, sir.
18 Q.        Another thing, if you're giving an answer
19 today and during the deposition you later realize
20 that your prior answer was incorrect, and if you
21 would like to go back and correct what you previously
22 said, you can do that. I'm not looking to put words
23 in your mouth or anything. But as I said, you know,
24 sometimes you think about things as time goes on, you
25 may realize you gave an incorrect answer. So you

Page 7

1  have the ability during the deposition to correct
2  something if you think you have said something
3  incorrect earlier. Do you understand that?
4  A.       Yes, sir, I do.
5  Q.        I mentioned earlier, I don't want you to
6  speculate. I don't want you to guess. If there's a
7  question that I ask that calls for an estimate and
8  you can reasonably estimate, that's fine. You can
9  tell me this is an estimate. But if you don't know
10 the answer, I don't want you to just make something
11 up just to answer my question, okay?
12 A.       Yes, sir.
13 Q.        I'm trying to think if I've forgotten any
14 of the important ones, but I think I covered a lot.
15          MR. YARNELL: May I?
16          MR. ADAIR: Absolutely.
17          MR. YARNELL: When we began the
18 deposition, the court reporter, Ms. Toto, asked
19 whether or not we were agreeing to the usual
20 stipulations as between the lawyers, and we said yes.
21 And I stated that I wanted you to read and review the
22 transcript. That is consistent with what Mr. Adair
23 was saying, that although while it is unlikely and
24 doesn't happen very often, in the event that
25 something you testify to, once you review the

Page 8

1  transcript, if you determined that it wasn't correct
2  or honest or you didn't understand the question or
3  whatever it is, you will have the opportunity to
4  correct it. Okay?
5          Now, the reading and reviewing of the
6  transcript is mostly to make sure that the court
7  reporter understood that which you were saying and
8  recorded it properly, which she will undoubtedly do;
9  and I don't want her to take umbrage at me suggesting
10 she might make a mistake, but you might make a
11 mistake too.
12          So it's just a matter -- what the
13 interest is here today is that you understand the
14 questions and that you answer them to the best of
15 your ability honestly but you do not answer something
16 that you either do not know or do not understand.
17 And it's really very simple. Okay?
18          THE WITNESS: Okay, sir.
19          MR. YARNELL: Thank you. I will shut
20 up now.
21 BY MR. ADAIR:
22 Q.        Okay. The other instruction that I want
23 you to understand is that you were earlier put under
24 oath to tell the truth. Do you understand that you
25 are under oath right now to tell the truth today?

Page 9

1  A.       Yes, I do, sir.
2  Q.        Do you understand that this is the same
3  oath that you would take if you were in court and
4  testifying?
5  A.       Yes, I do, sir.
6  Q.        With that being said, let me just tell
7  you, you know, briefly how I'd like to conduct the
8  deposition. I'm going to start out and -- I'm going
9  to start and get into some background questions,
10 questions about work, what you did prior to coming to
11 Berks County, what you've done after coming to Berks
12 County, a lot of technical questions which really go
13 to damages in the case.
14          But I'm going to start with that
15 because it might be stuff that you find a little more
16 comfortable to answer. We'll get into a rhythm and,
17 you know, you'll be able to answer the questions.
18          After that we're going to turn our
19 attention to the actual incidents and things that
20 occurred. And I'm going to give you a full
21 opportunity to explain those things. That's my
22 purpose today, to ask you questions about what
23 occurred; but I also want to hear your answers and,
24 you know, your understanding of what happened.
25          So do you understand that?

3 (Pages 6 - 9)

Page 10

1  A.      Yes, sir, I do.
2  Q.      Okay. With that being said, I'm going to
3  ask you, first of all, just some brief background
4  questions. What is your date of birth?
5  A.      July 10, 1975.
6  Q.      And where do you currently live?
7  A.      351 Spring Street, Reading, PA 19601.
8  Q.      And how long have you lived at that
9  address?
10  A.      I can say four years and probably nine,
11  ten months to be exact.
12  Q.      So since -- I guess that takes it back to
13  2010 you moved into that address?
14  A.      October to be exact.
15  Q.      And where did you live prior to Spring
16  Street?
17  A.      215 North Second Street.
18  Q.      Also in Reading?
19  A.      Also in Reading.
20  Q.      And how long did you live there?
21  A.      Average like a year and a couple of
22  months. I don't quite remember.
23  Q.      Okay. How long have you lived in
24  Reading?
25  A.      In total, since July 2008.

Page 11

1  Q.      And where did you live before you lived
2  in Reading?
3  A.      Maryland. 206 Shagbark Road,
4  S-H-A-B-B-A-R-K (sic) Road, Middle River, Maryland.
5  Q.      Okay.
6  A.      The zip code I don't quite remember.
7  Q.      That's okay. How long were you living in
8  Maryland in Middle River?
9  A.      13 months.
10  Q.      And how about before you lived there?
11  A.      I used to live 1451 Washington Avenue,
12  Apartment 13-D the Bronx, Bronx, New York 10456.
13  Q.      How long were you in the Bronx?
14  A.      In that address since 1993. I don't
15  remember if it was June or July of that year,
16  roughly.
17  Q.      Pretty good memory. I don't need all the
18  details. I'm just trying to get some sense --
19  A.      If I remember the detail, I will give you
20  the detail.
21  Q.      Great. I appreciate that.
22         And before you lived in the Bronx,
23  where did you live?
24  A.      Well, before that address I used to live
25  in the Bronx in another address, 1686 Clay Avenue

Page 12

1  Apartment 13 -- I mean 3-C, Bronx, New York 10456,
2  the same -- basically the same neighborhood.
3  Q.      Okay.
4  A.      And before that, I don't remember the
5  number but it was on Sheridan Avenue right in the
6  Bronx also. Those were the three addresses I live in
7  the Bronx.
8  Q.      How long were you in the Bronx total? Do
9  you remember from what year until what year?
10  A.      Since '89 to 2007. That will make like
11  18 years.
12  Q.      And before you lived in the Bronx, where
13  did you live?
14  A.      I was like back and forth to the
15  Dominican Republic and Puerto Rico.
16  Q.      Where were you born?
17  A.      Dominican Republic.
18  Q.      And are you a naturalized U.S. citizen?
19  A.      Yes, I am.
20  Q.      When were you -- when did you get
21  naturalized?
22  A.      The year was '97 but I don't quite
23  remember the date right now or the month.
24  Q.      And because I'm not very good at math,
25  how old were you when you moved into the United

Page 13

1  States? I guess I should clarify. Not Puerto Rico.
2  Into the continental --
3  A.      Into the United States, 14.
4  Q.      And did you move to -- was that to New
5  York City, to the Bronx?
6  A.      Yes, sir.
7  Q.      Your current address, 351 Spring Street,
8  does anyone live with you there?
9  A.      Yes, my fiancee.
10  Q.      And what's your fiancee's name?
11  A.      Odalis Ariza, O-D-A-L-I-S, A-R-I-Z-A.
12  Q.      And you indicated she is your fiancee,
13  correct?
14  A.      Yes, sir.
15  Q.      And how long have you lived with Ms.
16  Ariza?
17  A.      Since I moved to Reading.
18  Q.      How long have you two been engaged?
19  A.      I'm sorry if I take a pause but I want to
20  be exact as possible. Like a year before I got
21  fired.
22  Q.      So that would have been in 2010?
23  A.      Roughly.
24  Q.      Do you have a wedding date set?
25  A.      No.

4 (Pages 10 - 13)

Page 14

1 Q.      Does --
2 A.      We couldn't get anything settled because
3 I got fired.
4 Q.      Prior to getting fired did you have a
5 wedding date set?
6 A.      No.
7 Q.      Is there anyone else who lives with you
8 at the 351 Spring Street address?
9 A.      Well, I have a first floor apartment that
10 I rent, but it's currently vacant at this time, if
11 that count.
12 Q.      So right now it's just you and Ms. Ariza
13 live there, but you do have a rental apartment on the
14 premises, is that accurate?
15 A.      Yes, sir.
16 Q.      Have you ever rented that apartment?
17 A.      It's been rented before but right now
18 it's vacant.
19 Q.      How long has it been vacant?
20 A.      Since February.
21 Q.      And that would be 2015?
22 A.      Yes, sir.
23          MR. YARNELL: Can I ask him to
24 clarify?
25          MR. ADAIR: Sure.

Page 15

1          MR. YARNELL: I assume when you ask,
2 you mean on a full-time basis?
3          MR. ADAIR: That is what I meant. But
4 I can clarify.
5 BY MR. ADAIR:
6 Q.      Is there anyone who has lived with you on
7 a part-time basis?
8 A.      No.
9 Q.      From -- other than tenants, has there
10 been anyone who has lived with you other than Ms.
11 Ariza since 2008?
12 A.      No.
13 Q.      The apartment that you rent out, is that
14 a separate unit? Does it have its own access to the
15 outside or is it part of your building itself?
16 A.      It's part of the house but it has a
17 separate way -- I'm sorry, separate ways to come in
18 and go out.
19 Q.      Does it have a kitchen in it?
20 A.      Yes.
21 Q.      When did you first rent out that
22 apartment?
23 A.      I don't remember.
24 Q.      Was it when you were still working for
25 Berks County?

Page 16

1 A.      Don't exactly remember.
2 Q.      Now, have you ever been married?
3 A.      No.
4 Q.      And I understand from some paperwork that
5 you do have children?
6 A.      Yes, I do.
7 Q.      How many children do you have?
8 A.      Two.
9 Q.      What are their names?
10 A.      Christy Brewer and Steven Brewer.
11 Q.      Neither one of them live with you?
12 A.      No, they live with their mom.
13 Q.      Are they in the Reading area?
14 A.      No, New York.
15 Q.      And how old are they?
16 A.      Steven is 14 and Christy is 15.
17 Q.      I'm going to ask you some questions about
18 your schooling. We'll just start from the top. What
19 is the highest degree that you obtained?
20 A.      I have some college but I didn't
21 graduate.
22 Q.      We can start with that. So what college
23 did you go to?
24 A.      Bronx Community College that I went.
25 Q.      And how long were you there?

Page 17

1 A.      Roughly like three to four semesters.
2 Q.      Was there any area of study that you were
3 studying at the time?
4 A.      Medical lab technician and microbiology.
5 Q.      Is there a reason that you stopped
6 attending college?
7 A.      Well, I had a problem with my ex-partner,
8 with the mother of my kids. I was having some
9 difficulties back in 2001, 2002, something like that.
10 I don't remember. And then I had too much on my
11 plate at that time that I decided to stop going to
12 school until I find something better to do, another
13 job.
14 Q.      Okay. And when were you at the Bronx
15 Community College?
16 A.      I don't actually remember. It was from
17 early 2000s.
18 Q.      And that's fine. I mean that's an
19 estimate. That's all I'm asking you for. Did you
20 ever attend any other college other than the Bronx
21 Community College?
22 A.      No.
23 Q.      How about high school, do you have a high
24 school --
25 A.      Yes, I do.

5 (Pages 14 - 17)

Page 18

1 Q.        From what high school?
2 A.        William Howard Taft High School.
3 Q.        And is that in the Bronx?
4 A.        Yes.
5 Q.        And did your high school have any kind of
6 concentration or area of focus?
7 A.        No, just a regular vocation.
8 Q.        Some schools do have things broken up.
9 That's why I asked you that question.  When did you
10 graduate from high school?
11 A.        1994.  To be exact, June 1994.
12 Q.        Have you -- other than the Bronx
13 Community College, have you attended any other
14 schools from the time that you graduated from high
15 school to the present?
16         MR. YARNELL:  Objection to the form of
17 the question.  By schools do you mean any school of
18 any kind anywhere?
19         MR. ADAIR:  That's what I'm asking,
20 yes.
21         MR. YARNELL:  Okay.
22         MR. ADAIR:  Did that cure the
23 objection or would you like me to rephrase?
24         MR. YARNELL:  No, that's fine.  I get
25 it.

Page 19

1 BY MR. ADAIR:
2 Q.        Again, I'm not trying to confuse you and
3 I'm certainly not trying to make questions -- I do
4 want you to understand the question.
5 A.        I did like small trainings, like security
6 training.  I went to the Army.  I went to vocational
7 school for personal records specialist.
8 Q.        Let's talk about these.  Because there is
9 a wage loss claim so I'm trying to find out what your
10 qualifications, what your background, what types of
11 jobs you are qualified to work.
12         You were in the Army you just
13 indicated?
14 A.        Army Reserves.
15 Q.        And when were you in the Army Reserves?
16 A.        Since 1995 till 2003.  June 2003 to be
17 exact.
18 Q.        And did you receive an honorable
19 discharge?
20 A.        Yes, I did.
21 Q.        So you're not currently in the Reserves,
22 correct?
23 A.        No, sir.
24 Q.        Did you ever see active combat?
25 A.        No, sir.

Page 20

1 Q.        Were you ever deployed while you were in
2 the Reserves?
3 A.        No, sir.
4 Q.        And when you were in the Reserves, what
5 was your job?
6 A.        Human resources.
7 Q.        And what kind of training did they
8 provide you?
9 A.        We went to basic combat training, nine
10 weeks.  And then I went to the school, which is
11 called AIT.  I went --
12 Q.        Do you know what AIT stands for?
13 A.        I don't remember.
14 Q.        What did you learn in AIT school?
15 A.        Personal records specialist, like
16 archives, keep the personal records in order,
17 everything that has to do with human resources.
18 Q.        Did you learn how to conduct
19 investigations?
20 A.        That is not part of the job.
21 Q.        Okay.  Did they teach you about hiring
22 and firing?  Is that part of the job?
23 A.        No.
24 Q.        Because it's the Army, not civilian.
25         MR. YARNELL:  They are perfectly clear

Page 21

1 how to do that in the Army.
2 BY MR. ADAIR:
3 Q.        Did you have any other assignments other
4 than in HR?
5 A.        No.
6 Q.        What was the highest rank that you
7 obtained in the Reserves?
8 A.        I was E4 but they made a mistake on the
9 W-2 -- on the discharge form.  They say that it was
10 E3 but it was actually E4.  For the record E3 because
11 that's what it says on the paperwork.
12 Q.        Did you ever get that mistake fixed?
13 A.        No.
14 Q.        Okay.
15 A.        As long as I have an honorable discharge,
16 that's what happens, I'm good with that.
17 Q.        Didn't impact you?
18 A.        No.  Rank doesn't make the man.
19 Q.        Other than the Army, have you received
20 any other types of training?
21 A.        Can you rephrase that question?
22 Q.        Absolutely.  You were a police officer,
23 correct?
24 A.        Yes.
25 Q.        So did you receive training to become a

6 (Pages 18 - 21)

Page 22

1  police officer?
2  A.        Yes, I did.  I went to the academy in
3  Baltimore.
4  Q.        And how long was the Baltimore Police
5  Academy?
6  A.        Seven months.
7  Q.        And did you graduate from that?
8  A.        Yes.
9  Q.        When were you at the Baltimore Police
10 Academy?
11 A.        I started up in June 2007.  June 29th to
12 be exact.
13 Q.        And after you completed your training at
14 the Baltimore Police Academy, were you a police
15 officer?
16 A.        Yes.
17 Q.        Is that for the City of Baltimore?
18 A.        Yes.
19 Q.        Is there a difference between the City of
20 Baltimore Police Department and Baltimore County
21 Police Department?
22 A.        Jurisdiction.
23 Q.        They are two different police
24 departments?
25 A.        Yes.

Page 23

1  Q.        Did you work for both of those?
2  A.        No, just for Baltimore city police
3  department.
4  Q.        And how long did you work for Baltimore
5  city police department?
6  A.        Total was one year.
7  Q.        Did that include your training period?
8  A.        Yes.
9  Q.        So it was five months after -- you worked
10 as a police officer for five months after completing
11 the academy?
12 A.        Yes.
13 Q.        And what was the highest rank that you
14 obtained for the Baltimore Police Department?
15 A.        Regular police officer.
16 Q.        They call them patrol or anything like
17 that?
18 A.        No, just police officer.
19 Q.        Just police officer.  And so when did you
20 leave the Baltimore city police department?
21 A.        Very late June of 2008.
22 Q.        Why did you leave the Baltimore Police
23 Department?
24 A.        Even though I liked the job and
25 everything, I knew that I wouldn't -- I was not going

Page 24

1  to have time to complete my main goal, which was
2  finish my college degree, because we always worked 8,
3  10, 11, 12 hours every day; and it was really, really
4  hectic for me to go back to school.  So I find a job
5  in Berks County which was a steady schedule and I
6  decided to move even though I knew I was going to
7  take a pay cut.  My main goal was to finish school.
8  Q.        Were you fired from the Baltimore Police
9  Department?
10 A.        No.
11 Q.        Was it your decision to leave?
12 A.        Yes.
13 Q.        Were you asked to leave?
14 A.        Yes.
15 Q.        You were asked to leave?
16 A.        No.  No.  I was -- I asked --
17           MR. YARNELL:  He asked to leave.
18           MR. ADAIR:  Correct.  I know.
19 BY MR. ADAIR:
20 Q.        Just for clarification, you told them you
21 wanted to leave.  They didn't tell you they wanted
22 you to leave?
23 A.        No.
24 Q.        Again, I'm not trying to put words in
25 your mouth.  I'm just trying to get to the bottom of

Page 25

1  it.
2           So you came to Berks County and took a
3  pay cut.  While you were working in the Berks County
4  Sheriff's Department, did you attend any school?
5  A.        No.
6           MR. YARNELL:  Just for the record, I
7  object to the form of the question.
8           MR. ADAIR:  Okay.
9           MR. YARNELL:  Multiple things going at
10 the same time there.
11           MR. ADAIR:  All right.  I'll clarify
12 it.
13           MR. YARNELL:  Yeah.
14 BY MR. ADAIR:
15 Q.        While you worked for Berks County, did
16 you attend any school?
17 A.        No, sir.
18 Q.        Why not?
19 A.        I was setting everything down.
20 Q.        I'm sorry?
21 A.        I was setting myself down, like getting a
22 house, so many things on my plate at the same time
23 that I didn't have my mind settled for a school at
24 that time.
25 Q.        When you left the Baltimore city police

7 (Pages 22 - 25)

Page 26

1 department, do you know whether they indicated if
2 they would hire you back or not?
3 A.     Yes, they can hire me back any time.
4 Q.     Have you applied to the Baltimore city
5 police department for a job since you've left Berks
6 County?
7 A.     Yes.
8 Q.     When did you apply?
9 A.     It was October '13, of '13, I think.
10 Yeah, '13.  October '13.  2013.
11 Q.     Did they offer you a job?
12 A.     No.
13 Q.     Did they indicate why they would not
14 offer you a job?
15 A.     They didn't say a specific reason, but I
16 know it was because this case is going on right now.
17 Q.     And how do you know that?
18 A.     Because I don't have any problem on my
19 record as a police officer in the time that I was
20 there.  Never had any issues, never had any problems
21 at all.
22 Q.     Do you know whether they talked to anyone
23 in Berks County?
24 A.     I'm not sure; but in the hiring process,
25 anything that they ask me I'm going to tell them the

Page 27

1 truth, what's going on in my life at that particular
2 moment, so I let them know that this case was going
3 on.
4 Q.     So you told them that you had filed a
5 complaint against Berks County?
6 A.     Yes.
7 Q.     And did you tell them that verbally or
8 did you put that in writing?
9 A.     I put that in writing in part of my
10 paperwork and my applications.
11 Q.     Do you have copies of your application?
12 A.     No.
13 Q.     Do you have copies of your applications
14 for any jobs?
15 A.     No, sir.
16 Q.     Is there a reason that you didn't keep
17 copies of any applications?
18 A.     When you fill out an application, they
19 take over that paperwork and they don't give you any
20 copies of it.
21 Q.     You didn't make your own copy?
22 A.     No, because when you --
23        MR. YARNELL:  I object to the form of
24 the question.  I think your question assumes that he
25 made the application before he applied.  I assume he

Page 28

1 filled out the application before he applied.  I
2 think what he's saying is that when he applied they
3 gave him an application when he got to the place
4 where he was applying and they took the papers from
5 him.
6 BY MR. ADAIR:
7 Q.     My question doesn't assume that.  My
8 question to you was simply you did not make your own
9 copy of any applications?
10 A.     You're not allowed to.  Because when you
11 apply for Baltimore Police Department, it's a walk-in
12 process.  You just walk in, fill out all the
13 paperwork; and they take over all of that.
14 Q.     And my question was actually broader
15 because I asked whether you had kept copies of your
16 applications for any jobs, and you indicated that you
17 had not?
18 A.     For different police department that I
19 apply since I lost my job in Berks County, I don't
20 have any copies of it.  But I have copies -- I could
21 provide copies with the jobs that I apply -- I'm not
22 talking about law enforcement jobs, regular jobs that
23 I been applied in different -- many different
24 agencies all the way around Berks County.
25 Q.     And that was -- and actually my question

Page 29

1 was did you have copies of applications for any jobs?
2 A.     Well, at that time I didn't understand
3 what you specifically mean.
4 Q.     That's fine.  I'm not trying to argue
5 with you.  I'm trying to clarify.  I'm trying to
6 clarify what the question is.  So you do have copies
7 of some job applications?
8 A.     Yes, and I can go to different agencies
9 and get the paperwork.
10 Q.     I'm not going to ask you to do that.  I'm
11 just asking whether you do have copies of some
12 applications that you yourself made, correct?
13 A.     I don't have them with me, but I can
14 provide it.  I don't have it.
15        MR. YARNELL:  Can I, just so we can
16 bring this to a swifter end?  My understanding is
17 that any applications that we had copies of we had
18 provided.  I don't have that from memory but I
19 believe we may have.
20        MR. ADAIR:  The reason that I'm asking
21 that is that I had asked for copies of any
22 applications that he had, and none were provided.
23        MR. YARNELL:  We did look for them.
24        MR. ADAIR:  Now he's indicating that
25 he has some applications.

8 (Pages 26 - 29)

Page 30

1          MR. YARNELL: Right. I think the
2   problem here -- can we go off the record?
3          (Discussion held off the record.)
4   BY MR. ADAIR:
5   Q.      A question that I forgot to ask you
6   earlier but is important to your claim, you indicate
7   in your complaint that you consider yourself a black
8   Hispanic. Would that be accurate?
9   A.      Yes.
10  Q.      I just want to put that on record so that
11  it's clear because that's part of the claim.
12         MR. YARNELL: That's what it says.
13  BY MR. ADAIR:
14  Q.      I was asking you questions about
15  training, and you had training for -- you went to the
16  Baltimore Police Academy?
17  A.      Yes.
18  Q.      Are you currently certified to be a
19  police officer in Maryland?
20  A.      I believe it expire already.
21  Q.      So that you haven't attended -- I don't
22  want to put words in your mouth. Have you
23  attended -- do you know whether Maryland has
24  requirements that you take periodic updates to keep
25  your certification current?

Page 31

1   A.      Every year.
2   Q.      And when was the last time you took
3   updates to keep your Maryland certification updated?
4   A.      Once I left the Baltimore city police
5   department I never took any updates in Maryland.
6   Q.      Did you ever take your -- get your
7   training in Pennsylvania to be a police officer in
8   Pennsylvania?
9   A.      I took a test, which is just a waiver for
10  the entire academy, which I ace it. And then I went
11  for an update for two weeks in State College
12  University -- Penn State, State College, something --
13  I don't remember exact, for two weeks.
14  Q.      And when was that?
15  A.      Don't remember right now.
16  Q.      Was that when you were still working for
17  Berks County?
18  A.      Yes.
19  Q.      But you did waive into Pennsylvania?
20  A.      Yes.
21  Q.      To be a police officer in Pennsylvania
22  you are required to maintain certain yearly updates?
23  A.      Updates.
24  Q.      Have you maintained those yearly updates
25  in Pennsylvania?

Page 32

1   A.      Not since I lose my job with the Berks
2   County Sheriff Department.
3   Q.      When you were with Berks County Sheriff's
4   Department, did you maintain your yearly updates?
5   A.      Yes, for the sheriff requirement, yes.
6   Q.      What do you mean by the sheriff's
7   requirement?
8   A.      Every update that the sheriff department
9   require me to take, I took during the time I was
10  there.
11  Q.      And there may be -- did the sheriff -- to
12  your knowledge, did the sheriff's department require
13  you to have a current Pennsylvania police officer
14  certification?
15  A.      Current police officer certification, I
16  don't think so. We just filled out the sheriff
17  department requirement with the updates. That's all
18  we did.
19  Q.      If I use the term Act 120, do you know
20  what I'm talking about?
21  A.      Yes.
22  Q.      And that is through MPOETC. That's the
23  Pennsylvania organization that keeps police officer
24  certifications current, correct?
25  A.      Yes.

Page 33

1   Q.      Do you know whether you did your Act 120
2   training while you were with the sheriff's
3   department?
4   A.      No, I took a test, a waiver test for the
5   Act 120 qualifications.
6   Q.      But then they also have yearly update
7   requirements, correct?
8   A.      Yes, in the sheriff department, yes.
9   Q.      All right. I'll move on to some other
10  questions.
11         Other than this training, do you have
12  any other specialized training other than what we
13  talked about so far?
14  A.      No.
15         MR. YARNELL: Object to the word
16  specialized.
17  BY MR. ADAIR:
18  Q.      Do you have any other training?
19  A.      Out of the law enforcement training that
20  I have so far, no.
21  Q.      How about anything else? Do you have
22  training to be a welder? Do you have training to
23  work on cars? Do you have training for any other --
24  A.      No.
25  Q.      Have you -- do you have -- do you

9 (Pages 30 - 33)

Page 34

1 currently have a commercial's driver's license?
2 A.     No.
3 Q.     Have you ever had a commercial driver's
4 license?
5 A.     No.
6 Q.     Do you have an understanding that one of
7 the requirements to be a sheriff for Berks County was
8 to have a commercial driver's license?
9 A.     Yes.
10 Q.    Did you ever apply for a commercial
11 driver's license?
12 A.    Yes.
13 Q.    And did you get that commercial driver's
14 license?
15 A.    No.
16 Q.    Why not?
17 A.    Because the first two years that I was in
18 the sheriff department I was assigned to juvenile
19 division; and then when I was brought back to court,
20 then I started up my taking the test for the permit.
21 But in the process I got fired.
22 Q.    So before you took the test -- well, did
23 you ever take the commercial driver's license test?
24 A.    Yes.
25 Q.    Did you pass?

Page 35

1 A.     I fail a few times. But I pass one of
2 them and I was kind of back and forth. And then when
3 I was going to take the last one to pass it, because
4 I was kind of ready for it, then I got fired. I was
5 into -- I was willing into it to get my commercial
6 driver's license.
7        MR. YARNELL: I assume that is what is
8 colloquially referred to as a CDL.
9        MR. ADAIR: That's my understanding.
10       THE WITNESS: Yes.
11       MR. ADAIR: A CDL -- to the extent
12 we're using it, yes. CDL, commercial driver's license
13 would be the same thing for purposes of the
14 deposition.
15       MR. YARNELL: Fine with me.
16 BY MR. ADAIR:
17 Q.    Let me ask you, I want to start with --
18 and I don't want to go back over things that you've
19 already told me that you've done, but prior -- we're
20 going to talk about jobs that you've had prior to
21 working at Berks County. And I know that you've been
22 in the -- I believe you said it was Army Reserve?
23 A.    Um-hum.
24 Q.    And you said that you were a police
25 officer for the City of Baltimore?

Page 36

1 A.     Yes.
2 Q.     What other jobs have you held prior to
3 working for Berks County?
4 A.     I was a school aide and a
5 paraprofessional for the Board of Education in New
6 York.
7 Q.     Is it -- let's talk about what you did
8 after high school then. We'll just try to knock
9 these out as quickly as I can. What did you do after
10 high school?
11 A.    Joined the Army.
12 Q.    How about after the Army?
13       MR. YARNELL: I object to the form of
14 the question because I think he testified he was in
15 the Reserves, so he was likely employed at the same
16 time.
17 BY MR. ADAIR:
18 Q.    Would that be accurate?
19 A.    Yes.
20 Q.    What were you doing while you were in the
21 Army? I'm not -- let me clarify my question to make
22 this as easy as possible. I don't want to know I
23 worked here for one week and then went to -- I'm just
24 looking for what your work experience is, significant
25 jobs that you've held.

Page 37

1 A.     I'm trying to think to be exact as
2 possible. That's why I'm kind of taking my time.
3 That was close to 20 years ago.
4 Q.     That's fine.
5 A.     Right when I finished all my trainings, I
6 just had that job because it was hectic for me to
7 find a job in New York at that time. It was really
8 hard for me to find a job. So I couldn't held a year
9 for that first -- I could say like two years or
10 something, and then I joined what they call active
11 Reserves, where they call you for certain jobs for
12 certain weeks; and that's how basically I was
13 surviving. I was living with my mother at that time.
14 And then until I got a job with the Board of
15 Education, that was in -- I don't quite remember if
16 it was '98, '99.
17 Q.    Let's talk about your job with the Board
18 of Education. What was your job for the Board of
19 Education?
20 A.    I started up as a school aide.
21 Q.    This is in New York City?
22 A.    New York City.
23 Q.    And is there a particular school district
24 or how does that work?
25 A.    No, no, I work for a specific school. It

10 (Pages 34 - 37)

Page 38

1  was called Graphic Arts Communications.
2  Q.       Okay. And what did you do?
3  A.       Well, as a school aide I was taking the
4  attendance every morning and reporting to the
5  principal. Basically help out with the presence
6  because we didn't do anything physically with the
7  security at the cafeteria; you know, just presence.
8  Q.       How long were you a school aide?
9  A.       I don't remember right now. I don't
10 remember specific details. And then when I started
11 up college, started taking some college credits, they
12 offer me a job as a paraprofessional, which was not a
13 big difference. It was only like a office job,
14 changing the programs of the students, taking the
15 attendance still, a little bit more -- a little bit
16 better pay grade, that was the change, and the title.
17 Q.       Was that for the same school though?
18 A.       Yeah, same school.
19 Q.       And how long did you do that? You can
20 estimate. That's fine.
21 A.       I don't remember exactly. It was like
22 four, five years. I don't quite remember.
23 Q.       And then did you ever gain more
24 responsibility for the school as far as your job was
25 concerned?

Page 39

1  A.       I was gaining more and I was going to go
2  a little bit more than that and even more after I
3  finish my college degree. I would be a teacher or
4  something like that. But I find another job.
5  Q.       What job did you find?
6  A.       Better than that, it was in a storage
7  company.
8  Q.       And what did you do -- do you know the
9  name of it, the storage company?
10 A.       Tuck It Away.
11 Q.       Tuck It Away. And where was that?
12 A.       In New York.
13 Q.       In the Bronx?
14 A.       No, it was actually all the way around.
15 They have -- I was assigned manager and I was
16 assigned to different stores.
17 Q.       And what were your responsibilities?
18 A.       Store manager. Accounting, collection
19 calls, sales, you name it.
20 Q.       And how long were you a store manager?
21 A.       A little bit over a year.
22 Q.       So what timeframe are we looking at here?
23 Is this 2004, 2005?
24 A.       Something like that.
25 Q.       Do you recall how much you made with that

Page 40

1  job?
2  A.       At that time it was -- I don't quite
3  remember if it was 28 or -- between 27 to 29 a year,
4  27 to 29,000 a year.
5  Q.       And then you left that job?
6  A.       No, actually I was fired from that job.
7  Q.       And why were you fired from that job?
8  A.       Because I had an emergency and I got to
9  take care of my kids, go and pick them up; and I told
10 them and they didn't send me anybody at the time that
11 I needed. And then the next day they fired me. But
12 I went to the -- what's her report? To employment
13 office or something and I talk to a legal aide and I
14 ended up winning the case and they gave me some
15 compensation, like, I don't know, it was like for the
16 time off, it was like three or four thousand dollars.
17 I don't quite remember at the time.
18           And then they told me that I could get
19 my job back if I want it but I didn't want the job at
20 that time. It was too many hours.
21 Q.       Who did you report to at that job?
22 A.       The name of the manager I don't quite
23 remember right now.
24 Q.       Do you know where Tuck It Away is
25 headquartered?

Page 41

1  A.       Yeah, in New York.
2  Q.       Where in New York?
3  A.       Manhattan, in 138 and Broadway, I think.
4  Q.       So you didn't want that job. And what
5  did you do next?
6  A.       Well, by the time that the legal aide
7  offer me the job back and everything, I had a better
8  job, which it was at the Washington Bridge as a
9  security guard. And that was a better schedule,
10 better everything than that job was.
11 Q.       And did you work for an authority or did
12 you work for the state or was it a private agency
13 that provided security?
14 A.       It was a private agency. FJC it was
15 called.
16           MR. YARNELL: Pardon me?
17           THE WITNESS: FJC.
18           MR. YARNELL: Those three letters?
19           THE WITNESS: Yeah. It was the name
20 of it.
21 BY MR. ADAIR:
22 Q.       Do you know where they're headquartered?
23 A.       I don't remember the address but it was
24 in Queens, I think, the headquarters.
25 Q.       That was a security job. What were your

11 (Pages 38 - 41)

1 responsibilities?

2 A.       I was a security supervisor.

3 Q.       How many people did you supervise?

4 A.       Like 9 to 10 people.  I don't remember

5 right now.  There was like 9 or 10 different posts.

6 Q.       As a security officer what did you do?

7 A.       Inspect all the equipment, that they have

8 every equipment that they need for every specific

9 post, like radios, flashlights.  There was so many

10 different -- tiny equipment that they need to have in

11 a specific post that I just want to make sure that

12 everybody have what they need.

13 Q.       Did you make schedules for people?

14 A.       No.

15 Q.       Did you discipline -- were you

16 responsible for disciplining employees?

17 A.       Yeah, if you have to.  Not firing people,

18 but if I have to give them a warning, if I have to

19 give them like a -- anything.

20 Q.       A write-up or something?

21 A.       A write-up, yeah.

22 Q.       Did you discipline anyone while you were

23 there?

24 A.       No.  Not that I remember.

25 Q.       And how long did you have that job?

1 A.       It was a little bit over a year also.

2 Q.       And how much were you paid there?

3 A.       Like -- I don't remember.  It was like

4 12, $13 an hour, something like that.

5 Q.       Why did you leave that job?

6 A.       To become a police officer in Baltimore.

7 Always looking for an improvement.

8 Q.       How much were you paid as a police

9 officer in Baltimore?

10 A.       Assigned salary was close to $40,000

11 year.

12 Q.       Plus benefits?

13 A.       Plus the benefits.

14 Q.       Now, are there any other significant

15 jobs -- are there any other jobs that you worked for

16 more than a few weeks prior to working for Berks

17 County that you haven't told me about?

18 A.       No.  Not that I remember right now.

19 Q.       We're going to get into Berks County, but

20 just -- you worked for Berks County from July 2008

21 and then you were terminated in June of 2011?

22 A.       Yes.  June 10th to be specific.

23 Q.       Okay.  As I said, we're going to get back

24 to the Berks County stuff.

25          How about jobs that you have worked

1 after you were terminated from Berks County?  That's

2 what I want to ask you about now.

3 A.       After?

4 Q.       What's the first job that you got after

5 June 10th, 2011?

6 A.       That was in a place called Fidelity that

7 I find through an agency called -- what was the name

8 of the agency?  I don't remember the name of the

9 agency right now.  I worked for that company,

10 Fidelity, for like seven months.  And they started

11 giving us laid off.

12 Q.       And when were you hired by Fidelity?

13 A.       January -- I don't know if it was 2012 or

14 2013.  January I remember that it was.

15 Q.       In your interrogatory answers you

16 indicated that you worked for Fidelity Technology

17 Corporation from January 2012 to July of 2012?

18 A.       Yes.

19 Q.       Is that accurate?

20 A.       Yes.

21 Q.       Okay.

22 A.       I can't remember the exact year it was

23 right now.

24 Q.       No problem.

25          Between June 10th, 2011 and January

1 2012 when you were hired by Fidelity, did you apply

2 for any jobs?

3 A.       Yes.

4 Q.       What jobs did you apply for?

5 A.       Different agencies, different jobs that I

6 don't quite remember right now.

7 Q.       Do you remember any of them?

8 A.       It was so many through the Internet.  I

9 applied to all the agencies around Berks County.

10 Q.       When you say agencies, what do you mean?

11 A.       There is some type of agency that if you

12 fill out an application and they find jobs for you.

13 Q.       Got you.

14 A.       And that was easier for me than bouncing

15 from place to place.

16 Q.       So Fidelity was the first job that you

17 got?

18 A.       Yes.

19 Q.       Tell me what was your job -- what was

20 your job title while at Fidelity?

21 A.       Assembler.

22 Q.       What does Fidelity do?

23 A.       They do equipment for the United States

24 Army, from electrical equipment, cables, different

25 wirings.

12 (Pages 42 - 45)

Page 46

1  Q.        And how much were you paid at Fidelity?
2  A.        Like $10 an hour.
3  Q.        And who was your supervisor?
4  A.        I don't remember his name right now.
5  Q.        And they're in Reading?
6  A.        Yes.
7  Q.        Why did you leave Fidelity?
8  A.        I didn't leave.  They gave a few of the
9  new guys laid off.  They were cutting personnel and
10  they gave like four of us laid off, not because of
11  any problems.
12  Q.        Were you disciplined at all while you
13  were at Fidelity?
14  A.        No.
15  Q.        And what was the next job after that?  So
16  that would have been -- that was July 2012.
17  A.        I didn't get any job at all until I get
18  the one that I have right now.
19  Q.        So from July 2012 -- well, what is your
20  current job?
21  A.        I work in Garda, G-A-R-D-A.
22  Q.        And explain what Garda is.
23  A.        It's logistic and transporting and
24  delivering money to different stores, banks and
25  different entities.

Page 47

1  Q.        Like armored cars?
2  A.        Armored trucks.
3  Q.        And what do you do for Garda?
4  A.        I'm a driver right now.
5  Q.        Have you held any other positions with
6  Garda?
7  A.        No, not yet, because I haven't got my gun
8  permit yet.
9  Q.        And that's also in Reading?
10  A.        Yes.
11  Q.        And who is your supervisor at Garda?
12  A.        Supervisor.  I don't know his first name.
13  But I know his last name, Ortega.
14  Q.        And how much are you paid at Garda?
15  A.        Like 12.20 an hour, 12.25.
16  Q.        And how many hours a week do you usually
17  work?
18  A.        It varies because sometimes we can work
19  40 hours, sometimes we can work 50.  I'm not going to
20  be able to tell you an exact amount of hours that we
21  work.
22  Q.        Do you get paid overtime if you work over
23  40 hours?
24  A.        Not over 50.
25  Q.        You get paid overtime if you work over

Page 48

1  50?
2  A.        Yes.
3  Q.        And how much is overtime?
4  A.        Time and a half.
5  Q.        And can you estimate how much overtime
6  you work on a weekly basis?
7  A.        Not really because sometimes you work
8  overtime, sometimes you don't.  It varies.
9  Q.        So it's very -- it's random enough that
10  you can't estimate how much you work on a --
11  A.        Put it this way.  Sometimes we don't even
12  work 40 hours; but we guaranteed 40 hours.  Even if
13  you don't work the 40 hours, you get paid 40 hours;
14  but sometimes you don't work the 40 hours and
15  sometimes you end up work 60 hours.  That's why I
16  can't give you an estimate.
17  Q.        Okay.  One of the things that we had
18  requested through the request for production of
19  documents were your tax returns, and you gave them to
20  me from 2008 through tax year 2012.  I did not get
21  2013 and 2014.  Did you file taxes in 2013?
22  A.        Yes, I did.
23  Q.        Do you have a copy of your tax return?
24  A.        Yes, I do.
25            MR. YARNELL:  We will produce that tax

Page 49

1  return.
2  BY MR. ADAIR:
3  Q.        How about 2014, did you file taxes in
4  2014?
5  A.        Yes.
6  Q.        And do you have a copy of that?
7  A.        Yes.
8  Q.        I'm just making a note of that.
9            MR. YARNELL:  We will produce that as
10  well.
11            MR. ADAIR:  That will have more
12  information about the finances and stuff.
13  BY MR. ADAIR:
14  Q.        You indicated that -- there's an easier
15  way for me.  I'm just trying to do this the quickest
16  way possible.  I want to ask you about jobs that
17  you've applied for since leaving Berks County.  You
18  indicated that you didn't -- you couldn't remember
19  the ones that you had applied for prior to June of
20  2012.
21            MR. YARNELL:  I think he said that he
22  did it through the Internet or through agencies but
23  did not recall the names of the agencies or the
24  places on the Internet.
25            MR. ADAIR:  Yeah, I believe that that

13 (Pages 46 - 49)

Page 50

1  is accurate.
2          We might as well just mark this.
3  We'll mark this as Brewer 1.
4          (Brewer Exhibit Number 1 was marked
5  for identification.)
6          (Discussion held off the record.)
7  BY MR. ADAIR:
8  Q.      Mr. Brewer, I'm going to hand you a
9  document that's been marked as Brewer 1 and it's
10 Plaintiff's response to Defendant Eric Weaknecht's
11 first set of interrogatories. These are questions
12 that I sent to you through your lawyer and that you
13 answered. And I'm trying to make this question a
14 little easier.
15         If you would turn your attention to
16 question number 10 on Page 6. And I'll let you read
17 that, but question number 10 says identify all jobs
18 or employment for which you applied from June 10,
19 2011 to the present, including the name and address
20 of the employer, job and a description of the work
21 responsibilities. And your attorney objected, but
22 you identified some jobs that you had applied for,
23 and I just want to ask you about them.
24         The first job that's listed is the
25 Baltimore Police Department.

Page 51

1  A.      Yes.
2  Q.      And that would be the Baltimore city
3  police department?
4  A.      Yes.
5  Q.      And we already talked about that,
6  correct?
7  A.      Yes.
8  Q.      The second one is the Baltimore County
9  Police Department?
10 A.      Yes.
11 Q.      Did you apply to the Baltimore County
12 Police Department?
13 A.      Yes.
14 Q.      Do you recall when you applied to them?
15 A.      I don't recall when exactly, but I know
16 that I applied and I pass everything. And I know for
17 a fact that they didn't give me the job because this
18 case is going on.
19 Q.      Okay. Now, let me stop you there and ask
20 you to clarify what you just said. You said you
21 passed everything. What did you pass?
22 A.      The written test and the physical.
23 Q.      So they gave you a written test?
24 A.      Yes.
25 Q.      Did they give you the results of the

Page 52

1  written test back?
2  A.      No, they don't give the results. They
3  just tell you if you pass or fail.
4  Q.      And how do you know that you didn't get
5  it because you filed a complaint against Berks
6  County?
7  A.      Because that was part of my application.
8  They asked me the jobs I ever had and everything, and
9  I put it on. They asked if I get fire or anything
10 and I tell them that I got fire and I explained why
11 and what's going on.
12 Q.      You explained -- when you explained why
13 you got fired, what did you tell them?
14 A.      That there is a complaint going on -- I
15 didn't get into any details. I just told them that
16 there is a complaint going on from me and other
17 deputies.
18 Q.      A complaint going on from you and other
19 deputies?
20 A.      Yes.
21 Q.      Which other deputies were you referring
22 to?
23 A.      Like Isaac Santiago, who has a
24 complaint -- not actually against -- well, it is
25 against Berks County, of course. But the main person

Page 53

1  is Sergeant Pacifico at the time.
2  Q.      And I'm going to give you plenty of
3  opportunity to talk about that. Because, believe me,
4  that's what we're going to spend most of our time
5  talking about. Do you know for a fact that Isaac
6  Santiago -- do you know whether he filed a complaint
7  in a state or federal court against Berks County?
8  A.      He filed a complaint but I don't remember
9  what it was. If I can talk to my lawyer about it
10 because I don't remember.
11         MR. YARNELL: You've answered the
12 question to the extent that he's not -- he doesn't
13 want me to supply you with an answer.
14         MR. ADAIR: Correct.
15 A.      He file a complaint but I don't remember
16 what agency it was right now.
17 Q.      Do you know what happened to his
18 complaint?
19 A.      I don't have the knowledge of it right
20 now.
21 Q.      Do you know whether his complaint is
22 ongoing or whether it's been resolved?
23 A.      I believe it's ongoing.
24 Q.      And --
25 A.      As far as I know.

14 (Pages 50 - 53)

Page 54

1 Q.     And by the way, your attorney is correct.
2 I don't want to know what your lawyer knows. I just
3 want to know what you know. And if you don't know
4 something, you tell me that I don't know.
5 A.     Okay.
6 Q.     That's a perfectly acceptable answer.
7        MR. YARNELL: If I can just qualify.
8 As with the documents, he's only asking what you
9 know. He is not asking you to find out, okay?
10       THE WITNESS: Okay.
11       MR. YARNELL: As in every single
12 question here, there is nothing that he's asking you
13 other than what you presently know. If you don't
14 know, the answer is I don't know.
15       THE WITNESS: Okay.
16 BY MR. ADAIR:
17 Q.     Your lawyer is absolutely correct. Did
18 Isaac Santiago tell you that he filed a complaint?
19 A.     Yes.
20 Q.     Did the Baltimore County Police
21 Department tell you that you did not get the job with
22 them because either you were fired by Berks County or
23 because you filed a complaint against Berks County?
24 A.     No, they don't tell you specifics.
25 Q.     How about the Prince George Sheriff's

Page 55

1 Department? When did you apply for a job with them?
2 A.     I don't remember but that day -- I listed
3 that because you ask me all the jobs that I apply
4 for. On that specific case I couldn't pass the
5 physical because I was really, really sick that day.
6 So I couldn't know further down what would happen.
7 Q.     Certainly. How about the Maryland Park
8 Police, did you apply for a job with them?
9 A.     Yes.
10 Q.     Do you recall when that was?
11 A.     No. I was doing all the time -- I can't
12 recall any day the specific. I was desperate to get
13 a job.
14 Q.     Did you have to take a test?
15 A.     Yes, I did.
16 Q.     Did you pass the test to your knowledge?
17       MR. YARNELL: This is the Maryland
18 Park Police?
19       MR. ADAIR: Correct.
20 A.     The letter that I received, I sadly
21 didn't keep it because I was -- my head was not in
22 the right place at that time. They told me that at
23 this particular time I don't qualify for that job.
24 And I have a strong belief that it was because of
25 this complaint because I put it down on the

Page 56

1 application also.
2 Q.     But they did not tell you that they
3 didn't hire you because of the Berks County --
4 A.     Any police department, any law
5 enforcement agency that you apply, they not going to
6 tell you specific. But since I know myself and I
7 know my record, that I don't have any criminal
8 record, I don't have anything to hide, I know that
9 that was the only problem.
10 Q.     Just so that I -- and I'll ask you this
11 question flat out. Has any job that you've applied
12 for, have they ever explicitly told you that they
13 were not going to hire you because of what happened
14 in Berks County?
15 A.     No. In law enforcement, they don't tell
16 you specifics.
17 Q.     And that's fine. How about the Maryland
18 Fire Marshals, did you apply for a job with them?
19 A.     Yes.
20 Q.     And when was that?
21 A.     Don't remember the exact date also.
22 Q.     Do you remember the year?
23 A.     No.
24 Q.     Was it shortly after you were terminated
25 from Berks County or was it more recently?

Page 57

1 A.     It was shortly after. I don't remember
2 if it was '11 or '12. I don't remember.
3 Q.     Did you have to take a test?
4 A.     Yes, I did took a test.
5 Q.     Do you know whether you passed the test?
6 A.     Yes, I passed the test.
7 Q.     Did they tell you why they were not
8 hiring you?
9 A.     No. They -- it's schedule -- the
10 physical test, they scheduled for the physical part
11 of it but I couldn't take it that day because I was
12 really, really sick.
13 Q.     So you didn't take the physical test?
14 A.     No, I couldn't take it. The only two I
15 couldn't take it was Prince Georges Sheriff
16 Department and the fire marshal. Those days I was
17 really, really sick.
18 Q.     So is the reason that you weren't hired
19 by the Maryland fire marshal because you didn't take
20 the physical for them?
21 A.     No, I couldn't.
22       MR. YARNELL: That wasn't his
23 question.
24       THE WITNESS: Huh?
25       MR. YARNELL: That was not his

15 (Pages 54 - 57)

Page 58

1 question. He asked you whether the reason you were
2 not hired was because you didn't take the physical.
3        THE WITNESS:  Oh, yes.
4 BY MR. ADAIR:
5 Q.        Let me ask you about Gages Employment
6 Agency.  Is that the Gage Employment Agency that's
7 here in Berks County?
8 A.        Yes.
9 Q.        And you applied with them for jobs.
10 Would that be accurate?
11 A.        Yes.
12 Q.        So they're not actually an employer; they
13 help you find jobs?
14 A.        Yes.
15 Q.        Did they tell you about any jobs that --
16 did they find a job for you?
17 A.        No, they never called me.
18 Q.        They never called you back?
19 A.        No, they never called me.  Even though I
20 went every Monday like they requested to refresh
21 the -- to refresh the application every Monday, to
22 let them know that I'm still available.  I was --
23 every Monday I was there.
24 Q.        And when was it that you looked for work
25 through Gage Employment Agency?

Page 59

1 A.        I don't remember the dates.
2 Q.        Do you remember the years?
3 A.        Well, as soon as I lose my job, but I
4 don't remember the exact dates.
5 Q.        How about Tristar Employment Agency, what
6 are they?
7 A.        Same.  It's like an agency to get you a
8 job.
9 Q.        Are they here in Berks County?
10 A.        Yes.
11 Q.        And did they find you a job?
12 A.        Yes, but it was too far.
13 Q.        What job did they find for you?
14 A.        It was in a foundry like an hour and a
15 half to almost an hour and 45 minutes from here.
16 Q.        Do you remember the town that it's in?
17 A.        No, I don't remember.
18 Q.        How much did that job pay?
19 A.        $8 an hour.
20 Q.        So you didn't take that job?
21 A.        It wasn't even worth it.
22 Q.        Did they find any other employment for
23 you?
24 A.        No.
25 Q.        And when was that that they found that

Page 60

1 job for you?
2 A.        I don't remember.
3 Q.        How about the Aerotek agency?  What is
4 that?
5 A.        That's another agency.
6 Q.        Employment agency?
7 A.        Yes.
8 Q.        And are they here in Reading?
9 A.        Yes.
10 Q.        And did they find a job for you?
11 A.        Fidelity.
12 Q.        So they found Fidelity for you.  Did they
13 find any other jobs other than Fidelity?
14 A.        No, not after that.
15 Q.        And then Pennsylvania Career Link, that's
16 something that's available through the state,
17 correct?
18 A.        Yes.
19 Q.        Did you find any jobs through Career
20 Link?
21 A.        They don't actually find you jobs.  What
22 they do is they give you a lot of available jobs that
23 you can apply for, that I apply for tons of jobs that
24 I knew I was capable of doing.  Because honestly, I'm
25 not going to apply to be a mechanic.  I'm going to

Page 61

1 apply for something that I know that I'm suitable
2 for.  So I apply for different jobs.
3 Q.        Did you find any -- did you get any job
4 offers through --
5 A.        No.
6 Q.        -- Career Link?
7 A.        No.  No.
8 Q.        How about Akron Security Agency, what's
9 that?
10 A.        That's a security school that I went
11 through in New York to see if I can get the
12 training -- to update my training and try to get a
13 job in New York.
14 Q.        And when did you contact them?
15 A.        I don't remember the dates.
16 Q.        Was that shortly after you were
17 terminated or was it more recent?
18 A.        I don't remember.  I'm not going to be
19 able to tell you exact date.
20 Q.        Did Akron tell you that you could update
21 your training?
22 A.        Yeah, I update it.
23 Q.        So you did update your training?
24 A.        Yeah, I went to New York for like a whole
25 week and we did all the security training and all

16 (Pages 58 - 61)

Page 62

1 that. But at the end of it I couldn't apply to the
2 security license in New York because I have a
3 driver's license from Pennsylvania.
4 Q.      So you couldn't get your New York
5 security license?
6 A.      No, I couldn't.
7 Q.      Unless you got a New York driver's
8 license?
9 A.      Yes.
10 Q.     Did you apply for any security jobs in
11 New York?
12 A.     No, not even New York.
13 Q.     Have you -- other than what you've talked
14 about, because I don't want to go back over that,
15 have you applied for any other security jobs anywhere
16 else?
17 A.     Yes, right here in Berks County.
18 Q.     Do you recall as we sit here today which
19 security jobs you've applied for?
20 A.     I don't remember the name but I went to
21 like two interviews to them and they never called me
22 back.
23 Q.     Did they tell you why they were not going
24 to hire you?
25 A.     No, they just told me that they were

Page 63

1 going to call me and tell me my start date and all
2 that, and they never called me.
3 Q.      Other than what we've talked about so
4 far, can you recall any other jobs -- specific jobs
5 you've applied for?
6 A.      There was so many that I just -- it's
7 impossible for me right now to recall all of them.
8 Because I was desperate. I was incredibly desperate
9 to get a job anywhere to start paying my bills, and I
10 couldn't find anything at all.
11 Q.     Has any employer in any field ever told
12 you that they were not going to hire you because of
13 what happened in the Berks County Sheriff's
14 Department?
15         MR. YARNELL: You mean those words?
16         MR. ADAIR: Or words to that effect.
17 A.     Yes, there was one.
18 Q.     And what job was that?
19 A.     Auto Zone Warehouse.
20 Q.     And where are they located?
21         MR. YARNELL: It's a national chain of
22 stores.
23 BY MR. ADAIR:
24 Q.     Where did you apply?
25 A.     It's one of my neighbors that he took --

Page 64

1 I don't even know the address. He took the
2 application and they just call me over the phone and
3 they told me that my background looks nice but how
4 come a police officer want to work there.
5         So I didn't -- and I told, well, I
6 lose my job. How did you lose your job? And I
7 briefly explained what happened, and they told me
8 that they were going to call me back and they never
9 did.
10 Q.     Did they tell you that they were not
11 going to hire you because of what happened in Berks
12 County?
13 A.     They didn't need to.
14 Q.     My question was actually just very
15 specific. Did they tell you -- did they actually say
16 we're not going to hire you?
17 A.     No. No. No.
18 Q.     Do you know whether any of these jobs
19 that you applied for -- do you know whether any of
20 them ever spoke to anyone in Berks County as -- in
21 order to determine whether you were qualified for a
22 job?
23         MR. YARNELL: Did you understand what
24 he is asking?
25         THE WITNESS: Yes.

Page 65

1 A.      Not that I know of.
2 Q.      Again, I'm just asking for what you
3 actually know.
4 A.      Not that I know.
5 Q.      Okay. We're going to mark this as Brewer
6 2.
7         (Brewer Exhibit Number 2 was marked
8 for identification.)
9 BY MR. ADAIR:
10 Q.     I'm going to give you a document that's
11 been marked as Brewer 2, and it was turned over to me
12 by your lawyer and it was Bates labeled B 107. This
13 is an October 16, 2012 letter from East Penn
14 Manufacturing to you.
15         Did you apply for a job with East Penn
16 Manufacturing?
17 A.     Yes, I did.
18 Q.     Did they offer you a job?
19 A.     No.
20 Q.     Was this the only notification that you
21 received from them that you were not going to get a
22 job with them?
23 A.     Yes.
24 Q.     Did you ever talk to anyone from East
25 Penn about why you were not given a job?

17 (Pages 62 - 65)

Page 66

1  A.      No.
2  Q.      Do you have any firsthand knowledge why
3  they did not hire you?
4  A.      No.
5  Q.      Do you have any other rejection letters,
6  employment rejection letters?
7  A.      No.
8  Q.      Why do you believe that East Penn
9  Manufacturing did not hire you?
10  A.      At that time, they were hiring a lot of
11  people, a lot, including people that I know with
12  criminal records, which I don't mean to judge anybody
13  but they hire a lot of people and they didn't hire
14  me.
15  Q.      Who did they hire who has a criminal
16  record?
17  A.      One of my best friends told me about
18  that. I don't know anybody with a criminal record
19  that apply. But a friend of mine told me that
20  somebody he knew, he apply for this company and they
21  hire him.
22  Q.      And that person had a criminal record?
23  A.      Yes.
24  Q.      Do you know the name of that person who
25  was hired that allegedly has a criminal record?

Page 67

1  A.      No, I don't know the name.
2  Q.      Who was it that told you about it?
3  A.      A friend of mine who applied with me, and
4  they gave him a job there.
5          MR. YARNELL: He's asking for your
6  friend's --
7  Q.      What's your friend's name?
8  A.      Ambiorix DeLeon.
9  Q.      Would you spell that?
10  A.      Ambiorix, A-M-B-O -- let me write it
11  down.
12  Q.      Sure.
13  A.      That's not even a Spanish name.
14  Q.      It's quite a name.
15  A.      It's A-M-B-l-O-R-I-X, Deleon, D-E-L --
16          MR. YARNELL: Two words.
17  A.      -- L-E-O-N.
18  Q.      Do you know where that individual lives?
19  A.      Yes.
20  Q.      Where?
21  A.      1225 Church Street.
22  Q.      In Reading?
23  A.      In Reading.
24  Q.      I've got a question for you about -- and
25  I don't believe that there's any need to mark this as

Page 68

1  an exhibit but I'm going to show this to you if you'd
2  like just so you know what I'm referring to.
3          It's your 2012 tax return that your
4  attorney provided to me through discovery. And my
5  question has to do with -- it's the second to last
6  page which is marked B-19 in the lower right-hand
7  corner. What I wanted to ask, there is a 1099
8  miscellaneous form that was given to you from the
9  Reading Housing Authority.
10  A.      Um-hum.
11  Q.      For $3,451?
12  A.      Um-hum.
13  Q.      I just wanted to ask you, what does that
14  represent? Why did the Reading Housing Authority
15  give you a check or why did they pay you money?
16  A.      The person who lived downstairs on the
17  first floor, they had that program and they pay part
18  of the rent.
19  Q.      So the Reading Housing Authority was
20  paying part of the rent for your tenant?
21  A.      Yes.
22  Q.      That's my only question on the tax
23  return.
24  A.      That's actually the reason I didn't lose
25  my house.

Page 69

1  Q.      Now, your employment with Garda, do you
2  receive any benefits?
3          MR. YARNELL: Did you understand what
4  he means?
5          THE WITNESS: No.
6  Q.      That's fine. If not, if you don't
7  understand my question, tell me.
8  A.      Can you rephrase it?
9  Q.      Yeah. And I can make it a little more
10  clear. Do you get health benefits through Garda?
11  A.      Yes.
12  Q.      When you were working for Fidelity, did
13  you receive any health benefits?
14  A.      No.
15  Q.      With Garda, other than health benefits,
16  do you get paid vacation time each year?
17  A.      Yes.
18  Q.      How much paid vacation time do you get?
19  A.      Two weeks.
20  Q.      And do you get sick time?
21  A.      No.
22  Q.      That's part of the vacation time? Is
23  that how that works with Garda?
24  A.      To be honest I don't know how really they
25  work. I'm just there because I needed a job in the

18 (Pages 66 - 69)

Page 70

1  meantime to pay my bills and all that. That's
2  something that I'm not honestly going to stay there.
3  Q.      Do you have any kind of a pension program
4  through Garda?
5  A.      Not that I know of.
6  Q.      Is there any kind of 401(k) program
7  through Garda?
8  A.      Not to my knowledge right now.
9          MR. ADAIR: I tell you what, I'm done
10 with most of my background questions, and I'll say
11 that it's 12:00 right now.
12         We can go off the record.
13         (Discussion held off the record.)
14 BY MR. ADAIR:
15 Q.      Back on the record now. I told you
16 before we broke that we were going to come back and I
17 was going to ask you -- start the employment or start
18 the actual questions about Berks County. I do have a
19 couple additional questions that I thought I would
20 cover now before we get into that just because I
21 think it would be easier to take care of it at this
22 point in time.
23         First question is, from the time that
24 you were terminated from Berks County in June of 2011
25 to the present, have you had any kind of physical or

Page 71

1  mental injuries that would impact your ability to
2  work?
3  A.      Yes, I had a lot of depression, anxiety.
4  Q.      And let me start with the physical
5  injuries first and then -- because I'm going to
6  follow up with that, with your depression and
7  anxiety. Have you suffered any physical injuries or
8  have you had any accidents or anything from the time
9  you were terminated from Berks County to the present
10 that would impact your ability to work?
11 A.      No.
12 Q.      There was a medical record that was
13 provided to me by your attorney that showed that you
14 had received some treatment for some sprain and
15 strain. Were you in an accident or did you have an
16 injury or anything?
17 A.      No. I never had any accident.
18 Q.      Do you currently have any physical
19 limitations for why you couldn't work?
20 A.      No.
21 Q.      Let's talk about -- listen to my question
22 because I'm going to ask you something pretty
23 specific. Do you currently have any mental
24 limitations that would impair your ability to work?
25 A.      No.

Page 72

1  Q.      Okay. Now we'll expand that a little bit
2  more because you said that you suffered from anxiety
3  and depression after the time of termination.
4          MR. YARNELL: I don't know that he
5  understood your question. He suffered the symptoms
6  of those things, but to the extent that your question
7  assumes that they were derived from events that
8  happened after his termination, I object to the form
9  of the question.
10         MR. ADAIR: I am not interjecting any
11 of that. I'm going to give him an opportunity to
12 explain all of that right now.
13 BY MR. ADAIR:
14 Q.      Have you -- from the time of your
15 termination from Berks County to the present, have
16 you suffered from any mental injuries?
17         MR. YARNELL: Object to the form of
18 the question. I'm not sure that he knows what the
19 term mentally means.
20 BY MR. ADAIR:
21 Q.      Do you understand the questions?
22 A.      No.
23 Q.      Okay. From the time of your termination
24 until the present, have you seen any -- have you gone
25 to a doctor, psychiatrist, psychologist or licensed

Page 73

1  social worker because of a mental injury?
2          MR. YARNELL: Object to the form of
3  the question again because it assumes that he could
4  afford to do so.
5          MR. ADAIR: All right. I thought that
6  we've preserved all objections until the time of
7  trial.
8          MR. YARNELL: Well, objecting to the
9  form of the question is one of the ones that you have
10 to do under the circumstances.
11         MR. ADAIR: I'm not sure that's an
12 objection to the form of the question. That's an
13 objection to the evidence which supports the
14 question, which is a different objection.
15         MR. YARNELL: We may have a different
16 point of view. Go ahead.
17 BY MR. ADAIR:
18 Q.      I'll ask you this, have you seen any
19 doctors?
20 A.      Yes.
21 Q.      From the time -- listen to my question.
22         Have you seen any doctors from the
23 time you were fired to the present?
24 A.      Yes.
25 Q.      Tell me every doctor you've seen.

19 (Pages 70 - 73)

Page 74

1 A.        Dr. Minnich.  I don't recall the exact
2 date but I went there because I couldn't sleep.  I
3 wasn't eating well.  I was even not having -- well,
4 I'm going to be totally honest.  I was having problem
5 having relations with my partner.  And I got a lot of
6 anger.  I was really, really frustrated because of
7 the fact that it happened.  I was -- like the first
8 four, five months I couldn't even talk to my father.
9 Q.        Why couldn't you talk to your father?
10 A.        Because the way that he raised me and I
11 told I was feeling very shame about this situation.
12 Q.        Why were you feeling shameful?
13 A.        How things happened.  Because I got fired
14 from a job without any justification just because
15 somebody didn't like the way I speak English, just
16 because somebody didn't like the way I basically
17 conducted myself or --
18 Q.        Okay.  So you saw Dr. Minnich.  How many
19 times did you go see Dr. Minnich?
20 A.        I don't remember how many times but I
21 went and seen him many times.
22 Q.        Many times.  Was it a regular --
23 A.        Regular doctor.
24 Q.        -- appointment?  No, no.  Listen to my
25 question.  Was it a regular appointment?  Did you see

Page 75

1 him on a recurring basis or was it on an as-needed
2 basis?
3 A.        Both.
4 Q.        Let me give you this.  We'll mark this
5 as -- I believe this is 3.
6           (Brewer Exhibit Number 3 was marked
7 for identification.)
8 BY MR. ADAIR:
9 Q.        I'm going to give you that.  Take a look
10 at that.  What I've marked as Brewer 3 is a document
11 that your attorney provided through discovery.  I
12 believe the Bates label on the lower corner is B --
13 it's either --
14           MR. YARNELL:  152 I think.
15           MR. ADAIR:  152.
16           MR. YARNELL:  Or 452, I'm not sure
17 which.
18           MR. ADAIR:  Or 452.
19 BY MR. ADAIR:
20 Q.        It is a June 1, 2012 letter from Ryan J.
21 Minnich, M-I-N-N-I-C-H, D.O., to Berks County
22 Sheriff's Department.  How did you get this letter?
23 A.        Ask the doctor for that.
24 Q.        Why did you ask the doctor for this
25 letter?

Page 76

1 A.        Because I need proof that I've been
2 treated for the problems that I have.
3 Q.        This letter, it indicates that you became
4 Dr. Minnich's patient on January 13, 2012, is that
5 accurate?
6 A.        Yes.
7 Q.        Is that when you first saw Dr. Minnich?
8 A.        Yes.
9 Q.        So that's seven months after you were
10 fired, correct?
11 A.        Yes.
12 Q.        Had you ever seen Dr. Minnich prior to
13 this --
14 A.        No.
15 Q.        -- to your termination?
16 A.        No.
17 Q.        How did you find Dr. Minnich?
18 A.        Well, I didn't have any insurance.  I
19 went to my regular doctor, which was Jeffery Hassel,
20 I believe it was.  He treat me like -- he treat me
21 like -- I don't want to say the word, but he didn't
22 treat me right.  And I went to another doctor who
23 talked to them and tell him about my problems; and at
24 least Dr. Minnich, he help me out and he treat me
25 like a human being.

Page 77

1 Q.        My question is how did you find Dr. --
2 did someone refer you to Dr. Minnich?
3 A.        No, I just find him because I went to the
4 clinic and they refer -- I just told them that I need
5 to see a doctor.  And they told me that, you know,
6 Dr. Minnich is available.  I was like, okay.
7 Q.        What clinic did you go to?
8 A.        I don't exactly know the address.  The
9 address is right on the exhibit card, like 1020
10 Grings Hill Road.
11 Q.        So it's the address on the bottom of this
12 exhibit?
13 A.        Yes.
14 Q.        And Dr. Minnich, is he -- do you know
15 whether he's a psychiatrist or a psychologist?
16 A.        No, I think he's a regular doctor.
17 Q.        Okay.  Have you seen a psychiatrist or a
18 psychologist?
19 A.        I couldn't.
20 Q.        Why not?
21 A.        I didn't have insurance at that time.
22 Q.        Have you seen a therapist?
23 A.        No.
24 Q.        Have you seen a licensed social worker?
25 A.        No.

20 (Pages 74 - 77)

Page 78

1 Q.      How about a priest, have you talked to
2 your priest about problems?
3 A.      No. I talk to my sister, which is a
4 doctor, but not on the record.
5 Q.      Your sister is a doctor?
6 A.      Yes.
7 Q.      And what kind of a doctor is your sister?
8 A.      She's a psychology.
9 Q.      What's your sister's name?
10 A.      Sandra Brewer.
11 Q.      And where does she live?
12 A.      She live in New Jersey. We just -- she
13 just help me out and talk to me off the record
14 because I didn't have any insurance or anything. And
15 not only -- she provide support as a sister.
16 Q.      What is her address?
17 A.      I don't know it by heart. I just know
18 how to get there, but I don't know it by heart.
19 Q.      What town does she live in?
20 A.      I believe she live in Paterson. I
21 wouldn't know. I don't know it by heart. I just
22 know how to get there.
23          MR. YARNELL: There is a Paterson, New
24 Jersey.
25          MR. ADAIR: Yes.

Page 79

1 A.      I don't think she talk to me like a
2 psychiatrist. She just gave me like a sister
3 support.
4 Q.      Did she recommend that you find a
5 psychiatrist?
6 A.      She told me to, but since I didn't have
7 any insurance at that time --
8 Q.      Did she recommend anybody to you?
9 A.      No. No. We live a little far apart.
10 Q.      I was asking about Dr. Minnich. You said
11 you saw him both on a regular basis and also on an
12 as-needed basis?
13 A.      Yes.
14 Q.      When you saw him on a regular basis, what
15 was that? Was it every other week? Every week?
16 Daily? Every month?
17 A.      I couldn't be specific on that. I
18 couldn't be like specific, I couldn't.
19 Q.      On a monthly basis, how many times would
20 you see Dr. Minnich?
21 A.      I would say one, two, three times in a
22 month. Maybe I see him once, maybe I see him two or
23 three. I can't give you a specific amount of times.
24 Q.      And whenever you went to see him, was it
25 as a result of anxiety or depression?

Page 80

1 A.      Yes.
2 Q.      Was it ever the result of -- because of
3 physical ailments?
4 A.      No, not physical.
5 Q.      Are you continuing to see Dr. Minnich?
6 A.      No, he is not in the state anymore.
7 Q.      Where is he currently?
8 A.      I'm not sure where he at right now. I
9 believe he move to Texas or Arizona. I'm not sure.
10          MR. YARNELL: For what it is worth,
11 there's a Ryan Minnich, D.O., who is in the state of
12 Indiana.
13          MR. ADAIR: Okay.
14 BY MR. ADAIR:
15 Q.      Did you see any other doctors other than
16 Dr. Minnich?
17 A.      A few times in the emergency room that I
18 went at night, chest pains. Other than that -- than
19 the emergency, I didn't see any other doctor.
20 Q.      When was the last time you saw
21 Dr. Minnich?
22 A.      Don't remember. Long ago.
23 Q.      Was it 2012?
24 A.      No. I don't remember. To be exact with
25 you, I don't remember.

Page 81

1 Q.      I'm not looking for an exact. I'm
2 looking for a ballpark. Did you see him for more
3 than a year?
4 A.      I haven't seen him more than a year
5 because he moved already.
6 Q.      My question was, how long did you go to
7 treatment for him? Was it a year or was it longer
8 than a year or shorter than a year?
9 A.      I could say an average like a year or --
10 average a year. Could be more, could be less.
11 Q.      And when Dr. Minnich moved away, did you
12 look for another doctor?
13 A.      I tried but they took away my Medicaid.
14 Medicaid that was provided by public assistance, they
15 took it away and I couldn't see anymore.
16 Q.      Was that because you were making too much
17 money at that point?
18 A.      No.
19 Q.      Why was Medicaid taken away?
20 A.      I don't know. I wasn't even working at
21 that time and they took it away.
22          MR. YARNELL: Can we go off the record
23 for a second?
24          MR. ADAIR: Sure.
25          (Discussion held off the record.)

21 (Pages 78 - 81)

Page 82

1 BY MR. ADAIR:
2 Q.     Let's talk about you -- you said you went to
3 the emergency room.  What emergency room did you go
4 to?
5 A.     I went to Reading Hospital once.  And
6 then I went to St. Joseph emergency room.
7 Q.     When did you go to Reading Hospital?
8 A.     I don't remember the exact date.
9 Q.     How about the year?
10 A.     I don't remember if it was before or
11 after I was seeing Dr. Minnich.  I don't remember.
12 The only thing I remember was that I went there with
13 chest pain.
14 Q.     And what did they diagnose you with to
15 your knowledge?
16 A.     I don't quite remember.  I remember they
17 should be on the records, all the paperwork they
18 have.
19 Q.     Do you have medical records from going to
20 that -- to the emergency room?
21 A.     I'm not sure.
22     MR. YARNELL:  I don't think we
23 produced records from the emergency room.
24     MR. ADAIR:  No, I didn't get any.
25 That's why I was asking.

Page 83

1     MR. YARNELL:  I'm just confirming.  I
2 don't think we had.
3 BY MR. ADAIR:
4 Q.     How about St. Joseph's, when did you go
5 there?
6 A.     Last time was this year.  It was like
7 roughly a few months ago.
8 Q.     And what did you go there for?
9 A.     Pain on my right arm and chest pain.
10 Q.     And do you know what they diagnosed you
11 with?
12 A.     They did a lot of tests but they told me
13 that I have a pinched nerve on my right arm and to my
14 neck because of a lot of stress.  That's what they
15 told me.
16 Q.     Does that pinched nerve impact your
17 ability to use your arm at all?
18 A.     It hurts a lot but I couldn't stop
19 working.
20 Q.     That's not my question though.
21     Does that impact your ability to use
22 your arm?
23 A.     Yes.
24 Q.     How does it impact your ability to use
25 your arm?

Page 84

1 A.     A lot of pain, extremely painful.
2 Q.     Can you lift now as much as you could
3 before, before you had the pinched nerve?
4 A.     I never stopped lifting.  I never stopped
5 working.
6 Q.     Again, that's not my question.  I hear
7 what you're saying, but I'm asking you a very
8 specific question.  Can you lift as much now as you
9 could lift prior to having the pinched nerve?
10 A.     What was the question again?
11 Q.     Can you lift as much now as you could
12 prior to having a pinched nerve?
13     MR. YARNELL:  May I add something to
14 make it -- with or without the pain, are you still
15 able to lift as much as you did before?
16     THE WITNESS:  I can lift the same,
17 even with or without pain because I couldn't stop
18 working.  Even though that's not what you are asking,
19 I got to be specific on your question.
20 BY MR. ADAIR:
21 Q.     Look, it's fine that you can editorialize
22 after that, but answer the question and then you can
23 explain it further if you feel it's necessary.
24 A.     Well, I couldn't, but I did it anyway.
25 Q.     You couldn't lift?

Page 85

1 A.     I couldn't.
2 Q.     Are you saying now that you can't lift as
3 much now as you could before?
4 A.     See, for some reason I don't understand
5 what you mean with that.  I don't understand.
6 Q.     I'm asking -- it's a very simple
7 question.  Can you lift as much today as you could
8 lift before you had a pinched nerve?
9     MR. YARNELL:  He just wants to
10 physically know whether you can lift it, not whether
11 or not it's painful or otherwise.  He just wants to
12 know whether you can lift it.
13 A.     Yes.
14 Q.     That's all my question is.  I'm not
15 trying to hide anything there from you.
16     Do you have any outstanding bills from
17 Dr. Minnich?
18 A.     No, not from Dr. Minnich.
19 Q.     Now, you indicated you went to
20 Dr. Minnich because you couldn't sleep at night.  Do
21 you still have problems sleeping at night?
22 A.     Sometimes.  Not as often as before.
23 Q.     Talking about today, how often do you
24 have trouble sleeping at night on a weekly basis?
25 A.     Once every two week.

22 (Pages 82 - 85)

Page 86

1  Q.        How about not eating well? Actually,
2  strike that. Let me go back. Back when you went
3  back to see Dr. Minnich, seven months after you were
4  terminated, how often was it that you couldn't sleep
5  then?
6  A.        Oh, four or five nights a week.
7  Q.        You also indicated that you were not
8  eating well back then. What do you mean by that?
9  A.        Not feeling hungry or not eating at the
10 right time or sometimes not eating at all during the
11 day. Different scenarios.
12 Q.        Did you lose any weight as a result?
13 A.        I believe so.
14 Q.        How much?
15 A.        Not sure.
16 Q.        More than 10 pounds?
17 A.        Yeah, I could say that.
18 Q.        More than 20 pounds?
19 A.        No.
20 Q.        Between 10 and 20?
21 A.        Yes, something like that.
22 Q.        How about today, do you have difficulty
23 eating today?
24 A.        No.
25 Q.        How long did your -- did the not eating

Page 87

1  well last?
2  A.        I'm not sure. After I see Dr. Minnich,
3  started up some medication and I was being able to be
4  a little more calm, started like eating little bit
5  better and sleeping a little bit better from time to
6  time.
7  Q.        Did you put the weight back on that you
8  lost?
9  A.        Not really.
10 Q.        So you weigh 10 to 20 pounds less now
11 than when you worked for the Berks County Sheriff's
12 Department?
13 A.        I'm not sure about that. Besides that, I
14 work out also and I don't pay attention to my weight.
15 I just keep myself as healthy as I can.
16 Q.        Do you work out today?
17 A.        No.
18 Q.        I don't mean physically today, but do you
19 work out these days, in the present?
20 A.        I could say like twice a week now or
21 maybe once because I work so many hours, so sometimes
22 I can't even -- I not be able to work out.
23 Q.        Where do you work out?
24 A.        At a gym called Planet Fitness, 5th
25 Street in the mall. What's the name of the mall?

Page 88

1  Fairgrounds Mall. I go there sometimes.
2  Q.        Are you a member there?
3  A.        Yes.
4  Q.        Now, you said you had trouble with
5  relations with your partner. I know this is a tough
6  question but I got to ask you to explain to me what
7  you mean by that.
8  A.        I couldn't have sexual relations with my
9  partner at the beginning when I got fired because of
10 the -- the depression that I have, the anxiety and,
11 being honest, the anger that I had with the fact that
12 I was terminated from Berks County.
13 Q.        How long did those difficulties last?
14 A.        An average of eight, nine months, maybe
15 more.
16 Q.        Do you have difficulties with that today?
17 A.        No, not right now.
18 Q.        Prior to your termination -- I hate to
19 ask you a personal question but I got to. Prior to
20 your termination, on a weekly basis how often would
21 you have sex with your partner?
22 A.        Three, four times a week.
23 Q.        And during this eight or nine month
24 period, how often did you have sex with your partner
25 on a weekly basis?

Page 89

1  A.        Once every three months, if that.
2  Q.        And how about these days?
3  A.        Not many because she got to go to work in
4  New York to help -- you know, to help with the bills
5  and all. I can't tell you an exact time -- exact
6  frame of time right now because she's back and forth
7  to New York.
8  Q.        Are the issues, the problems these days,
9  related to depression and anxiety as a result of
10 being terminated from Berks County or do they have
11 more to do with just schedules and life activities?
12 A.        I don't understand your question.
13 Q.        Sure.
14           You indicated that your -- it appeared
15 to me, I believe that you said you're not having
16 sexual relations with your partner as much now as you
17 were back when you worked for Berks County. Would
18 that be accurate?
19 A.        Yeah, because she didn't have to go to
20 work.
21 Q.        And my question is, talking about now, is
22 the reason that you're having less sex these days a
23 result of her having to go to work or is it a result
24 of you being fired from Berks County?
25 A.        Both.

23 (Pages 86 - 89)

Page 90

1 Q.      So you still have problems having sex
2 with her these days because you were fired from Berks
3 County?
4 A.      Well, to be exact, the reason that we are
5 not together that much is because she got to go to
6 New York and work to help us with the bills, so we
7 not together that often like we used to be before.
8 Q.      So she didn't work prior to --
9 A.      She works.
10 Q.      Listen to my question.  You have to let
11 me finish my question.  Prior to you being fired from
12 Berks County, did she work?
13 A.      Yes.
14 Q.      Where did she work?
15 A.      The same, New York.
16 Q.      I don't know --
17 A.      In New York, Madison Square Garden.
18 Q.      What does she do there?
19 A.      She's a security supervisor.
20 Q.      For Madison Square Garden?
21 A.      Yes.
22 Q.      And she's still a security supervisor at
23 Madison Square Garden?
24 A.      Yes.
25 Q.      And has anything changed with her job

Page 91

1 from then till now?
2 A.      Yes.
3 Q.      What?
4 A.      When I used to work in the sheriff
5 department, she only worked there on weekends,
6 Friday, Saturday and Sundays, which sometimes I went
7 to New York and see my kids and visit my family,
8 and then we go back on Sunday night.  But now she got
9 to work like most of the week.  She doesn't like work
10 only the weekends like before.  She got to work more
11 now to help us with the bills.
12 Q.      So it's your testimony that she didn't
13 work as much before because you made more money?
14 A.      Yes.
15 Q.      And the only reason she's -- well, is
16 this accurate?  The only reason that she's working
17 more today is because you don't make as much money?
18 A.      Yes.
19 Q.      There's no other reason that she's
20 working more today?
21 A.      No.  No.
22       MR. YARNELL:  He needs to take a break
23 to use the bathroom.
24       MR. ADAIR:  Absolutely.
25       (A brief recess was taken.)

Page 92

1 BY MR. ADAIR:
2 Q.      Let me turn your attention, we'll talk about
3 Berks County now.  You began working for Berks County
4 on July 16, 2008.  Would that be accurate?
5 A.      Yes, sir.
6 Q.      You were hired to work in the sheriff's
7 department, correct?
8 A.      Yes.
9 Q.      During your tenure with the county, what
10 was your job title?
11 A.      Deputy sheriff.
12 Q.      Did you ever have any kind of a promotion
13 while you were with the county?
14 A.      No.
15 Q.      Let's talk about your shifts and
16 assignments for the county.  When you first started
17 working as a deputy sheriff, did your shift and
18 assignment change at all during your tenure with the
19 county?
20 A.      No.  It was the same shift.
21 Q.      What shift did you work?
22 A.      First shift, from 8 to 4:30.
23 Q.      And did your job assignment change over
24 the three years that you were with the county?
25 A.      Not that often.

Page 93

1 Q.      What job assignments did you have?
2 A.      At the beginning I was assigned to court.
3 And then I was assigned to juvenile court division.
4 It's the same, in court, but I was assigned to the
5 juvenile division for the first -- you could say
6 almost two years there.
7 Q.      Did you have any other assignments?
8 A.      Then after that I came back to regular
9 court.
10 Q.      When did you come back to regular court?
11 A.      I don't remember.  After like -- close to
12 two years in juvenile.
13 Q.      What were your basic job duties?
14 A.      Transporting the prisoner from the
15 holding cell to the courtroom.
16 Q.      Is that pretty much what you did?  Did
17 you have any other job duties that you did on a
18 regular basis?
19 A.      When we have like overtime with different
20 jobs like transporting the prisoner from the
21 courthouse to the jail, to the county jail; and
22 besides a few overtimes that I did special details.
23 Q.      Who were your immediate supervisors
24 during your three years at Berks County?  Who was
25 your first immediate supervisor?

24 (Pages 90 - 93)

1  A.      At the beginning Sergeant Gipprich.
2  Q.      And how long was sergeant Gipprich your
3  supervisor?
4  A.      For a long period of time.  I don't
5  remember exact.  And then it was Captain Berrios, who
6  was in charge of courts.  And then that's when my
7  nightmare starts with Sergeant Pacifico.
8  Q.      How long was Captain Berrios your
9  supervisor?
10  A.     I don't remember.  I don't remember
11  exactly but he was for a period of time.
12  Q.      And then Pacifico became your immediate
13  supervisor?
14  A.      Yes.
15  Q.      And Captain Berrios, he is Hispanic,
16  correct?
17  A.      Yes.
18  Q.      What was your relationship with Captain
19  Berrios?
20  A.      As an employee and supervisor, that's it.
21  Q.      Did you have a positive relationship with
22  him as a supervisor?
23  A.      Yes.  And with Sergeant Gipprich also.
24  Q.      Now, I know that you did not have a
25  positive relationship with Vince Pacifico, correct?

1  A.      Well, when he was a deputy, nobody liked
2  him and I was the only one who say good morning to
3  him and try to be on his -- to try to be a good
4  coworker with him.  Then when he became a sergeant,
5  that's when everything starts.
6  Q.      When he was a deputy before his
7  promotion, did you have a good relationship with him
8  or was it --
9  A.      No.  No.  No.  Never had any good
10  relationship with him.  I just say -- I just be
11  polite like I'm polite with everybody.  Good morning,
12  sir.  Good morning, how are you doing?  How are you?
13  Even though nobody like -- I could say -- I could
14  strictly say that 80 or maybe 90 percent of the whole
15  department didn't like him as a deputy.  I always
16  used to be polite to him and say good morning and
17  greet him when I see him.
18  Q.      Let me ask you a question.  Before I get
19  into the details, I'm going to mark this as 4.
20          (Brewer Exhibit Number 4 was marked
21  for identification.)
22  BY MR. ADAIR:
23  Q.      I'll let you take a look at that.  Let me
24  know when you are done.
25          Have you had a chance to take a look

1  at it?
2  A.      Yes, I did.
3  Q.      The document that we just marked as
4  Brewer 4 is entitled County of Berks Harassment
5  Training for Employees Acknowledgement Form, May
6  2010.  Is that your signature on this form?
7  A.      Yes.
8  Q.      And did you sign that on May 27, 2010?
9  A.      Yes.
10  Q.      And it says, by my signature below I
11  acknowledge that I attended the County of Berks
12  harassment training for employees.  I further
13  acknowledge that I received the County of Berks
14  harassment policy and it's my responsibility to abide
15  by the provisions outlined in the policy.
16          Did I read that paragraph accurately?
17  A.      Yes, you did.
18  Q.      Did you attend harassment training for
19  employees?
20  A.      Yes.
21  Q.      Tell me what you recall about the
22  harassment training for employees.
23  A.      At this particular time I don't recall
24  anything of that.
25  Q.      But you did attend it?

1  A.      Yes, I did.
2  Q.      Did you also receive a copy of the Berks
3  County harassment policy?
4  A.      I believe I did.
5  Q.      I'm going to give you this, which we'll
6  mark as 5.
7          (Brewer Exhibit Number 5 was marked
8  for identification.)
9  BY MR. ADAIR:
10  Q.      You can take a look at it.  You don't
11  need to read the whole thing through right now,
12  unless you want to.  I'm not going to ask you
13  detailed questions at this point but I may ask you
14  some questions later.  Just tell me when you've had a
15  chance to --
16  A.      Go ahead.
17  Q.      What we marked as Brewer 5 is entitled
18  harassment policy.  It has an effective date of
19  November 4, 1993.  But then it says it was revised on
20  May 10th, 2010.  Is that accurate?
21  A.      Yes.
22  Q.      That's what it says.  Is this the
23  harassment policy that you received when you were a
24  deputy?
25          MR. YARNELL:  If you recall.

25 (Pages 94 - 97)

Page 98

1 A.      Yes.
2 Q.      And that's all the questions I have about
3 that for right now.
4         (Brewer Exhibit Number 6 was marked
5 for identification.)
6 BY MR. ADAIR:
7 Q.      Now, let me give you this, which we will
8 mark as Brewer 6.  When you've had a chance to look
9 at it, just let me know.
10 A.      Go ahead.
11 Q.      What's been marked as Brewer 6 is a
12 letter to you dated August 11th, 2009 and it says,
13 re: time clock violation-failure to clock in/out
14 without notifying a supervisor, first offense.  Is
15 that accurate?
16 A.      Yes.
17 Q.      In August of 2011 -- I'm sorry, on August
18 11th, 2009 would it be accurate to say that Sergeant
19 Pacifico was not your supervisor at that point in
20 time?
21 A.      No.
22 Q.      He was not your supervisor, correct?
23 A.      No.
24 Q.      And this is discipline that you received
25 in August of 2009 for not clocking in and out,

Page 99

1 correct?
2 A.      Um-hum.
3 Q.      Yes?
4 A.      Yes.
5 Q.      Is that your signature on this page?
6 A.      Yes.
7 Q.      And it's also signed by Anthony Damore,
8 correct?
9 A.      Yes.
10 Q.      And by Gary Cirulli, correct?
11 A.      Yes.
12 Q.      Did you believe that this warning that
13 you received for time clock violation was merited
14 because of your behavior?
15 A.      Yes, absolutely.
16 Q.      Okay.  Do you believe that you were given
17 this discipline because of your race or your
18 nationality?
19 A.      No.
20 Q.      You can put that aside if you like.
21         (Brewer Exhibit Number 7 was marked
22 for identification.)
23 BY MR. ADAIR:
24 Q.      I have this one, which we will mark as 7.
25 Tell me when you've had a chance to look at it.

Page 100

1 A.      Go ahead.
2 Q.      This is a letter to you dated January
3 7th, 2011, which under the re line says time clock
4 violation-failure to clock in/out without notifying a
5 supervisor, first offense.  Did I read that
6 accurately?
7 A.      Yes.
8 Q.      This was also discipline that you
9 received for a time clock violation, correct?
10 A.      Um-hum.
11 Q.      Correct?
12 A.      Yes.
13 Q.      And is that your signature on this page?
14 A.      Yes.
15 Q.      And it was also signed by Sheriff
16 Weaknecht, correct?
17 A.      Yes.
18 Q.      And by Vince Pacifico, correct?
19 A.      Yes.
20 Q.      And at this point in time Vince Pacifico
21 was your supervisor, correct?
22 A.      Yes.
23 Q.      Did you believe that this discipline was
24 warranted?
25 A.      I don't understand what you mean.

Page 101

1 Q.      Do you believe that you deserved to get
2 a -- well, did you have a time clock violation?
3 A.      Oh, yes, definitely.
4 Q.      Did you believe that you were given this
5 discipline because of your race or nationality?
6 A.      No.
7 Q.      I want to ask you some questions about
8 the incident that occurred in October of 2010 when
9 you were assigned to Judge Sprecher's courtroom.
10 A.      Um-hum.
11 Q.      Do you remember that incident?
12 A.      Yes.
13 Q.      Tell me what you recall happening.
14 A.      The Judge was in a video conference.  He
15 was not in the courtroom at that time.  For some
16 reason I felt tired, I was sleepy; and I told the
17 clerk of courts or one of the assistants if I could
18 go get a coffee because there was nobody in the
19 courtroom at that time.  There was no -- it was only
20 like two assistants and that was about it.  They
21 said, yeah, go ahead.
22 Q.      Was that Royce?  Was the name of the guy
23 that you talked to Royce Spadt?
24 A.      I don't remember his name but I do
25 remember how he looks.

26 (Pages 98 - 101)

Page 102

1  Q.    What did he look like?
2  A.    Tall person, maybe taller than me,
3  glasses, a little bald. I'd say mid, maybe late 40s.
4  I ask him if I could get a cup of coffee. He said,
5  yeah, go ahead, the Judge is not even going to go out
6  for the next hour or two.
7        I went to get a coffee and when I came
8  back Pacifico was there, and he tell me why you out
9  of the courtroom. I said, I asked him if I could get
10  a cup of coffee and he told me that I could go. And
11  even though the Judge assistants or one of the staff
12  member told him, yes, I told him that, that he could
13  go, he still write me up.
14        But again, since I'm a -- I consider
15  myself an honorable person, I apologize to him; and I
16  said, well, it's not going to happen again. And he
17  took that as an advantage, like I admit that I do
18  something wrong. He write me up anyway. I took full
19  responsibility because I told him I was going to take
20  him out of my back.
21  Q.    You told him what?
22  A.    I told him that simple fact that I took
23  responsibility for that occasion in particular would
24  take him out of my back.
25  Q.    Get him off your back?

Page 103

1  A.    Yeah, get him off my back, I'm sorry.
2  Q.    That's okay.
3  A.    And I took full responsibility for it.
4  Q.    Let me ask you some follow-up questions
5  about that. Was it your understanding that as a
6  deputy sheriff it was your responsibility to remain
7  in that courtroom as long as it was open to the
8  public?
9  A.    At that time that I went to the cafeteria
10  and get a coffee, I locked the door.
11  Q.    You locked the door?
12  A.    Because there was no civilian person,
13  there was nobody there.
14  Q.    But -- okay. So you locked the door, but
15  there were employees inside, correct?
16  A.    Yeah, there was two; and they allowed me
17  to go, because I asked them.
18  Q.    Was it your understanding that other
19  county employees other than the sheriff's department
20  could give you permission to leave the courtroom
21  without notifying the control center?
22  A.    Well, I didn't take it that way at that
23  time because I locked the door. And the courtroom --
24  nobody didn't have access to the courtroom except for
25  the employee that was inside the courtroom. I told

Page 104

1  him that I was going to come back in like five
2  minutes, maybe less, to go to the third floor and get
3  a coffee. So I didn't find any harm on that.
4  Q.    Was it your understanding that it was
5  policy for you to notify the sheriff's department if
6  you were leaving that room?
7  A.    Not if I lock it.
8  Q.    It was your understanding that if you
9  locked it you could just leave?
10  A.    No, because I wasn't going to leave for
11  like a long period of time.
12  Q.    Now, when you came back and found Vince
13  Pacifico there, was he in the courtroom?
14  A.    Yes, he got key.
15  Q.    He got a key?
16  A.    Yeah. Every deputy sheriff have a key to
17  almost -- I could say the majority of the courtrooms.
18  Q.    Did Vince Pacifico call you from his
19  radio while he was in Courtroom 3 and ask where you
20  were?
21  A.    No.
22  Q.    That didn't happen?
23  A.    No, I didn't -- if it happened -- I'm not
24  saying it didn't happen. If it happens, my radio --
25  I didn't get the reception.

Page 105

1  Q.    Did you tell Vince Pacifico over the
2  radio that you were in Courtroom 3 when you were not
3  in Courtroom 3?
4  A.    Not that I recall.
5  Q.    Let me give You Exhibit 8.
6        (Brewer Exhibit Number 8 was marked
7  for identification.)
8  BY MR. ADAIR:
9  Q.    Why don't you take a look at that. Let
10  me know when you've had a chance to take a look at
11  it.
12  A.    I did.
13  Q.    Okay. And this is a -- Exhibit Brewer 8
14  is an October 20, 2010 letter to you from Chief
15  Damore, correct?
16  A.    Um-hum.
17  Q.    It's a written warning for violation of
18  the County of Berks disciplinary guidelines policy
19  for failure to follow general instructions or
20  procedures, correct?
21  A.    Um-hum.
22  Q.    Is that a yes?
23  A.    Yes.
24  Q.    This is discipline that you received as a
25  result of that October 7, 2010 incident, correct?

27 (Pages 102 - 105)

Page 106

1  A.      Yes.
2  Q.      First of all, if you look at the second
3  page, is that your signature?
4  A.      Yes.
5  Q.      And you had union representation,
6  correct?
7  A.      Yes.
8  Q.      Do you know who your union representation
9  was for that?
10  A.      I don't remember who it was.
11  Q.      But there's somebody from the union
12  signed there, correct?
13  A.      Yes.
14  Q.      Let me look at some of these -- some of
15  these sentences in here; and it says here at
16  approximately 10:07 a.m., Sergeant Pacifico entered
17  Courtroom 3, which was open with civilians and court
18  staff present.  That's what it says in this letter,
19  correct?
20  A.      Um-hum.
21  Q.      Yes?
22  A.      Yes.
23  Q.      And is it your testimony that, in fact,
24  the courtroom was not open and there were no
25  civilians present?

Page 107

1  A.      Not when I left.
2  Q.      But were there when you got back?
3  A.      Not that I recall, but if that's what it
4  says, that's what it was.
5  Q.      Okay.  And this goes on to say, Sergeant
6  Pacifico waited for several minutes and then called
7  you on the radio and asked for your location.  At
8  that time you responded you were in Courtroom 3.
9  When Sergeant Pacifico answered that he was in
10  Courtroom 3, you then responded that you were on your
11  way.  Did I read that correctly?
12  A.      Yes.
13  Q.      Is it your memory that Sergeant Pacifico
14  did not call you over the radio from Courtroom 3?
15  A.      I didn't remember but now that you read
16  it, I recall it.  Yes, he called me.
17  Q.      And did you tell Sergeant Pacifico that
18  you were in Courtroom 3?
19  A.      That I don't remember that if I told him
20  that I was in the Courtroom 3.  That I don't recall
21  that.
22  Q.      Do you think that that's not accurate?
23  A.      No.
24  Q.      So you think that is accurate, you just
25  don't recall it?

Page 108

1  A.      Yes.  I never denied that.  I sign it and
2  I took full responsibility of it.
3  Q.      So do you believe that what's written in
4  here is accurate?
5  A.      Yes.
6  Q.      Is anything that's written in this
7  inaccurate?
8  A.      No.
9  Q.      Do you believe that this discipline was
10  given to you because of your race or your national
11  origin?
12  A.      Yes.
13  Q.      Why do you believe that?
14  A.      Because everybody does that in the
15  sheriff department.  When the Judge is not there and
16  they need to get something to drink, it's a -- it's a
17  really laid back job.  I'm not saying that it's not
18  risky or we're not going to be able to take full
19  responsibility of the job, but it's an easy job.
20  When the Judge is not there and somebody needs to go
21  and get something to drink, everybody does that.  The
22  only one that got written up was me.
23  Q.      Did you misrepresent to Vince Pacifico
24  that you were in a courtroom when you were not, in
25  fact, in that courtroom?

Page 109

1  A.      I don't recall to say I'm not going to --
2  to that particular part, I don't recall that.
3  Q.      Would it be accurate for me to say that
4  you did not provide any response saying -- let me
5  rephrase that.  Is it true that you never objected to
6  this discipline and said that it was inaccurate, the
7  representation that you were in the courtroom when
8  you, in fact, were not in the courtroom?
9  A.      I never denied this.  I signed for it and
10  I took full responsibility even though it totally was
11  unfair because I was the only one written up by doing
12  something like that when everybody does.  But I took
13  full responsibility and I admit my mistakes.
14  Q.      Did you tell your union representative
15  that you thought the reason that you were written up
16  was due to your race and national origin?
17  A.      No.  But I thank you for that.  Now I
18  remember who it was, the union representative.
19  Q.      Who is that?
20  A.      Mike Gring.
21  Q.      Mike Gring?
22  A.      Mike Gring.
23  Q.      Matt Green?
24  A.      Mike.  Mike.  Mike Gring.  Now I remember
25  who it was.

28 (Pages 106 - 109)

Page 110

1  Q.      So you did not tell Mike Gring that you
2  believe you were being disciplined due to your race
3  and national origin?
4  A.      No, I didn't tell him that because he was
5  very close friends with Pacifico.
6  Q.      Did you tell anyone else at this time you
7  believed you were being written up due to your race
8  and national origin?
9  A.      Yes.
10 Q.      Who?
11 A.      I told Deputy Ortiz about that. And I
12 told also Deputy Doris Natal. I told her. I was
13 like making a comment out of it because nobody --
14 nobody in the sheriff department got written up when
15 the Judge is not there. They take little breaks to
16 go to the bathroom, to get something to drink real
17 quick if the Judge is not there. I'm being clear
18 with that. If the Judge is not there and we don't
19 see anybody in the courtroom, everybody take little
20 breaks; and that's what I did.
21 Q.      But that is against the policy, correct?
22 A.      Yeah, you could say that.
23 Q.      So you told --
24 A.      That's why I took my full responsibility
25 of it.

Page 111

1  Q.      Because you violated the policy?
2  A.      Yes.
3  Q.      But you had an opportunity back then to
4  raise the fact that this was based upon your race and
5  nationality, correct?
6  A.      No.
7  Q.      Why did you not have an opportunity to do
8  so?
9  A.      Well, because I made a mistake, and I'm a
10 person who admits their -- my mistakes. I always
11 admit my mistake. If I made a mistake, I made a
12 mistake, period. I'm human. But nobody -- and you
13 can go through the records, nobody has been written
14 up for getting something to drink or anything when
15 the Judge is out or taking little breaks like that.
16 Q.      You didn't answer my question though.
17         MR. YARNELL: I don't think he
18 understood your question.
19 BY MR. ADAIR:
20 Q.      I'm going to ask my question again.
21 A.      Go ahead.
22 Q.      My question to you was simply this, you
23 had an opportunity at the time this discipline was
24 given to you to say that I am being disciplined as a
25 result of my race and national origin.

Page 112

1          MR. YARNELL: Objection.
2  Q.      Correct?
3          MR. YARNELL: It assumes that he could
4  have provided such a response. Are you speaking in
5  response to the comments here or are you speaking in
6  general?
7          MR. ADAIR: I think my question is
8  clear.
9  BY MR. ADAIR:
10 Q.      Can you answer my question?
11 A.      Can you rephrase it?
12         MR. YARNELL: Do you understand it?
13 A.      Rephrase it again.
14 Q.      Absolutely. You had an opportunity to
15 raise an objection to the discipline you received and
16 claim that you believed it was the result of your
17 race and/or national origin, correct?
18         MR. YARNELL: Objection to the form to
19 the extent it doesn't define what is meant by raised
20 an objection with respect to when, where, how.
21         MR. ADAIR: We will play this game all
22 day long if you want to go that way. That's fine.
23 BY MR. ADAIR:
24 Q.      At the time you were disciplined, did you
25 have an opportunity to oppose the discipline that was

Page 113

1  given to you?
2  A.      Um-hum. Yes.
3  Q.      And how would you have done that?
4  A.      Well, I had an opportunity to say certain
5  things, but the way that I thought at that time, if I
6  made a mistake, take full responsibility of it; and
7  that's what I did.
8  Q.      Sir, you are not answering my question.
9  My question is, did you have an opportunity?
10 A.      What do you mean did I have an
11 opportunity?
12 Q.      Could you have objected to the discipline
13 given to you?
14 A.      Yes.
15 Q.      You could have?
16 A.      Yes.
17 Q.      And as part of that, could you have said
18 the reason this discipline is being given to me is
19 because I'm Hispanic?
20 A.      I could have.
21 Q.      And could you have said the reason this
22 discipline is being given to me is because I'm black?
23 A.      Yes, I could have.
24 Q.      But you didn't, correct?
25 A.      No, I didn't.

29 (Pages 110 - 113)

Page 114

1 Q.      That was my question.
2          And, you know, look, we'll stay here
3 as long as we have to to get these questions
4 answered.
5 A.      Go ahead.
6 Q.      I mean, I'm not trying to play games.
7 I'm not trying to make these difficult, but if you
8 guys want to play games --
9 A.      Seriously, I don't understand the
10 question. I got to think about it, what you're
11 asking me.
12          MR. YARNELL: Drew, I'm not playing
13 games with you. Just ask your questions.
14 BY MR. ADAIR:
15 Q.      Would it be accurate for me to say that
16 you did not tell Chief Damore that you thought you
17 were being disciplined due to your race or
18 nationality?
19 A.      No, I didn't tell him.
20 Q.      When did you tell Deputy Ortiz that you
21 believe you received this discipline due to your race
22 or nationality?
23 A.      If I can correctly recall, it was like
24 several days after.
25 Q.      And what did Deputy Ortiz advise you to

Page 115

1 do?
2 A.      No, he just told me to be careful with
3 Pacifico. And then way before that, I'm going to say
4 I don't have anything to prove it, but somebody who
5 died, Kyle Lesher, he is a former deputy who died, he
6 told me when Pacifico came along, be careful, he is a
7 very racist officer.
8 Q.      And I'm going to give you an opportunity
9 to talk about racism with Pacifico so --
10 A.      And then going back to what I talked to
11 Deputy Ortiz, he told me, well, be careful with him.
12 That's what he told me. He was at the warrant
13 division at that time.
14 Q.      Did he tell you to go to anybody with
15 your complaint?
16 A.      No, no. We never talk further about
17 that.
18 Q.      How about Doris Natal, when did you tell
19 her that you thought you were being disciplined for
20 this incident as a result of your race and
21 nationality?
22 A.      In fact --
23          MR. YARNELL: Excuse me.
24          (Discussion held off the record.)
25 BY MR. ADAIR:

Page 116

1 Q.      I was asking you before we took a break
2 when you told Doris Natal that you thought that this
3 October 20, 2010 discipline was given to you on the
4 basis of your race and nationality.
5 A.      I don't understand what you mean.
6 Q.      Sure. When did you tell Doris Natal that
7 you believe that you were disciplined because of your
8 race and nationality?
9 A.      I'm not sure but like several days after
10 that, you know, I don't know, maybe 10, 15 days. I'm
11 not sure. We got into a conversation and I let her
12 know that I was written up for the reason that we
13 have right here. She told me, for that? Everybody
14 does that around here, nobody gets written up. So
15 Kyle Lesher was right about that. He is racist and
16 he going to start. That was like a magic wand.
17 Q.      At this point in time you knew -- it was
18 your understand -- your belief that --
19 A.      No, I knew that he was like basically
20 breathing on my neck all the time. Everywhere that I
21 was, he was there looking at what I was doing before
22 this. He was looking for an excuse to write me up.
23 Q.      And you believe that the reason he was
24 doing that was because of your race and nationality?
25 A.      Yes.

Page 117

1 Q.      And it had nothing to do with any other
2 reason other than your race and nationality?
3 A.      No, I don't think so.
4 Q.      What did Doris Natal tell you to do when
5 you told her that you believed you were being
6 disciplined due to your race and nationality?
7 A.      I don't recall she telling me anything
8 about doing anything else about it. And then when I
9 talk it over again with Deputy Ortiz, he told me,
10 well, there's nothing we can do about it because the
11 sheriff's wife works in the human resources and
12 nothing is going to happen. It's not going to go
13 further than that. And then after that he was
14 subject to numerous investigations, and nothing
15 happens to Pacifico.
16          MR. YARNELL: Can I ask just one thing
17 because I'm not clear. The he you're referring to,
18 when you say he was subject to, was that --
19          THE WITNESS: Sergeant Pacifico. At
20 that time Sergeant Pacifico.
21          MR. YARNELL: I'm sorry. Go ahead.
22 BY MR. ADAIR:
23 Q.      You just referred to the sheriff's wife.
24 And that's Jessica Weaknecht, correct?
25 A.      Yes.

30 (Pages 114 - 117)

Page 118

1 Q.      And it was your understanding that she
2 was an employee in the human relations department of
3 Berks County, correct?
4 A.      Honestly I didn't know at that time. I
5 didn't pay attention to details like that. I just
6 went to do my job and went home.
7 Q.      Was it your understanding that she was
8 not even located in the government services building?
9 A.      I don't recall that.
10 Q.      Did you know that Jessica Weaknecht was
11 located out at the Berks County jail?
12 A.      I didn't know the details. I didn't
13 know.
14 Q.      Did you know whether Jessica Weaknecht's
15 authority in human resources was limited to the jail
16 at that time?
17 A.      I don't know about that. I didn't know.
18 I just heard that comment, and for me to write down a
19 complaint or anything about that, I'm like, well she
20 works in human resources so it's not going to go
21 anywhere. And that's what everybody thought about it
22 until things started escalating and getting worse and
23 worse and worse.
24 Q.      I want to talk to you about the incident
25 that happened on December 2, 2010 in domestic

Page 119

1 relations. That's when the general call went out
2 when you were assigned to domestic relations. Do you
3 remember that incident?
4 A.      Yes.
5 Q.      What do you recall from that incident?
6 A.      Again, I went to get something to drink;
7 and then argument started over two gentlemen, and one
8 of the ladies who work at domestic relations hit the
9 panic button. And then everybody come up.
10 Q.      But you didn't respond to that panic
11 button, did you?
12 A.      My radio didn't work.
13 Q.      Did you tell anybody that your radio
14 didn't work?
15 A.      Like four or five times I told Sergeant
16 Pacifico and Chief Damore, and they took the radio
17 away several times to fix it; and I don't know if
18 they fix it or not but it never worked.
19 Q.      I'm going to mark this as 9.
20         (Brewer Exhibit Number 9 was marked
21 for identification.)
22 BY MR. ADAIR:
23 Q.      Let me know when you've had a chance to
24 look at that.
25 A.      That's accurate.

Page 120

1 Q.      You just had a chance to take a look at
2 Brewer Exhibit 9, which is a December 3, 2010
3 incident report prepared by Carmen Carrero, correct?
4 A.      Yes.
5 Q.      Correct?
6 A.      Yes.
7 Q.      And do you believe that the information
8 contained in here is accurate?
9 A.      It is.
10 Q.      And is there anything in this report that
11 you do not believe is accurate?
12 A.      So far everything seems accurate to me.
13         MR. YARNELL: Read the whole thing.
14 A.      Okay. Give me one minute.
15         Yes.
16 Q.      Everything is accurate in that report?
17 A.      Yes.
18         MR. YARNELL: Can I ask you for
19 clarity, the term Plaintiff in this report is
20 referring to mothers of children or what is it
21 referring to, do you know?
22         MR. ADAIR: I do know that that's
23 referring to mothers of children as compared to --
24 because this is domestic relations.
25         MR. YARNELL: I assumed so but I

Page 121

1 just -- the use of the word Plaintiff --
2         MR. ADAIR: However, I am not the
3 author of the report, and while I know that that's
4 what it refers to, I can't really testify to that;
5 but I can tell you --
6         MR. YARNELL: I'm not asking you to
7 testify.
8         MR. ADAIR: That's my understanding.
9 BY MR. ADAIR:
10 Q.      So everything in this report is
11 accurate --
12 A.      Yes.
13 Q.      -- to your memory, correct?
14 A.      (Witness nodded head.)
15 Q.      Correct?
16 A.      Yes.
17 Q.      So on December 2nd, 2010, between 11:00
18 and 11:15 you told Ms. Carrero that you were going to
19 go get a cup of coffee, correct?
20 A.      Um-hum.
21 Q.      Yes?
22 A.      Yes.
23 Q.      And while you were away, between 11:15
24 and 11:30 an incident broke out in domestic
25 relations, correct?

31 (Pages 118 - 121)

Page 122

1  A.     Yes.
2  Q.     But you weren't there, right?
3  A.     No.
4  Q.     And as a result of that incident, Ms.
5  Carrero hit the panic button, correct?
6  A.     Yes.
7  Q.     And you were not one of the deputies that
8  responded to that, correct?
9  A.     No.
10  Q.     Deputy Hatfield responded and Deputy
11  Fanok, F-A-N-O-K --
12  A.     Yes.
13  Q.     -- responded to escort an unruly person
14  out of domestic relations, correct?
15  A.     Yes.
16  Q.     And then you showed up between 11:40 and
17  11:45, correct?
18  A.     That's the only thing that I'm not in
19  agreement.  It wasn't that long.  It wasn't -- the --
20  everything is accurate except for the time.  I know
21  for a fact that I didn't last that long getting
22  something to drink.
23  Q.     How long were you gone?
24  A.     I'm not sure but it wasn't that long
25  because it was a matter of going down and coming back

Page 123

1  up.  Grabbing whatever I went to grab and coming back
2  up right away.  When I came up, everything was
3  already solved and all the other deputies were there.
4         I didn't hear anything on my radio.
5  Even though they told me the captain is calling you,
6  but I don't hear anything.  And what's the name,
7  Robert Essig, Deputy Essig, he was hearing
8  everybody's radio except mine.  He said, you're
9  right, your radio's not working.  I'm like, well, I
10  didn't hear anything; and I tried to turn it back on
11  and on, and it didn't work.
12  Q.     So you don't know how long you were gone?
13  A.     I'm not going to be -- I'm not going to
14  tell you specifically but it wasn't like low minutes.
15  It was a matter of went downstairs, pick something up
16  and went back upstairs right away.
17  Q.     What did you pick up?
18  A.     I don't remember if it was a cup of
19  coffee or soda or something to drink real quick.
20  Q.     Do you know Carmen Carrero?
21  A.     She is a coworker that was working there,
22  but not that I know as really friends or anything
23  like that.
24  Q.     When was the last time you talked to Ms.
25  Carrero?

Page 124

1  A.     Probably that day or a little bit after
2  that.
3  Q.     You haven't talked to her since then?
4  A.     No.
5  Q.     When you came back up, had you brought a
6  poinsettia?
7  A.     Somebody gave me a poinsettia, like some
8  flowers because I don't know who point me out and
9  told the lady who was selling that he was a Veteran,
10  an Army Veteran or something like that, that I served
11  in the Army.  Oh, thank you for your service and she
12  gave me one of those, one of those small flowers,
13  Christmas flowers.
14  Q.     So in addition to the drink you brought a
15  poinsettia back up to domestic relations?
16  A.     Yes, yes, yes.
17  Q.     And did you give that poinsettia to Ms.
18  Carrero?
19  A.     No, I turned it over, I put it -- yeah,
20  you want this?  They gave it to me, and I give it to
21  her.  Now that I brought her because I wanted it to,
22  was coincidental.
23  Q.     Did you request relief prior to going
24  down to get a cup of coffee that day?
25  A.     Yes, I believe like two times; and they

Page 125

1  told me that they didn't have anybody available at
2  that time.  I kept waiting and waiting and waiting.
3  I wait for a period of time that I don't recall right
4  now.
5  Q.     But then you finally went and got your
6  cup of coffee, correct?
7  A.     Yes.
8  Q.     Without requesting relief at that time?
9  A.     Yes.
10  Q.     Now, Vince Pacifico, did he have anything
11  to do with that incident in domestic relations?
12  A.     No, not that I recall, no.  He got
13  involved later on.
14  Q.     With this incident?
15  A.     Yeah.
16  Q.     How did he get involved later on?
17  A.     When I was getting this written up and
18  everything, he got involved and he started adding
19  fuel to the fire, if I could say something like that.
20  Q.     Explain to me what he did.
21  A.     Instigating things and saying how bad of
22  a deputy I was, this and that, and a whole bunch of
23  stuff.
24  Q.     Who did he say that to?
25  A.     To Chief Damore at that time.

32 (Pages 122 - 125)

Page 126

1  Q.    So he --
2  A.    I mean he was saying it to everybody in
3  the conference room when I was getting this -- which
4  I get a suspension for this.
5  Q.    Correct. And we'll talk about that in a
6  minute. But he said to Chief Damore -- he was in a
7  conference room with Chief Damore?
8  A.    No, no, no. When I was getting this
9  disciplinary written up, he just show up. I don't
10 know if he was supposed to get involved in that or --
11 I don't remember. I don't recall. But he just show
12 up and he start saying bad things about me and he
13 start telling me things that I don't quite recall
14 right now.
15 Q.    I'm going to have to ask you exactly what
16 he said.
17 A.    I don't remember.
18 Q.    You said he said bad things about you
19 during a disciplinary conference?
20 A.    Um-hum.
21 Q.    What did he say?
22 A.    He was trying to like instigate it, like
23 to make me look bad or make me feel bad. I don't
24 remember exact words.
25 Q.    How about the substance, what was the

Page 127

1  topic that he was discussing?
2  A.    I don't remember exact words. I'm not
3  going to break my mind right now thinking about
4  what -- I don't remember. I know that he was there
5  instigating and all that but I don't remember exactly
6  what he said.
7  Q.    My question is not exactly what he said.
8  My question is the topic, what topic was he
9  discussing?
10       MR. YARNELL: Do you understand what
11 he's asking you?
12 A.    What do you mean the topic that he was
13 discussing?
14 Q.    You don't remember exactly what he was
15 saying, but how about generally what was the gist of
16 what he was saying?
17 A.    Specifically what he was saying, I don't
18 remember. I told you I don't remember.
19 Q.    And again, I'm not asking you
20 specifically, I'm asking you generally.
21 A.    And again and again, I don't remember
22 what he said specifically. I remember that Chief
23 Damore was giving me the written up. He was giving
24 me a five-day suspension, that if I want to fight it,
25 that he was giving me all the options and everything;

Page 128

1  and he start saying things that I didn't even pay
2  attention to. But he was saying something. I don't
3  quite remember right now.
4  Q.    You don't remember anything he said?
5  A.    Right at this particular moment, I don't
6  remember. Maybe I remember like two or three days
7  from now, but I don't remember right now.
8  Q.    I understand but I'm not going to get to
9  talk to you two or three days from now.
10 A.    I know that. But I'm saying that right
11 now -- right at this particular moment I don't
12 remember what he was saying.
13 Q.    Okay. You were interviewed following
14 this incident by Samantha Palkowski from human
15 resources, correct?
16 A.    Yes.
17 Q.    Would you agree with me that when you
18 were interviewed by Ms. Palkowski, that you did not
19 mention anything that you thought that this incident
20 was given to you -- that this discipline was being
21 given to you or you were being investigated as a
22 basis of your race or national origin?
23 A.    No.
24 Q.    So you didn't say anything about race or
25 national origin, correct?

Page 129

1  A.    I didn't mention none of that.
2  Q.    Why not?
3  A.    I didn't mention it. I thought at that
4  time anything that I say against Pacifico or anything
5  at all, it would be bad because he had been subject
6  for many investigations and nothing have been done to
7  him. But this particular one --
8  Q.    Hang on, hang on. Before you go on, you
9  told that to Ms. Palkowski?
10 A.    No.
11 Q.    So you didn't mention any of that to Ms.
12 Palkowski?
13 A.    No.
14 Q.    You didn't mention race or national
15 origin at all?
16 A.    No, no, no.
17 Q.    We'll mark this one as 10.
18       (Brewer Exhibit Number 10 was
19 marked for identification.)
20 BY MR. ADAIR:
21 Q.    Before we go to that and before you take
22 a look, let me ask you another question. If you had
23 wanted to say something to Ms. Palkowski that you
24 believe you were being disciplined as a result of
25 race or your national origin, you could have said

33 (Pages 126 - 129)

Page 130

1  something to her, correct?
2  A.      Well, to be honest with you, at that time
3  I didn't thought it was going to go anywhere. It was
4  not -- that's what was my understanding at that time,
5  that if I would have say something anyways, he
6  wouldn't go. In this particular moment, I was going
7  to say in my regular work, and I didn't even mention
8  that.
9  Q.      Hang on, because we're not at this
10 document that you're looking at yet, okay.
11         But there was -- no one stopped you
12 from saying to Ms. Palkowski, I think that I'm being
13 disciplined as a result or I think this whole
14 incident is the result of my race and national
15 origin, correct?
16         MR. YARNELL: He just testified that
17 he felt it was pointless.
18         MR. ADAIR: No, he did not testify to
19 that. In fact, you're testifying to it right now.
20 That was not his language.
21         MR. YARNELL: His words were I didn't
22 think it would go anywhere.
23         MR. ADAIR: Steve, it's his testimony.
24         MR. YARNELL: That's what he said.
25         MR. ADAIR: Let him testify.

Page 131

1          MR. YARNELL: You want to say it
2  again, go ahead.
3  A.      At that particular moment, and any other
4  moment, I didn't think it was going to go anywhere.
5  Q.      I'll ask my question again. No one
6  stopped you from saying it was as a result of your
7  race or your national origin, correct?
8  A.      No, nobody stopped me.
9  Q.      And you could have, if you had chosen to,
10 said that you thought it was the result of my race
11 and national origin, correct?
12 A.      Then at that time -- to be honest with
13 you, I was kind of -- I was even afraid of saying
14 anything at that time. I didn't want to say anything
15 because I know for a fact that they were going to
16 take Pacifico's side on it.
17 Q.      Sir, I'm going to ask you the same
18 question.
19         Will you just read the question
20 back, and will you just answer the question?
21 A.      Ask me the question again.
22         MR. ADAIR: Will you read that back to
23 him, please.
24         (The reporter read the referred-to
25 portion of the record.)

Page 132

1  A.      Yes.
2  Q.      Thank you. Now, if you take a look at
3  what we marked as Exhibit 10. Have you had a chance
4  to take a look at it?
5  A.      Um-hum.
6  Q.      Before I ask you this, you didn't tell
7  Ms. Palkowski that your radio didn't work, did you?
8  A.      No, I didn't tell her.
9  Q.      Now, you were disciplined as a result of
10 the incident in domestic relations, but you were also
11 disciplined for another incident as well, correct?
12 A.      That one I try to explain to them that I
13 didn't know the outside area of Reading, that I
14 needed a GPS or a map in order for me to keep doing
15 the other subpoenas. And it was never provided.
16 Q.      So the other incident, that was a
17 December 6, 2010 incident where you were assigned to
18 serve subpoenas?
19 A.      Subpoenas.
20 Q.      Correct?
21 A.      Yes.
22 Q.      And you served some subpoenas but you
23 didn't serve all of them, correct?
24 A.      All the Reading area part, I serve them
25 all. But when it was like I don't know these

Page 133

1  address, I don't know, I went back to the control
2  room. I told Joe Garipoli if I can talk to any
3  sergeant. He told me there was no sergeant
4  available. And I try to contact somebody to get me a
5  GPS, a map or something that I could go back out
6  there and finish the subpoenas. I try to explain
7  that.
8          And every time I made a mistake or
9  something I always -- I admit to it. In the other
10 one about the subpoenas, I didn't get any GPS or a
11 map when I told them that I didn't know the outside
12 of the Reading area.
13 Q.      Now, in this discipline, if you look at
14 the second page of it, which is marked as Berks 411,
15 it says during the investigation interview on
16 December 8, 2010 by your own admission you did not
17 complete any work the rest of your shift, returning
18 the subpoenas not served to the department. Did I
19 read that correctly?
20 A.      Where is that at?
21 Q.      I'm sorry, it's the first paragraph, a
22 couple sentences down.
23 A.      Okay, got it.
24         MR. YARNELL: He's asking whether
25 those are the words that are there.

34 (Pages 130 - 133)

Page 134

1  A.    Yes, that's what it is.
2  Q.    The next sentence says, you continue to
3  state you are not familiar with the City of Reading,
4  therefore you could not complete the assignment.
5  Further, you failed to ask for a map, GPS unit or
6  speak to a supervisor to help serve the subpoenas or
7  find other tasks to complete.
8        My first question, did I read that
9  correctly?
10  A.    Yes, you read that correctly.
11  Q.    Do you agree with that sentence?
12  A.    No.
13  Q.    So you believe -- it's your testimony
14  that you did ask for a map or GPS?
15  A.    Yes, I did.
16  Q.    So you believe that that is inaccurate in
17  this discipline, correct?
18  A.    Yes, it is inaccurate.
19  Q.    Did you ever bring that to anyone's
20  attention, that that is not accurate?
21  A.    I told Mike Gring again. He was the
22  union rep. And I told him, Deputy Gring, I didn't
23  have any map or any GPS because I don't know the
24  outside area of Reading. I know Reading area, well
25  at least in my part of it. If I don't know, I can

Page 135

1  find it easily. But the outside area like Exeter and
2  Shillington, at that time I didn't know anything
3  about it. So it was pointless for me to get out of
4  there without any tools to serve those subpoenas.
5  Q.    So it's your recollection that Mike Gring
6  was present with you during this disciplinary -- when
7  this discipline was given to you?
8  A.    I believe they called him. They called
9  him and then I talked to him. I don't know if it was
10  after or before, but I remember that I talked to him
11  and let him know about this.
12  Q.    Now, if you look at the last page, you
13  signed this last page, correct?
14  A.    Yes.
15  Q.    And you also initialed where it says
16  employee initial if union representation is waived,
17  correct?
18  A.    Um-hum.
19  Q.    Yes?
20  A.    Yes.
21  Q.    So when you received this discipline, you
22  didn't have union representation, correct?
23  A.    Yeah, but I talked to Mike about that
24  because he wasn't able to be there at that time.
25  Q.    Did you ask for another union

Page 136

1  representative to be present?
2  A.    There was no one available.
3  Q.    Did you ask for it to be postponed?
4  A.    And then --
5  Q.    Hang on. Did you ask for it to be
6  postponed?
7  A.    No.
8  Q.    Why not?
9  A.    No, I didn't ask to be postponed because
10  I didn't know that I was supposed to ask that at that
11  time.
12  Q.    On this last page where there is a
13  section that says employee reasons or response, did
14  you indicate that you had actually asked for a radio
15  or a map -- I mean a map or GPS?
16  A.    Yes, I told -- what's the name, Deputy
17  Garipoli if there were any supervisors around, any
18  captain that can provide me with something or let him
19  know what's going on. And he told me there was no
20  sergeant around.
21  Q.    I'm sorry, I'm not following you. This
22  was during the disciplinary hearing?
23  A.    No, no, no. That was before. I'm
24  telling you the facts of this.
25  Q.    I'm not talking about that right now.

Page 137

1  We're at the disciplinary hearing. I'm asking you,
2  on this last page where it says employee reason or
3  response, you could have indicated there that you
4  believed that this was inaccurate, correct, that you
5  had actually asked for a GPS or a map; but you did
6  not indicate, did you?
7  A.    No, I didn't.
8  Q.    Why not?
9  A.    To be honest with you, I don't recall. I
10  don't recall why I did that, why I didn't wrote that
11  down.
12  Q.    And you received a five-day suspension
13  for this, correct?
14  A.    Yes.
15  Q.    And you also didn't indicate that you --
16  that your radio wasn't working, did you?
17  A.    Well, at the time of my disciplinary I
18  didn't say that, but before that and between the
19  times I always turn it back to Sergeant Pacifico and
20  to Chief Damore and let them know my radio is not
21  working, my radio's not working, my radio's not
22  working. I told him like four or five times. And
23  they took the radio, keep it for like two or three
24  days and then give it back to me saying that it was
25  fixed already.

35 (Pages 134 - 137)

1  Q.      But you had an opportunity to put that
2  down in response to the discipline and you didn't,
3  correct?
4  A.      No, I didn't.
5  Q.      And you had an opportunity to indicate
6  that you believe this discipline was being given to
7  you as a result of your race or national origin; and
8  you didn't indicate that to Chief Damore, did you?
9  A.      No.
10  Q.      And you didn't indicate that to Sam
11  Palkowski either, did you?
12  A.      No.
13  Q.      And you didn't tell Sheriff Weaknecht,
14  did you?
15  A.      No, I never had the opportunity to speak
16  with Sheriff Weaknecht.
17  Q.      Did you ask to speak with him?
18  A.      No.
19  Q.      Did you believe that this -- these two
20  incidents, that you should have been disciplined as a
21  result of these two incidents?
22  A.      Yes.
23  Q.      Did you believe a five-day suspension was
24  appropriate?
25  A.      Yes.

1  Q.      I'm looking at the last paragraph here,
2  and it says -- I'm going to ask you to take a look at
3  the last paragraph, on the last page.
4  A.      Um-hum.
5  Q.      You're expected to follow all policies
6  and procedures at the County of Berks in the
7  sheriff's department as well as maintain satisfactory
8  work performance. Any further infractions or future
9  incidents of this nature will result in immediate
10  termination of your employment with the County of
11  Berks. Did I read that accurately?
12  A.      Yes. Yes.
13  Q.      Was it your understanding that any
14  further infractions or future incidents of that
15  nature would result in your immediate termination?
16  A.      Yes.
17  Q.      Let's talk about the May 19th, 2011
18  incident, and that's the incident that occurred in
19  the district attorney's office for which you were
20  terminated. What do you recall from that incident?
21  A.      Basically I was on lunch, and there was a
22  prisoner that need to be taken all the way up to the
23  district attorney's office; and I told -- I knew that
24  I had these two infractions already, so I wanted to
25  like wake up and not do anything wrong. So I

1  volunteered to bring the prisoner to make the sheriff
2  department look good and all that.
3         I went upstairs, I asked one of the
4  employees, one of the female staff, if I could leave
5  him in the conference room. She said no, because
6  there's no law enforcement officers around, there's
7  no detectives around. I said okay, no problem.
8         Since I didn't find anybody, I went
9  inside the conference room. I sit the prisoner in
10  the chair, and then I proceed to make a phone call,
11  say control room, to see who was requesting that
12  prisoner. And they told me it was Detective Ivan
13  Martinez. He's on his way down from the 15th floor
14  right now.
15         And, okay, so he should be here,
16  because I got to go back to my courtroom, my
17  assignment. Yeah, he should be there soon. I was
18  waiting there; and then like roughly like two, three
19  minutes after that, Detective Martinez show up. I
20  told him, is that the prisoner you request? He said,
21  yes, thank you. I shake hands with him, and I went
22  on my way. That's what I recall right now.
23  Q.      Did you at any point in time leave the
24  room, the conference room --
25  A.      No. No.

1  Q.      Let me ask my question, okay?
2  A.      Okay.
3  Q.      At any point in time did you leave the
4  conference room with the prisoner inside of it?
5  A.      No.
6  Q.      Do you know who Wendy Bundens is?
7  A.      No.
8  Q.      Do you know who Bobbi Green is?
9  A.      No.
10  Q.      If I represented that those were the two
11  women who were in the district attorney's office who
12  you spoke with that day, does that refresh your
13  recollection?
14  A.      I remember seeing one of them, not two.
15         MR. YARNELL: Could you say the names
16  again?
17         MR. ADAIR: Wendy Bundens,
18  B-U-N-D-E-N-S.
19         MR. YARNELL: B-U-N --
20         MR. ADAIR: D-E-N-S and Bobbi Green.
21         MR. YARNELL: Thank you.
22         (Brewer Exhibit Number 11 was
23         marked for identification.)
24  BY MR. ADAIR:
25  Q.      Let me know when you have had a chance to

Page 142

1  take a look at it.
2          (Discussion held off the record.)
3  BY MR. ADAIR:
4  Q.      We'll go back on the record.  Have you
5  had a chance to look at this document?
6          MR. YARNELL:  Have you read every
7  word of this?
8  BY MR. ADAIR:
9  Q.      If not, read it, please.  Take your time.
10 Have you had a chance to take a look at it?
11 A.      Yes.
12 Q.      I want to ask you some questions about
13 this termination notice.  I'm going to ask you the
14 accuracy of some stuff.  And I'm not going to ask you
15 just whether you think all this is accurate because I
16 think you believe there are inaccuracies in this
17 report, correct?
18 A.      Yes.
19 Q.      So let's see what parts we can agree on.
20 This says on December -- I'm reading from the first
21 full paragraph there.  On Thursday, May 19th, 2011
22 you escorted a prisoner to the district attorney's
23 office.  When you arrived there you asked the
24 district attorney staff member if you could leave the
25 prisoner with them.  Is that part accurate?

Page 143

1  A.      Yes.
2  Q.      And the staff member told you that you
3  could not leave the prisoner with her.  Is that part
4  accurate?
5  A.      Yes.
6  Q.      So you proceeded to take the prisoner to
7  a conference room and place a phone call to the
8  sheriff's department control room to confirm the
9  drop-off location.  Is that accurate?
10 A.      Yes.
11 Q.      The control room relayed the request was
12 made for the prisoner to meet Detective Martinez in
13 the district attorney's office.  And I believe that's
14 what you testified to earlier, correct?
15 A.      Yes.
16 Q.      While in the conference room, the staff
17 member also verified the prisoner was to see
18 Detective Martinez and Detective Martinez was on the
19 15th floor.  Is that accurate?
20 A.      No.
21 Q.      So she didn't tell you that Detective
22 Martinez was on the 15th floor?
23 A.      I don't recall that, no.
24 Q.      You explained that you could not escort
25 the prisoner to the 15th floor because you were

Page 144

1  needed elsewhere.  You asked again if you could leave
2  the prisoner with the staff member, to which she
3  again declined and informed you that she would
4  contact Detective Martinez.  Is that part accurate?
5  A.      No.  Because --
6  Q.      Explain what's not accurate.
7  A.      Well, I'm the one who called the control
8  room to find out.  I don't know if she did it on her
9  own, I don't know about that.  But I did call the
10 control room, and they told me -- to be specific, it
11 was Deputy Fell.  She told me, I already spoke with
12 Detective Martinez.  He's on his way down from the
13 15th floor.  He's going to meet you down there, on
14 the 5th floor in the direct attorney's office.
15 Q.      It then says, at this time you follow the
16 staff member around the corner and down the hall to
17 the nearest administrative employee's desk, which
18 resulted in you leaving the prisoner unattended, out
19 of your line of sight and several feet away from you
20 for approximately three minutes.  Is that accurate?
21 A.      No.
22 Q.      So you did not follow her --
23 A.      No.
24 Q.      -- down the hall -- hang on.  Let me ask
25 my whole question.  You did not follow her down the

Page 145

1  hall to the administrative employee's desk?
2  A.      Nope.
3  Q.      And so you did not -- at no point in time
4  was the prisoner left out of your sight?
5  A.      Nope.
6  Q.      Prior to this -- prior to this day, this
7  incident, had you ever seen that woman from the
8  district attorney's office that's referenced in this
9  report?
10         MR. YARNELL:  Do you recall the woman?
11         THE WITNESS:  No.
12         MR. YARNELL:  Which?
13         MR. ADAIR:  I'm sorry.
14         MR. YARNELL:  I don't know if he's
15 answering what I said or what you said.
16 BY MR. ADAIR:
17 Q.      I'll ask the question again.  Because,
18 again, I'm not trying to trick you here.  The woman
19 that you talked to on that day in the district
20 attorney's office, prior to May 19th, 2011 had you
21 ever seen her before?
22 A.      Not that I recall.  I don't even remember
23 her face.
24 Q.      Have you seen her since that time?
25 A.      No.

37 (Pages 142 - 145)

Page 146

1 Q.      Do you know whether she would have any
2 reason to lie about you?
3        MR. YARNELL:  You can answer his
4 question but --
5 A.      I don't know.
6 Q.      You don't know if she would have a reason
7 to lie about you?
8 A.      I don't know.
9 Q.      Do you have any suspicions why she might
10 tell a falsehood about you?
11 A.      No.
12        MR. YARNELL:  You can answer the
13 question, but it's pure speculation.
14 A.      I wouldn't know.
15        MR. ADAIR:  It's not speculation if he
16 has a reason that he believes.
17        MR. YARNELL:  He's already testified
18 that he doesn't know the reasoning.
19        Go ahead.
20 BY MR. ADAIR:
21 Q.      You were terminated as a result of this
22 incident, correct?
23 A.      Yes.
24 Q.      And do you believe that discipline for
25 this incident was the result of your race or your

Page 147

1 nationality?
2 A.      Honestly, I don't know how to prove it,
3 but I believe so.
4 Q.      Why do you believe it was done on the
5 basis of your race and nationality?
6 A.      Because Pacifico was involved.
7 Q.      How was Pacifico involved?
8 A.      I have a strong belief that he called her
9 and told her what to say.
10 Q.      And by her you're referring to the woman
11 in the district attorney's office?
12 A.      Yes.
13 Q.      Did you observe him do that?
14 A.      No.
15 Q.      Do you know anyone who observed him do
16 that?
17 A.      No.
18 Q.      Have you ever talked to anyone who has
19 any firsthand knowledge that Pacifico called this
20 woman?
21 A.      No.
22 Q.      Do you know whether Pacifico even knows
23 who she is?
24 A.      I don't know.  I wouldn't know about
25 that.

Page 148

1 Q.      Do you know anyone who -- has anyone ever
2 told you that she and Pacifico know each other?
3 A.      No.
4 Q.      Did Pacifico have -- did you ever -- did
5 Pacifico ever interview you as a result of this
6 incident?
7 A.      No.
8 Q.      Was Pacifico present when you were being
9 interviewed as a result of this incident?
10 A.      No.
11 Q.      Do you have any firsthand knowledge as to
12 whether Pacifico spoke with Chief Damore about this
13 incident?
14 A.      Not that I know of.
15 Q.      Do you know anyone who has firsthand
16 knowledge of whether Pacifico spoke to Chief Damore?
17 A.      No.
18 Q.      Do you know whether Pacifico spoke with
19 Sam Palkowski about this incident?
20 A.      No.
21 Q.      When you were interviewed, you were
22 interviewed by Sam Palkowski and Chief Damore about
23 this incident, correct?
24 A.      Yes.
25 Q.      And did you tell either one of them that

Page 149

1 you believe that this incident was the result of your
2 race or nationality?
3 A.      No.
4 Q.      Why not?
5 A.      If I would have said anything, it was not
6 going to go anywhere anyway because of the reason
7 that I told you before.  He has been into a lot of
8 investigation before and nothing happens, and he got
9 everything under control around there.
10 Q.      I'm sorry, I don't understand.
11 A.      Pacifico has everything under control,
12 and human resources.  He know people and there was no
13 way that he -- at that particular time he was going
14 to get anything -- any complaint go through with him.
15 Q.      Let me stop you for a minute.  Who did
16 Pacifico know in human resources?
17 A.      I don't know.  He just --
18 Q.      Why did you think Pacifico knew anybody
19 in human resources?
20 A.      Well, there's certain things that I don't
21 have the proof of it.  I'm not going to talk about it
22 because I don't have proof.
23 Q.      This is my chance to ask you questions,
24 sir, and I want to know why do you think Pacifico had
25 connections in human resources?

38 (Pages 146 - 149)

Page 150

1 A.      I don't have any --
2          MR. YARNELL: Just tell him what you
3 think.
4 A.      Well, there was a comment that he was
5 dating somebody from human resources.
6 Q.      Who made that comment?
7 A.      There's a few people that make that
8 comment that I heard from that I'm not going to
9 mention any names, but I know for a fact that they
10 were mentioned around -- that's why every time he got
11 any investigation going on, nothing happens to him.
12 Q.     All right. I'm going -- I got to follow
13 up on that. First of all, who did you hear he was
14 dating in human resources?
15 A.     I really don't know because I didn't pay
16 attention to any other people. I just overheard
17 people talking about that.
18 Q.     Who did you overhear? Who said that he
19 was dating someone from human resources?
20 A.     I don't quite recall right now, but I
21 heard a lot of comments on that; and since I don't
22 like gossip or anything like that, always when I
23 heard any comments like that, I just like kind of get
24 away from that.
25 Q.     Here's my problem. You've sued my

Page 151

1 clients. You're making allegations that Pacifico was
2 involved in this. You're telling me that you've
3 heard comments that he's dating someone from human
4 resources. You understand that this is my
5 opportunity to ask you questions, correct?
6 A.      Yes.
7 Q.      And you don't know --
8          MR. YARNELL: I want to tell him
9 something.
10         MR. ADAIR: I'm going to ask him my
11 question, and then you can talk to him, you can tell
12 him after that.
13         MR. YARNELL: Fine.
14 BY MR. ADAIR:
15 Q.      You don't know anyone who made the
16 comment that Pacifico was dating someone in human
17 resources?
18 A.      Specifically I don't remember names or
19 anything like that but I just heard the comments
20 around. I can't tell you specifically who it was,
21 who comment on that.
22         MR. YARNELL: What he has just said is
23 correct. If you know the name of any person, you may
24 not shield them from being questioned. If you have
25 any name of anybody -- if you don't recall it, you

Page 152

1 can say you don't recall it if that's true. But if
2 you recall the name of any person who has -- from
3 whom you heard this or who has said it, whether now
4 or another time, you must tell him.
5 A.      I wish -- I wish I would know some names
6 right now and I recall some names and I could tell
7 you that. But I don't recall any name right now.
8 What I remember the comments all the way around about
9 that.
10 Q.     Okay.
11 A.     That's why he felt like he was
12 untouchable at that particular time.
13 Q.     Did he tell you he felt he was
14 untouchable?
15 A.     He didn't need to say it. The way he
16 walk, his demeanor, the way that he treat people,
17 especially Hispanic people.
18 Q.     You indicated that Vince Pacifico, you
19 believe, was maybe dating somebody in HR. How about
20 Chief Damore, why didn't you tell him that you
21 thought this was the basis for race or nationality?
22 He's not in HR.
23 A.     Well, I don't have any solid proof about
24 that.
25 Q.     About what? Why didn't you tell him?

Page 153

1 A.      No, no, no. About the comments that he
2 was dating somebody in human resources. I don't have
3 proof of that. I'm just telling you -- you're asking
4 me and I'm telling you what I know and what I heard.
5 Q.      I guess -- here's what I don't
6 understand. You're getting fired as a result of
7 something that you're now saying was done because of
8 your race and nationality, and you're interviewed by
9 Chief Damore --
10 A.     Um-hum.
11 Q.     -- and you don't mention race and
12 nationality. Why not?
13 A.     To be honest with you, I don't know. I
14 don't know why I didn't mention that. Maybe I was
15 confused at that time, I didn't know what to say. I
16 was totally -- oh.
17 Q.     Let's turn back to the discipline,
18 document 11; and you had union representation,
19 correct?
20 A.     Yes.
21 Q.     By Kim DeVault?
22 A.     Yes.
23 Q.     Did you tell her that you believed that
24 you -- that this discipline was the basis of your
25 race and nationality?

39 (Pages 150 - 153)

Page 154

1 A.        She didn't defend me. She didn't say
2 anything at all. So I didn't find the confidence to
3 say anything to her. She just sit there and, oh, got
4 to sign right here. I don't -- it was bull. I
5 didn't find the opportunity to say -- I didn't feel
6 confident to say at that time.
7 Q.        Even though you were being terminated?
8 A.        Yes.
9 Q.        Did you feel confident to say it in your
10 own right?
11 A.        Yes.
12 Q.        Then why didn't you say it?
13 A.        Well, I wasn't confident enough, like I
14 told you, I was really confused about all of this at
15 that time. I didn't know what to think. I didn't
16 know what to do.
17        At that particular moment when I was
18 getting fired, I was nervous, I was throwing up.
19 There was a sergeant looking at me like they want to
20 shoot me or something like that, they want to escort
21 me out of the building. I was nervous.
22        The way that I saw him looking at me,
23 I gave him all my magazines and everything, letting
24 him know that I'm not a threat, that I'm not a
25 violent person. I was totally nervous at that time.

Page 155

1 Q.        That's why you didn't mention it?
2 A.        I feel nervous. I was confused and
3 nervous at that time.
4 Q.        Now, do I understand that -- actually,
5 might as well mark this.
6        (Brewer Exhibit Number 12 was
7 marked for identification.)
8 BY MR. ADAIR:
9 Q.        I will represent to you that Exhibit 12
10 is a grievance that your attorney supplied to me. Is
11 that your signature on the lower right-hand corner?
12 A.        Yes.
13 Q.        And do you know whether the union filed a
14 grievance as a result of your termination?
15 A.        I don't recall.
16 Q.        That is your signature, correct?
17 A.        Yes.
18 Q.        Did you ever tell anyone in the union
19 after you were terminated that you believe you were
20 terminated on the basis of your race and nationality?
21 A.        No.
22 Q.        Why not?
23 A.        Like I told you before, I was feeling
24 nervous. I was feeling all -- I couldn't think right
25 at that time. I was -- I wasn't myself at that time.

Page 156

1 Q.        You would agree with me, would you not,
2 that you signed this grievance on June 15, 2011,
3 which was just short of a month after you were
4 terminated, correct?
5 A.        Yes.
6 Q.        But you still didn't mention to them that
7 you believed you were being terminated based on your
8 race and nationality, correct?
9 A.        No.
10 Q.        Is it your understanding that that
11 grievance was ultimately withdrawn by the union?
12 A.        No, I didn't know that.
13 Q.        I guess my question is this, do you know
14 why the grievance was withdrawn?
15 A.        I didn't know. Nobody told me. Nobody
16 communicate anything with me. Not that I recall.
17 Q.        Do you know -- did you know Mike Natole,
18 N-A-T-O-L-E, who is an office manager for the
19 district attorney's office?
20 A.        No, I don't really recall that name.
21 Q.        Did you ever have any contact with the
22 office manager for the district attorney's office?
23 A.        Not that I remember.
24 Q.        Turning back to Exhibit 11, which is the
25 discipline, you were terminated for failure to follow

Page 157

1 general instructions and procedures, correct? If you
2 look at the top. Feel free to read it. I'm not
3 trying to --
4        MR. YARNELL: That's what it says.
5 A.        If that's what it says, that's what they
6 wrote down.
7 Q.        That's what they classified it as?
8 A.        Yes.
9 Q.        Let me rephrase that. That is how they
10 classified it, correct?
11 A.        Yes.
12 Q.        And in fact, the other discipline that
13 you received, none of that was for insubordination,
14 was it?
15 A.        Insubordination, no.
16        MR. YARNELL: You understand?
17 Q.        You were never disciplined for
18 insubordination, were you?
19 A.        No. Disobeyed anybody -- any order?
20 No. Not that I recall, no.
21 Q.        I mean all the discipline we just looked
22 at, none of that was for insubordination?
23 A.        No.
24 Q.        Let me -- what I want to do is I want to
25 go over some of these allegations because you make a

40 (Pages 154 - 157)

Page 158

1  lot of allegations in your complaint and I want to go
2  over what you contend in there so I can understand
3  what you're talking about. So we might as well -- we
4  might as well mark this. This is the complaint.
5        (Brewer Exhibit Number 13 was marked for
6  identification.)
7  BY MR. ADAIR:
8  Q.      I'll have you take a look at that. This
9  is your verified complaint that was filed in the
10 case, correct?
11 A.      Yes.
12 Q.      If you look to the last page -- and
13 although this is your typed signature rather than
14 signed signature, you reviewed the complaint and the
15 information in it was true and correct to the best of
16 your knowledge, correct?
17 A.      Yes.
18 Q.      My first question -- and I'm just going
19 to go through this -- the easiest way for me to do it
20 is just going to paragraphs where I've got questions
21 for you. But in Paragraph 7, you indicate that you
22 filed pro se charges of discrimination with the
23 Pennsylvania Human Relations Commission which alleged
24 that you were the target of discriminatory treatment
25 because of your race and nationality.

Page 159

1            You did file a complaint with the
2  Pennsylvania Human Relations Commission, correct?
3  A.      Yes.
4  Q.      Now, did you actually draft that
5  complaint?
6  A.      With the help of my attorney.
7  Q.      Your attorney helped you draft that
8  complaint?
9        MR. YARNELL: No, you wrote it.
10       THE WITNESS: Which one? The one --
11       MR. YARNELL: The one with the PHRC.
12 You wrote that.
13       THE WITNESS: Okay. Yes, I did.
14 BY MR. ADAIR:
15 Q.      Here, I've got a copy of that. Just let
16 me show you this.
17 A.      Yes, I did that one.
18 Q.      The one with the PHRC, you typed it up?
19 A.      Yes.
20 Q.      And did you receive any help typing that
21 up?
22 A.      A few corrections from my attorney.
23 Q.      Look, trust me, I don't want to ask you
24 anything that you may have had --
25       MR. YARNELL: He doesn't -- you filed

Page 160

1  the complaint with the Pennsylvania Human Relations
2  Commission. I didn't do anything with that one. The
3  one I did was this one.
4        THE WITNESS: Okay.
5        MR. YARNELL: It is true that with
6  regard to this one, it was modeled after what was
7  said there.
8        MR. ADAIR: That's fine. I don't want
9  to get into anything there.
10 BY MR. ADAIR:
11 Q.      I'm just trying to find out, did you have
12 a lawyer when you filed your complaint with the
13 Pennsylvania Human Relations Commission?
14       MR. YARNELL: No.
15 A.      No. No.
16 Q.      Did anyone help you put together that
17 complaint? Would you like to see a copy of it to
18 refresh your recollection?
19 A.      Yeah, let me see it.
20       MR. YARNELL: Can I say something for
21 a second?
22       MR. ADAIR: Sure.
23       MR. YARNELL: I saw the Human
24 Relations Commission complaint when you filed it. I
25 understood you to have filed it on your own. I

Page 161

1  didn't ask you whether somebody helped you put it
2  together. But as far as I knew, you did it on your
3  own. That's all I'm saying. He's asking you whether
4  there was something else going on.
5        MR. ADAIR: I'm just asking whether he
6  had help; and if so, I'm going to ask him who helped
7  him. And if it's a lawyer, I don't want to know what
8  was said, I just want to know if a lawyer helped him.
9  That's all I'm asking.
10 A.      No, I didn't get any help on the first
11 one. Not on the first one.
12 Q.      Okay. That's really all I'm going to.
13 Did you get any help from Isaac Santiago putting that
14 together?
15 A.      Over the phone.
16 Q.      Over the phone he helped you put that --
17 A.      Not like he want to tell me what to write
18 or anything like that. He just tell me to --
19 things -- you know, like what's the name -- he just
20 told me like basically how to organize it and how to
21 be more legible for anyone who can read it and all
22 that. That's all.
23 Q.      Other than Isaac, did anybody else help
24 you?
25 A.      No, not that I recall.

41 (Pages 158 - 161)

1 Q.     Okay.
2        MR. YARNELL: Can I ask a question off
3 the record?
4        (Discussion held off the record.)
5 BY MR. ADAIR:
6 Q.     We will move along here. Let me come
7 down to Paragraph 18. And Paragraph 18 states,
8 Defendant Sergeant Pacifico has historically targeted
9 Hispanic non-Caucasian individuals. Individuals,
10 including Plaintiff, complain verbally about
11 discrimination to the Berks County Sheriff or the
12 Berks County Department of Human Resources.
13       Now, I want to ask you about, first of
14 all, did you complain about discrimination?
15 A.     No.
16 Q.     You didn't complain to either the sheriff
17 or to the department of human resources?
18 A.     No.
19 Q.     Do you know anybody who complained
20 verbally about discrimination to the Berks County
21 Sheriff or the Berks County Department of Human
22 Resources?
23 A.     I believe Santiago did. I have a strong
24 belief that Doris Natal did, not for sure, but I
25 think that they did, because I was brought up to

1 human resources to be questioned about the subject on
2 two times actually, an investigation going on with
3 Pacifico, about how he treat people and how he's
4 treating other individuals. I was brought up to and
5 I told him, yes, he is not treating us right. And I
6 tell the truth what was happening at that time.
7 Q.     Okay. Let me do some follow-up, and this
8 is probably going to take us a couple minutes here.
9 You were talking about you were brought up to human
10 resources twice about Pacifico. To your memory, both
11 of those times were you brought up specifically to
12 discuss Pacifico or was it part of a larger
13 investigation or a different investigation?
14 A.     As far as I know, it was for Pacifico.
15 Q.     Okay.
16 A.     Because they ask me specifically about
17 Pacifico. They didn't ask me about any other
18 supervisor around.
19 Q.     Okay. Let's talk about both of those
20 times. When was the first time you were brought up?
21 A.     Don't have any specific date.
22 Q.     Was it close to the time that you were
23 terminated or was it long before that?
24 A.     Before that. Before. Yeah, two times
25 was like -- I don't know. I don't remember. It

1 wasn't that far from that time.
2 Q.     Both times were close to the time you
3 were terminated or --
4 A.     Actually the first time that I was
5 brought up to human resources, that's when everything
6 started happening, like getting written up the first
7 time for the coffee incident in Courtroom 3. When --
8 like I told you before, I never heard anybody being
9 written up for that. And I was written up for that.
10 Q.     Let's talk about this first time that you
11 go up. So this was -- this was before the coffee
12 incident -- before the first coffee incident?
13 A.     The first time, yeah.
14 Q.     And who did you talk to in human
15 resources?
16 A.     Don't remember.
17 Q.     Was it a man or a woman?
18 A.     It was a female.
19 Q.     And what did she look like?
20 A.     I don't recall right now. I don't
21 recall. Since I have this depression and all this,
22 I've been kind of forgetting little details like
23 that. I didn't do it before but since I have that
24 depression and anxiety problems, I have been like not
25 remembering things the right way. I mean like faces

1 and names and all that.
2 Q.     How about, do you recall if she was tall
3 or short? Do you remember anything?
4 A.     All I remember was that she was sitting
5 like the same distance that we are right now.
6 Q.     Which is about 4'?
7 A.     Probably.
8 Q.     Did you go to an office or did you go to
9 a conference room?
10 A.     That was an office.
11 Q.     And do you recall where in human
12 resources that office was as you come in the door?
13 Was it straight or was it to the right?
14 A.     I don't recall at this time. All I
15 remember was that I was brought up to an office.
16 That's what I think it was.
17 Q.     And what did she ask you?
18 A.     All I remember -- she asked me a couple
19 questions. One of the questions that I remember was
20 how Pacifico treated me. And I told them that he
21 treated me like a little kid; and if I'm not
22 mistaken -- don't take this as granted, but I believe
23 I told her that he treated me that way because he
24 didn't like the way -- he didn't like my accent or
25 something like that. I don't recall but I remember

Page 166

1 that I mentioned something like that. And that he
2 treated me like a little kid, which I didn't like it.
3        MR. YARNELL: I need to use the
4 bathroom.
5        (A brief recess was taken.)
6 BY MR. ADAIR:
7 Q.      We were just -- we were talking about you
8 going up to HR, and you believe that you were brought
9 up there twice. And the first time we were talking
10 about, you believe it was before any of the
11 discipline started, correct?
12 A.      Yes.
13 Q.      And you testified that you thought that
14 he was treating you like a little kid. Did they talk
15 to you about anyone other than Pacifico?
16 A.      No.
17 Q.      Did they tell you why they wanted to talk
18 to you about Pacifico?
19 A.      No, they just asked me how Pacifico
20 treated me in particular; and I told them that he
21 treated me like a little kid, that I didn't like it,
22 the way that he treated me and disrespected me. But
23 that's basically what I recall. And I told them that
24 probably he didn't like me because of my accent.
25 That's what I told them. That's basically what I

Page 167

1 remember about, but they asked me different -- more
2 questions. They asked me more questions, but I don't
3 recall right now.
4 Q.      Now, a minute ago you said you're not
5 sure whether or not you mentioned anything about your
6 accent. As we sit here today, do you recall whether
7 you mentioned your accent during this meeting?
8 A.      I believe I did. I have a strong belief
9 that I did.
10 Q.      Okay.
11 A.      And that he treat me like a little kid.
12 Q.      That part I got.
13 A.      And disrespect me, yeah.
14 Q.      That part I got.
15        MR. YARNELL: And I heard the
16 reference to the accent last time also, but go ahead.
17        MR. ADAIR: He did, but he also -- he
18 first time he said he can't swear to this but he
19 thinks that he might have said something about the
20 accent.
21 BY MR. ADAIR:
22 Q.      But now it's a strong belief, is that
23 correct?
24 A.      That's actually what I recall. They
25 asked me many more questions that I can't talk about

Page 168

1 it right now because I don't exactly recall.
2 Q.      Let's talk about the second time you went
3 up there.
4 A.      The second time. The second time. I'm
5 trying to think about what happened the second time.
6 Q.      Well, let me ask you this. Who did you
7 meet with the second time you came up there?
8 A.      I believe it was the same person.
9 Q.      Was it a woman again?
10 A.      Yeah, a female.
11 Q.      Do you recall what she looks like?
12 A.      I don't recall. I don't recall how she
13 looks like.
14 Q.      Did you meet -- did you go to the same
15 office?
16 A.      I don't think so. I don't recall if I
17 went to the same office or not.
18 Q.      What do you recall about where you were?
19 A.      I know that I was brought up to the --
20 for the second time upstairs. And right now that I'm
21 thinking very hard, the only thing that I remember
22 was, can you tell Doris Natal to come up. And then I
23 went and told Doris Natal to go upstairs or something
24 and she meet up there. She tell me, I'm going to go
25 later on because I'm handling the control room and I

Page 169

1 don't have any time right now. That I remember.
2 Q.      Did you recall what she talked to you
3 about the second time you went to HR?
4 A.      No.
5 Q.      It was Pacifico or was it something else?
6 A.      The two times it was about Pacifico.
7 Q.      That's all? They didn't mention anybody
8 else?
9 A.      They didn't mention anybody else. The
10 thing is right now I'm concentrating on what really
11 happens because I don't want to guess or I don't want
12 to tell you something that didn't really happen.
13 Q.      I'm asking for your memory. And I
14 understand --
15 A.      Right now the only thing that I remember
16 was the first time that I was brought up, the
17 first -- actually the first two questions that it was
18 that I already told you about; and then the second
19 time I don't remember anything at all.
20 Q.      When did the second time happen? Was
21 that closer to your termination?
22 A.      It was a few months before my
23 termination.
24 Q.      I'm going to mark this exhibit as 14.
25        (Brewer Exhibit Number 14 was

43 (Pages 166 - 169)

1 marked for identification.)
2 BY MR. ADAIR:
3 Q.     Are you certain you were brought up twice
4 and maybe not only one time? Before you look at
5 that. My question is are you certain you were
6 brought up to HR twice to talk about Pacifico and
7 maybe you were not only brought up one time?
8 A.     That could be the case because after the
9 second time I don't recall anything.
10 Q.     Okay.
11 A.     That could be the case.
12 Q.     And I'll just tell you that I don't
13 know -- I have seen no records, no one has told me
14 they talked to you twice, okay. So that's why I'm
15 asking.
16         I've got here -- and you can take a
17 look at this. These are -- this document which has
18 been marked as Brewer 14, I will represent to you
19 that these are notes that were taken by Sam Palkowski
20 as part of an interview, and it was not an interview
21 into Pacifico. It was an interview into things that
22 were going on in the sheriff's department in general.
23         And it was actually -- came down as a
24 result of Isaac -- no, I'm sorry, Jose Davila
25 complaining about Captain Berrios. If you take a

1 look at this, this was her notes from an interview
2 with you; and in there, Ms. Palkowski indicated that
3 she want -- that you wanted to speak to her
4 specifically about Pacifico. Is that consistent with
5 what you were saying earlier, you talked to her about
6 Pacifico?
7 A.     I told you that I was -- that was my
8 recall.
9 Q.     And is it possible -- do you think --
10 does this refresh your recollection as to maybe
11 whether she was asking you about other incidents and
12 you wanted to talk about Pacifico?
13 A.     If that's what it is, that's what it is.
14 But I --
15         MR. YARNELL: That's not what he's
16 asking you. I'm sorry to interrupt you. But you
17 can't just agree with him and say if that's what it
18 is, that's what it is because it's written. He's
19 asking you to tell the truth and telling what you
20 actually know. If you don't actually know, the
21 answer is I don't know, not I agree with you because
22 you want me to.
23 A.     I was brought up to talk about -- and
24 then I tell them about Pacifico.
25 Q.     So now after reviewing this, your

1 recollection is refreshed or is that -- does not
2 refresh your recollection? I'm not trying to put
3 words in your mouth. I'm just asking you what you
4 know or you don't know.
5         MR. YARNELL: Do you mind if I ask him
6 a direct question?
7         MR. ADAIR: No.
8         MR. YARNELL: He's asking you, were
9 you asked to come to human resources to speak about
10 Pacifico and were you then questioned about Pacifico.
11 That's all he's asking you. And if you're not sure,
12 that's fine. But if the answer is yes, that's fine;
13 if the answer is no, that is fine. It simply has to
14 be the truth.
15 A.     I don't remember right now since they
16 call me specifically to talk about Pacifico, but I
17 know that when I went upstairs I talk about Pacifico.
18 Q.     And that's consistent. That's fine.
19 Now, if you look at this -- and I'll represent, if
20 you look at the last page, right there towards the
21 top Ms. Palkowski wrote, he treats me like a little
22 kid. That's consistent with what you were saying
23 earlier about Pacifico, correct?
24 A.     Yes.
25 Q.     Have you read this page?

1 A.     No.
2 Q.     Read this whole page. I don't want to
3 start questioning you about something. Just go ahead
4 and read it.
5 A.     This is not legible for me.
6 Q.     It's difficult, I understand that. Read
7 as much as you can.
8         I'll tell you right now what my
9 question will be is whether this refreshes your
10 recollection of your meeting in HR.
11         MR. YARNELL: Do you know what that
12 means, what he just said to you?
13         THE WITNESS: No, I really don't
14 understand.
15         MR. YARNELL: May I make it swifter?
16         MR. ADAIR: Absolutely.
17         MR. YARNELL: He wants to know -- and
18 if the answer is no, then your answer to him is no,
19 because it is simply you must tell the truth. All
20 right.
21         He's saying after you read this -- not
22 that what this says is true or that it's accurate or
23 anything else. All this is saying is, reading this,
24 does this make your memory clearer. If it doesn't,
25 it doesn't.

44 (Pages 170 - 173)

Page 174

1    THE WITNESS:  No, it doesn't because
2 it's not legible. For me, I don't clearly understand
3 what -- I can understand a few words but not
4 everything.
5    MR. YARNELL:  Well, that's fine. And
6 if he wants to ask you more, that's up to him.
7 BY MR. ADAIR:
8 Q.    If this does not help you remember
9 anything, then no, I don't have any other questions
10 about your meeting. And then we can move on.
11    MR. YARNELL:  I would be more than
12 happy to be of assistance at any time.
13    MR. ADAIR:  Thank you.
14 BY MR. ADAIR:
15 Q.    We were talking about people who
16 complained about discrimination with respect to
17 Pacifico. We're off that.
18    MR. YARNELL:  Before we talked about
19 this, again I'm going to act as a translator to some
20 extent. And I don't mean that in a demeaning way.
21 We've been here a long time and you're not a
22 professional deponent.
23 BY MR. ADAIR:
24 Q.    I was looking at -- go back to -- this is
25 the complaint, Exhibit 13, Paragraph 18. And I had

Page 175

1 asked you which individuals complained verbally about
2 discrimination. And I'm asking you specifically --
3 and I'll ask you now -- who complained about
4 discrimination to your knowledge by Pacifico as the
5 basis of race or national origin?
6    MR. YARNELL:  I think he already
7 testified that it was Santiago and Doris Natal, is
8 what he said before.
9 BY MR. ADAIR:
10 Q.    Okay. Is there anyone else? Are those
11 the only two people that you're aware of complained?
12 A.    As far as I remember, those two; but
13 there's definitely more complained than that.
14 Q.    I only want to know people who complained
15 about race or national origin.
16 A.    I'm talking about that's the only two
17 that I know for a fact, but there's more than that
18 that I'm not sure of.
19 Q.    Okay. Let me ask you then, what is your
20 knowledge about Santiago complaining about Pacifico?
21 Who did Santiago complain to that Pacifico
22 discriminates on the basis of race or national
23 origin?
24 A.    As far as I know, he made a complaint to
25 human resources and then he make another complaint to

Page 176

1 the state, I believe.
2    MR. YARNELL:  Human Relations
3 Commission?
4 A.    Human Relations Commission, he made
5 another complaint.
6 Q.    Do you know who he complained to at human
7 resources?
8 A.    No.
9 Q.    Do you know when he complained about
10 that?
11 A.    No.
12 Q.    Do you know what the basis of that
13 complaint was to human resources?
14    MR. YARNELL:  Do you understand what
15 he means?
16    THE WITNESS:  Yes. The basis that --
17 I wouldn't know about the complaint that he make in
18 human resources.
19    MR. YARNELL:  May I -- again, I'm
20 sorry. I'm doing this to make it clearer I hope. If
21 you object, that's fine.
22    He is not asking you to have a perfect
23 understanding of every word that Isaac Santiago said.
24 He is asking you, did Isaac Santiago complain about
25 discrimination on the basis of nationality or race or

Page 177

1 anything else?
2    THE WITNESS:  I have a firm belief --
3    MR. ADAIR:  No, that isn't my
4 question.
5    MR. YARNELL:  Then I retract it.
6    MR. ADAIR:  It's close.
7    MR. YARNELL:  Not bad.
8 BY MR. ADAIR:
9 Q.    My question is very easy. What was the
10 basis, why was he complaining about race or national
11 origin, Pacifico?  What did Pacifico do that spurred
12 his complaint?
13 A.    Well, the difference of treatment that he
14 got between the Hispanics and other races and the
15 white -- and the white deputies.
16 Q.    How was Santiago treated differently than
17 white deputies?
18 A.    He was asked by Pacifico -- as far as I
19 know he was asked by Pacifico to take a whole truck
20 load of prisoners from the courtroom to the
21 jailhouse, to the county jail by himself, which you
22 are not supposed to do that. You are supposed to go
23 at least two deputies into a truck. And he ask him
24 to go by himself. But I don't know the details of
25 it.

45 (Pages 174 - 177)

Page 178

1  Q.      Did you know about this while you were
2  still working for Berks County?
3  A.      Yes, because that happened before I was
4  fired.  I overheard but I didn't get into details.
5  Q.      And as a result of hearing about that,
6  did that have any impact on you?
7  A.      Yes.
8  Q.      What impact did it have on you?
9  A.      Well, I'm not the only one being
10  discriminated by Pacifico or harassed.
11  Q.      Did it impact your ability to do your job
12  as a sheriff about -- from hearing Santiago saying
13  that story?
14  A.      Yes, and the way that I saw him treating
15  Doris Natal, the way that I see him treating -- the
16  way I see Pacifico treat Maddie Gregory, which she is
17  Hispanic also.
18  Q.      We're going to talk about that.  We're
19  going to talk about that.
20  A.      And then --
21  Q.      But I'm talking -- hang on, because
22  you're getting so far afield of my questions.  You
23  have to listen to what I'm saying.  You're answering
24  what you want to answer.  And I'm just asking you --
25          MR. YARNELL:  Objection.  I don't

Page 179

1  think that's fair either.
2          MR. ADAIR:  You know what, let me ask
3  my question so we can move forward.
4          MR. YARNELL:  We are moving forward.
5  The fact is that if you preface a question by saying
6  this -- and I'm not being a jerk, but if you simply
7  say I want to ask you about each of the individuals
8  in Paragraph 27 where the names are named, and ask
9  it.
10          MR. ADAIR:  We're going to --
11          MR. YARNELL:  I know you're going to
12  do that.  But as Isaac Santiago, you can do it in
13  advance of 27.  And just say only as to Isaac
14  Santiago.
15          MR. ADAIR:  I'm sorry, and I
16  apologize, Steve, but I think these questions are not
17  particularly complex.  I think that most -- with the
18  exception of some that I have not phrased well, I
19  think they're pretty straightforward and I'm
20  frustrated that I'm not getting straight answers.
21          THE WITNESS:  You're not getting
22  straight answers?
23          MR. ADAIR:  To some of it, no.
24          MR. YARNELL:  Let me suggest to you --
25  can we go off the record?

Page 180

1          MR. ADAIR:  Yeah.
2          (Discussion held off the record.)
3  BY MR. ADAIR:
4  Q.      We will talk about Isaac Santiago, Doris
5  Natal.  You believe that both of them complained
6  about race and/or national discrimination to the
7  county or HR, correct?
8  A.      Yes, I have a strong belief.
9  Q.      You testified that you believe there were
10  others also?
11  A.      Yes.
12  Q.      Which others?
13  A.      I'm not sure if they did a formal
14  complaint or not.
15          MR. YARNELL:  He didn't ask a formal
16  complaint.  All he asked was if others did.  Just
17  name them.
18  Q.      Correct.
19  A.      I'm not sure.
20  Q.      Okay.  That's fine.
21  A.      I'm not sure.
22  Q.      That's fine.  Now, I'm going to go to the
23  next paragraph, 19.  You say Sergeant Pacifico was
24  unable to keep his emotions in check when presented
25  with a stressful situation without abusing his

Page 181

1  authority as a sergeant.  What do you mean by that?
2  A.      I wouldn't know of his lack of
3  experience.  I don't know what it was but --
4          MR. YARNELL:  He's just asking you to
5  describe it, not to explain it.
6          MR. ADAIR:  Actually I did ask him to
7  explain it because I don't understand what he means
8  by it.
9          MR. YARNELL:  In that case I'll shut
10  up.
11  A.      In the way he conduct himself when there
12  is any situation, when he got to talk to anybody,
13  especially if it's a Latino person --
14          (Phone ringing.)
15          MR. ADAIR:  Let's stop for one second.
16          (Discussion held off the record.)
17  BY MR. ADAIR:
18  Q.      Let me ask you a fresh question.  We were
19  talking about Paragraph 19.  Can you give me an
20  example of Pacifico being unable to keep his emotions
21  in check when presented with a stressful situation
22  without abusing his authority as a sergeant?
23  A.      Well, actually one example was he scream
24  at Doris Natal right in front of me in the control
25  room when she was running everything smoothly.

46 (Pages 178 - 181)

Page 182

1 Everything was fine and everything and he just came
2 over and he scream at her. I have a firm belief that
3 he didn't have any reason to do that.
4 Q.       What was the stressful situation that was
5 going on?
6 A.       None.
7 Q.       Okay.
8 A.       Stressful maybe for him.
9 Q.       Okay. Let's go to Paragraph -- same
10 page, 21-A, you say that Pacifico on more than three
11 occasions said to Plaintiff, take your hat off. Then
12 Pacifico would say, oh, never mind, that's your hair.
13 A.       Yes.
14 Q.       Plaintiff understood this to be
15 discriminatory remark directed at him because of his
16 race. First of all, how many times did Pacifico say
17 that to you?
18 A.       An average like three times.
19 Q.       He said it to you three times?
20 A.       Yes.
21 Q.       And were there other people present when
22 that was said?
23        MR. YARNELL: At any of the times or
24 all of the times?
25        MR. ADAIR: Any of the times.

Page 183

1 A.       Yes, there were people present. I'm
2 thinking about their names. That would be Joe
3 Garipoli; and I know that there was more people there
4 but I don't remember who they were at this particular
5 moment, but there were more people there.
6 Q.       And why did you believe that was a
7 discriminatory remark made to you because of your
8 race?
9 A.       Because if he used to make any jokes or
10 joke around, especially -- let me take you as an
11 example. If I don't joke around with you, why do you
12 got to joke around with me?
13 Q.       So you had not made any jokes prior to
14 that?
15 A.       No.
16        MR. YARNELL: He had not made any
17 jokes?
18        MR. ADAIR: Correct.
19 A.       Me make any jokes with Pacifico? No.
20 Q.       With anybody at that time -- at any of
21 those three times, were you joking around at those
22 three times when he said this?
23 A.       No.
24 Q.       Did you ever make fun of your own
25 nationality or race?

Page 184

1 A.       I may joke around with friends, with the
2 people that I consider a little bit more than
3 coworkers, which is not with everybody, with the same
4 case with everybody. When I joke around, why not?
5 Q.       And that's fine. Did you ever make, you
6 know, jokes about your Hispanic background or
7 anything like that?
8 A.       Yes.
9 Q.       And did you ever make any of those jokes
10 during roll call?
11 A.       I don't think so, not in roll call.
12 Maybe after.
13 Q.       Did you ever make any of those jokes when
14 Pacifico may have been in the area?
15 A.       Probably, but not with him.
16 Q.       So they weren't directed to him but he
17 may have been in the area?
18 A.       Yeah, but my understanding is that if I
19 don't joke around with you, why you got to joke
20 around with me. I haven't given you that confidence.
21 Q.       Okay.
22        MR. YARNELL: It's like the Jews. You
23 can call them names because they call each other
24 names. It's fine. It's not a problem.
25 BY MR. ADAIR:

Page 185

1 Q.       What kind of jokes did you make about
2 your Hispanic --
3 A.       A whole bunch.
4 Q.       Did you ever make any about your accent?
5 A.       Probably.
6 Q.       Okay.
7        MR. YARNELL: Can I -- he asked you at
8 the beginning not to speculate. Don't guess.
9 A.       Well, yes because I joke around, like I
10 mention before, with the people that I consider
11 friends or a little bit more than coworkers. But I
12 never joke with Pacifico. And then there's certain
13 people there that I don't joke around with.
14        And my understanding is if I don't --
15 like I say to you before, if I don't joke around with
16 you, why you got to joke around with me.
17 Q.       Sure.
18 A.       I may say good morning to you, I may
19 greet you and be professional with you, but if we
20 don't have that type of relationship, why you got to
21 try to joke around with me?
22 Q.       But you did make some of those jokes when
23 he was in the area. They just weren't directed to
24 him, correct?
25 A.       No. Yes. I'm sorry, yes. I make the

47 (Pages 182 - 185)

Page 186

1 jokes but it wasn't directed to Pacifico.
2 Q.      Okay.  Let's go on to the next
3 question -- or next paragraph, B.  Pacifico
4 repeatedly criticized and became angry at Plaintiff
5 because he exchanged words in Italian with
6 Italian-speaking deputies or in French or in Spanish.
7 Pacifico repeatedly -- said repeatedly to Plaintiff,
8 how many fucking languages do you know?  This caused
9 Plaintiff to reasonably believe he was discriminated
10 against because of his nationality as a
11 Spanish-speaking person.
12         Do you speak Italian or do you just
13 know some words in Italian?
14 A.      I know some words.  I can basically go
15 by.
16 Q.      How about French?  Do you know French?
17 A.      The same.
18 Q.      And Spanish?
19 A.      That's my primary language.
20 Q.      So Pacifico said to you, how many fucking
21 languages do you know?
22 A.      Yes.
23 Q.      And how many times did he say that to
24 you?
25 A.      A couple of times.

Page 187

1 Q.      Okay.  And he became angry at you because
2 you were using Italian words or you were using French
3 words?
4 A.      The demeanor that he show up at that time
5 when he got his facial expression and his redness
6 showed me that he was mad about it, he was angry
7 about something and I don't know why.  Because I
8 exchange a few words with Italian descendent deputies
9 and he got mad about it.  He made that comment, how
10 many fucking language do you know.
11 Q.      And you believe he said that to you
12 because you're -- your nationality as a
13 Spanish-speaking person?
14 A.      Yes.  Yes, because he didn't say anything
15 to the Italian descendent deputies.  He just said it
16 to me.
17 Q.      And they were speaking Italian?
18 A.      Yeah.  Well, we were -- not speaking, but
19 exchanging words and trying to learn from each other.
20 Q.      Did you ever hear him saying anything
21 like that to any of the Italian-speaking deputies
22 when they were speaking Spanish?
23 A.      No.  No.
24 Q.      Is it possible he may have done that but
25 you didn't hear it?

Page 188

1 A.      No.
2 Q.      Let's go to the next one.  On an occasion
3 Plaintiff went to Pacifico's office and saw a list of
4 employees on the wall.  The only black Hispanic
5 employees on the list were he and Isaac Santiago.
6 They were the only two marked in red, while all the
7 others were in black.  Plaintiff asked Pacifico if
8 they were the only two that Pacifico wanted to fire
9 and he responded, don't take it like that.
10         When did that incident occur?
11 A.      That was before I got fired and I went to
12 take some paperwork over to him and I saw my name and
13 Santiago's name with red marker.  And I ask him, is
14 that your next victim or something like that, I said.
15 Or is that the people you want to get fired? Oh,
16 don't take it like it.  That's what he say.
17 Q.      And did you ask him why those names were
18 on the wall?
19 A.      No.
20 Q.      Do you know why those names were on the
21 wall?
22 A.      Well, Santiago had a complaint at that
23 time, and me, I think -- I believe that I was -- that
24 I had a target on my back marked by him.
25 Q.      You believe that that was a list -- he

Page 189

1 had a list -- who were the other names that were up
2 there?
3 A.      There were other names but in black ink.
4 Q.      How many other names were up there?
5 A.      I don't know, like four or five other
6 names.
7 Q.      And your two were in red?
8 A.      Mine and Santiago's was in red.
9 Q.      So did you believe that that was his list
10 of who he wanted to fire?
11 A.      I have a strong belief, yes.
12 Q.      And he told you not to take it that way?
13 A.      Yes.
14 Q.      Did you ask him why those names were up
15 there?
16 A.      No, I didn't ask him.
17 Q.      Why not?
18 A.      Because I didn't want to get into an
19 argument or make something big out of that.  Honestly
20 at that time I was getting mad and nervous at the
21 same time.
22 Q.      Was this shortly before you were fired?
23 A.      I could say that, very few months before
24 I got fired.
25 Q.      Was that at a time that you had a CDL

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 190

1 license? Did you ever have a CDL?
2        MR. YARNELL: He testified he never
3 did.
4 A.       No, I never did because I was assigned to
5 juvenile court; and then when I was removed from
6 there, then I started up my process, which I think it
7 was two taken and I pass one and I fail one. And
8 then I was getting ready to take the other one right
9 at the time that I was terminated.
10 Q.      Do you know whether Isaac Santiago had a
11 CDL?
12 A.      Not that I know of.
13 Q.      He did not have one to your knowledge?
14 A.      I don't know.
15 Q.      You don't know?
16 A.      I don't know whether he has it or not.
17 Q.      Okay. Did you tell anybody about that
18 list that you saw on the wall?
19 A.      Not that I remember right now.
20 Q.      Next one is Plaintiff was aware that Jose
21 Davila, another black Hispanic deputy, was referred
22 to by Pacifico as a Puerto Rican cockroach and that
23 Pacifico said he would crush him.
24        Did you witness that incident?
25 A.      No. I heard a lot of people saying that

Page 191

1 comment, that he say that. He emailed that comment
2 to somebody and that person -- you know how rumors
3 start and all that. But I don't specifically know
4 how it happened, but that's the comments that I
5 heard.
6 Q.      Who did you hear it from?
7 A.      I don't quite recall because it was
8 something about -- something after roll call that
9 they were commenting about.
10 Q.      Did Jose Davila tell you that Pacifico
11 called him a Puerto Rican cockroach?
12 A.      No. I never talked to Jose about that.
13 Q.      It was other people that you heard it
14 from?
15 A.      Yeah. Actually it was a sergeant
16 assigned to warrant division. So I didn't get the
17 chance to talk to him about that.
18 Q.      How many times did Pacifico call Jose
19 Davila a Puerto Rican cockroach to your knowledge?
20 A.      Just that time, and in the email that he
21 allegedly sent he said that he will crush him.
22 Q.      The next one, E, Pacifico wrote up
23 Plaintiff allegedly for getting a cup of coffee and
24 in doing so he criticized Plaintiff's accent?
25 A.      Yes.

Page 192

1 Q.      Which cup of coffee incident is that
2 referring to?
3 A.      The first one.
4 Q.      And he criticized your accent?
5 A.      When he wrote me up, which I don't know
6 why you don't have it right there, he said that I --
7 he wrote it down that I needed it, it, it.
8 Q.      I'm sorry, I didn't understand what you
9 just said.
10 A.      Can I write it down?
11 Q.      Yeah. Certainly.
12        MR. YARNELL: That's his accent.
13 BY MR. ADAIR:
14 Q.      I apologize. You can write it down. I
15 just didn't understand what you said.
16        MR. YARNELL: I'm making a joke.
17 A.      That was how he was supposed to write it,
18 that I said I needed it, I needed it, I needed it. I
19 need it.
20 Q.      I needed it?
21 A.      Uh-huh. And then he wrote it down like
22 that. He added up -- in his writing, he added up
23 like three of this, of this it, like I say it like
24 that.
25 Q.      So he wrote, I needed it, it, it?

Page 193

1 A.      Yes.
2 Q.      And this was in writing?
3 A.      Yes, in his writing.
4 Q.      In handwriting?
5 A.      No, no, no, on his -- when he write me
6 up, when he wrote me up, that's the way he wrote it
7 down.
8 Q.      Okay. I'm going to have this marked as
9 Brewer 15.
10        (Brewer Exhibit Number 15 was
11 marked for identification.)
12 BY MR. ADAIR:
13 Q.      Why did you believe that Pacifico putting
14 three its -- I needed it, it it -- was making fun of
15 your accent?
16 A.      I believe it was two -- I'm not sure if
17 it was three, but it was two or three times that he
18 wrote it like that. Well, he didn't have to do that
19 remarks when he was writing me up. He didn't have to
20 specifically wrote it like that because I was
21 admitting and taking responsibility of what I did.
22 He didn't need to go that specific. And he did. He
23 went overboard.
24 Q.      He didn't need to put down what you said
25 to him, why you needed the coffee?

49 (Pages 190 - 193)

Page 194

1 A.      No, he didn't have to write it the way
2 that he wrote it.
3 Q.      I needed it, it, it?
4 A.      Yes.
5 Q.      Did you say to him I needed it, it, it?
6 A.      No, I said I needed a cup of coffee.
7 Q.      I'm trying to understand why you
8 interpreted that as making fun of your accent. And I
9 apologize, I really just don't understand why that --
10 why you interpreted that as making fun of your
11 accent.
12 A.      Well, because he didn't have to write it
13 that way. He understood what I told him. I know I
14 have an accent and I hope I'm not offending anybody
15 with it. But I know that you can understand clearly
16 what I'm telling you right now.
17 Q.      I do.
18 A.      So he understood at that time what I told
19 him. He didn't even have to do that remarks on his
20 writing.
21 Q.      So you didn't think it was a typo on his
22 part, you thought it was an intentional --
23 A.      That was an intentional.
24 Q.      Did he mention anything about writing it
25 that way intentionally to you?

Page 195

1 A.      No.
2 Q.      Pacifico routinely investigated black
3 Hispanic deputies. First of all, who do you consider
4 to be black Hispanic deputies?
5 A.      Hispanic is not a race. We all mixed.
6 And by the way, nobody is pure white or pure black.
7 Everybody is mixed. But Hispanic are the -- you
8 know, the descendent of people from Puerto Rico,
9 Dominican Republic in my case, from black communities
10 or from any country from Latin America. That could
11 be from Mexico all the way down to Argentina.
12 Q.      Let me -- just to kind of get to what I'm
13 asking, do you have a distinction between black
14 Hispanic deputies and Hispanic deputies?
15      MR. YARNELL: I suggest you use the
16 term white Hispanic might be more applicable.
17 BY MR. ADAIR:
18 Q.      Are you drawing a distinction or are
19 there -- is there a distinction between black
20 Hispanic deputies and white Hispanic deputies or
21 other Hispanic deputies?
22 A.      No. No. No. I just want to make it
23 specific that Hispanic people, we all mix.
24 Q.      I understand that. I understand that
25 very well. I'm trying to figure out why you are

Page 196

1 using the term black Hispanic rather than just saying
2 Hispanic.
3      MR. YARNELL: For the record, people
4 from Spain are Hispanic. They are Caucasian. They
5 are white in their skin color. They are white
6 Hispanics. There is a distinction.
7      MR. ADAIR: I'm asking why he was
8 using it.
9 A.      Because like I told you before, we are
10 mix in Latin America.
11 Q.      So you're referring to Hispanic deputies
12 of Latin American descent. Would that be accurate?
13 A.      Yes.
14      MR. YARNELL: There you go.
15      MR. ADAIR: That is -- actually,
16 that's how I have heard it referred to traditionally,
17 was, you know, Hispanics of Latin descent. So I
18 apologize.
19      MR. YARNELL: You don't need to
20 apologize. The U.S. Census since 1980 had two
21 categories; white Hispanics, black Hispanics. It was
22 changed in 1990.
23 BY MR. ADAIR:
24 Q.      After the execution of a warrant at a
25 raid and receipt of a complaint from a person,

Page 197

1 Pacifico chose to investigate Elvin Ortiz even though
2 there was no evidence pointing to Ortiz as opposed to
3 the other black -- the other non-black or Hispanic
4 deputies in the raid group. Plaintiff was informed
5 of these facts by Deputy Ortiz.
6      First of all, let me ask you this.
7 When did Deputy Ortiz tell you this?
8 A.      After I get fired. We were talking about
9 I was going to make a complaint and he told me that
10 he can testify about that.
11 Q.      So you didn't know about that while you
12 were working at the county?
13 A.      No, because that happened right after or
14 in between the times that I was fired. I'm not
15 really sure.
16 Q.      Tell me -- well now, so if I understand
17 correctly, Pacifico investigated Ortiz based upon a
18 complaint, correct?
19      MR. YARNELL: If you know.
20 A.      Yes, it was a complaint, but the
21 complaint didn't have anything to do with Deputy
22 Ortiz because he was at the rear door of this warrant
23 search. And the people in the house or whoever did
24 the complaint was complaining about the deputies in
25 the front door. So he should go and do his

Page 198

1 investigation to the deputies at the front door, not
2 the one in the back, who was Deputy Ortiz at that
3 time.
4 Q.      Was Deputy Ortiz disciplined as a result
5 of that investigation?
6 A.      No. I doubt it.
7        MR. YARNELL: Do you know?
8        THE WITNESS: What?
9        MR. YARNELL: Do you know?
10       THE WITNESS: No, I don't know it.
11 BY MR. ADAIR:
12 Q.      Do you know whether -- well, no, the
13 question is -- don't answer, just tell me you don't
14 know.
15 A.      Yeah.
16       MR. YARNELL: That's what I just said,
17 if you don't know.
18       MR. ADAIR: I'm sorry. I thought you
19 said don't answer.
20       MR. YARNELL: No, I said if you don't
21 know.
22 BY MR. ADAIR:
23 Q.      Do you know whether Pacifico recommended
24 discipline against Ortiz?
25 A.      I don't know.

Page 199

1 Q.      Let's go down to G. In another
2 investigation Pacifico called Deputy Ortiz as a
3 witness and told him that if he did not cooperate he
4 would put a target on Ortiz's back because he had the
5 power to do so. This caused Ortiz to feel
6 intimidated because he alone was singled out and was
7 black and Hispanic. This was told to Plaintiff by
8 Deputy Ortiz and caused Plaintiff to feel
9 discrimination because of his race and nationality.
10 Thereafter Deputy Ortiz told Pacifico he was going to
11 a lawyer about discrimination. Only then did
12 Pacifico lessen his harassment of Ortiz.
13       My first question is, when did Deputy
14 Ortiz tell you about this?
15 A.      After I was fired.
16 Q.      And what did Deputy Ortiz tell you?
17 A.      The same thing that is wrote right here.
18 Q.      Okay. What did Pacifico call Ortiz as a
19 witness for?
20 A.      Well, he didn't get into details. He
21 just -- he was going to cooperate and whatever --
22 because that's what, you know, we here for as law
23 enforcement. We got to cooperate in whatever the
24 case may be. But he just kind of like threaten him
25 by saying if he doesn't cooperate, I'm going to put a

Page 200

1 target on your back and I can do so and I have the
2 power to do so.
3 Q.      So Deputy Ortiz told Pacifico that he was
4 going to a lawyer about discrimination and only then
5 did Pacifico lessen his harassment of Ortiz?
6 A.      Yes.
7 Q.      Did Pacifico call Ortiz as a witness?
8 A.      I don't know. I don't know the details
9 of what happened after that. He just told me that
10 little incident that clarify that Pacifico was
11 targeting Hispanic deputies.
12 Q.      Paragraph H, Isaac Santiago, a black
13 Hispanic deputy, had a confrontation with Pacifico
14 near Plaintiff, which made him feel intimidated and
15 subjected to excessive punishment. This arose
16 because Pacifico forced Santiago to do a transport of
17 a prisoner to Berks County Prison by himself in
18 strict violation of procedure. Pacifico never did
19 this to a non-black Hispanic deputy. Plaintiff was
20 informed of these facts by Santiago and believes that
21 he, like Santiago, is being subjected to
22 discrimination.
23       First of all --
24       MR. YARNELL: I think he testified to
25 this previous.

Page 201

1        MR. ADAIR: He testified to this but
2 I've got some questions about it.
3        MR. YARNELL: That's fine.
4 BY MR. ADAIR:
5 Q.      Is this -- did you actually witness this
6 incident where Pacifico forced Santiago to transport
7 the deputies?
8 A.      No, but that was the reason he made the
9 complaint.
10 Q.      Well, there was a reason he made the
11 complaint?
12 A.      Yes, Santiago.
13 Q.      When did you learn about this incident
14 where Pacifico forced Santiago to do a transport of
15 prisoners?
16 A.      That was before I got fired.
17 Q.      Was there a confrontation between
18 Santiago and Pacifico over this transport?
19 A.      I'm not sure about that. If there was
20 any confrontation, I don't know about that.
21 Q.      You have here Isaac Santiago, a black
22 Hispanic deputy, had a confrontation with Pacifico
23 near Plaintiff, which made him feel intimidated and
24 subjected to excessive punishment.
25       Did you observe a confrontation

51 (Pages 198 - 201)

Page 202

1 between Santiago and Pacifico?

2 A.     No, I'm just going based on what he told

3 me about it.

4 Q.     What Santiago told you?

5 A.     Yeah, I didn't witness anything.

6 Q.     And when you have here, which made him

7 feel intimidated, is that referring to you feeling

8 intimidated or is that referring to Santiago?

9 A.     Santiago being intimidated.

10 Q.     Okay. Next one, all black Hispanic

11 deputies other than Captain Severo Berrios, who on

12 information and belief was treated differently only

13 because of his rank, were subjected to discrimination

14 by Pacifico.

15     We're going to go through some names,

16 but is it your belief that Captain Berrios was not

17 subjected to discrimination by Pacifico?

18 A.     As far as I know, I don't think he never

19 tried anything with him because he -- at that time

20 Pacifico was a captain -- I'm sorry. I rephrase

21 that. He was a sergeant. And Captain Berrios was a

22 captain. So he got more rank than he does, so he's

23 not going to mess around with somebody with more

24 rank.

25 Q.     Did you ever approach Captain Berrios and

Page 203

1 tell him that you thought you were being

2 discriminated against because of your race or

3 national origin?

4 A.     I believe, but I'm not sure about it,

5 that I make a comment to him about that.

6 Q.     What comment did you make?

7 A.     Thank you. Appreciate it. There was a

8 time that Captain Berrios, based upon my experience

9 as a police officer in Baltimore, he told me, why you

10 don't join the warrant division? There's going to be

11 a school sometime, tactical school, something like

12 that, that you may go. But the only problem is that

13 Pacifico had to sign it; and I told him forget about

14 it, he's not going to sign it. So, Captain, I'm

15 sorry, I'm not going to be able to join your team

16 because he's not going to sign it. I talked to him

17 about that.

18 Q.     Did you tell Captain Berrios that that

19 was because of your race that he wasn't going to sign

20 it?

21 A.     I don't believe I told him that about

22 that, but I knew that he wasn't going to sign it and

23 he wasn't going to -- he was actually my immediate

24 supervisor at that time. And he -- I have a firm

25 belief that he want to keep me on the loop, that way

Page 204

1 he can do whatever the heck he wants.

2 Q.     Well, I'm coming back to what you said to

3 Captain Berrios. Would it be accurate for me to say

4 that you never told Captain Berrios you thought you

5 were being discriminated against because of your race

6 or your national origin?

7 A.     I don't think I did specifically like

8 that but I -- but we talk about it. We talk about

9 the problem that I had with Pacifico, that -- that I

10 know for a fact -- I didn't go into details, but I

11 told him that I knew for a fact that he wasn't going

12 to sign for me to go to some kind of -- I don't

13 remember exactly what it was, but it was some kind of

14 a tactical school.

15 Q.     You told him you were having problems

16 with Pacifico, but you never told Captain Berrios

17 that you thought it was because you were Hispanic and

18 black, correct?

19 A.     I don't think I did. I'm not sure that I

20 did.

21 Q.     Why wouldn't you have?

22 A.     I don't know why I didn't. We wasn't

23 talking about that at the time.

24 Q.     Captain Berrios -- did you believe he was

25 an approachable individual?

Page 205

1 A.     Oh, yes. Yes, he was.

2 Q.     Pretty easy to talk to?

3 A.     Yes.

4 Q.     And a lot of the guys liked him, didn't

5 they?

6 A.     Everybody likes him.

7 Q.     Except for --

8 A.     Pacifico.

9 Q.     -- Jose Davila?

10 A.     Who?

11 Q.     Except for Jose Davila.

12 A.     And Pacifico.

13 Q.     Jose Davila didn't get along with Captain

14 Berrios, correct?

15 A.     No. No, they didn't. I don't know why.

16 It's actually a surprise for me because they were

17 both likeable guys on their own ways. They were both

18 likeable guys. I don't know why they didn't get

19 along.

20 Q.     Did you ever hear that Captain Berrios

21 made a comment that Jose Davila shouldn't be in the

22 sheriff's department?

23 A.     No, I never heard that comment.

24 Q.     You ever hear that he was disciplined --

25 Captain Berrios was disciplined for making that

52 (Pages 202 - 205)

1 comment?

2 A.      No, I didn't.

3 Q.      Going to the next paragraph, other
4 non-Hispanic, non-African ancestry deputies have been
5 written up for insubordination and received nothing
6 more than a written warning, and yet Plaintiff was
7 terminated.

8        Would you agree with me that you were
9 not terminated for insubordination?

10 A.      Can you rephrase that question, please?

11 Q.      Sure. The reason for your termination --
12 the county did not terminate you -- they didn't
13 classify it as insubordination, did they?

14 A.      No.

15 Q.      You were never disciplined for
16 insubordination, were you?

17 A.      No.

18 Q.      Where this paragraph says that other
19 non-Hispanic, non-African ancestry deputies have been
20 written up for insubordination and received nothing
21 more than a written warning and yet Plaintiff was
22 terminated, that is not accurate. You were not
23 terminated for insubordination, correct?

24 A.      No.

25 Q.      You have here in Paragraph 27, other than

1 Hispanic sheriff department -- I can't read. You
2 have in Paragraph 27, other Hispanic sheriff
3 department employees who have experienced acts of
4 discrimination during the employment of Mr. Brewer
5 include but are not limited to -- and I'm going to
6 ask you what you know about each of these and what
7 you knew about at the time that you were employed by
8 Berks County.

9        Madeline Gregory. How was -- first of
10 all, while you were employed by Berks County, did you
11 know that she was discriminated against because of
12 her nationality?

13 A.      I believe so.

14 Q.      Well, I'm asking what you -- you believe
15 that you knew she was discriminated against while you
16 were employed?

17 A.      Yes, because she was written up
18 apparently because Sergeant Pacifico, I think, find
19 her in the hospital. I don't know really the details
20 of it. But there was -- there was something going on
21 that they were fighting about, that they were like
22 arguing. There was a lot of argument about, but I
23 don't recall. There was obviously a problem there
24 with Madeline Gregory, that she can testify over
25 that.

1 Q.      I'm not asking what she can testify to
2 because I can ask her those questions when I take her
3 deposition. But my question is what you knew about
4 while you were working at Berks County.

5 A.      Well, I heard the comments.

6 Q.      What did you hear?

7 A.      The same thing that I told you, that she
8 got written up because she was in the hospital; and I
9 don't really know the details of what happened. But
10 that was not fair the way that Pacifico wrote her up
11 for something like that. I'm not sure.

12 Q.      Why wasn't it fair?

13 A.      That's what I'm saying, I don't really
14 know; but there was some problem involving this
15 person. That's why I put them in there.

16 Q.      So something happened but you don't
17 really know the details?

18 A.      Exactly. Exactly. But something --
19 something happened.

20 Q.      Okay. When was the last time you talked
21 to Madeline Gregory?

22 A.      I barely spoke to her when I was employed
23 there, and I talk to her like once or twice early
24 over the phone after I got terminated.

25 Q.      When was the last time you spoke to her?

1 A.      I don't recall.

2 Q.      Was it within the last year?

3 A.      No, more than that. I believe it was
4 more than that. I'm not sure but it was -- I have a
5 strong belief it was more than that.

6 Q.      You have here she's fearful that if she
7 speaks of the discrimination, she will be terminated.
8 Why do you say that?

9 A.      Because that's the way things are handled
10 in the sheriff department.

11 Q.      Did she tell you that?

12 A.      No.

13 Q.      So she didn't say that but that's your
14 belief, that she's afraid to talk, she'll be
15 terminated?

16 A.      Yes, because she was try before -- how do
17 you say that word?

18        MR. YARNELL: Threatened.

19 A.      Threatened before.

20 Q.      When was she threatened?

21 A.      That was long ago, long ago. I don't
22 know exactly the time, but I believe Sergeant
23 Pellicotti was the name who talked to her and try to
24 tell her not to testify in something. I'm not sure.
25 I don't remember. But that's the way -- you know,

Page 210

```
 1  everybody is afraid to talk in the sheriff
 2  department.
 3  Q.       I have to go back and ask you this.  Did
 4  Sheriff Pellicotti discriminate against her because
 5  of her race or nationality to your knowledge?
 6  A.       No, not that I know.  I couldn't testify
 7  about that.
 8         MR. YARNELL:  Can we go off the record
 9  for a second?
10         (Discussion held off the record.)
11  BY MR. ADAIR:
12  Q.       So you heard -- did she tell you that
13  Pellicotti threatened her?
14  A.       No, I just heard the comment.  Everybody
15  knows everything that happens and they comment about
16  it and they say, look, this is what happened with
17  this.  This is what happened with Brewer.  This is
18  what happened with Ortiz.
19  Q.       Was the incident with Pellicotti -- do
20  you know whether that had anything to do with race or
21  nationality?
22  A.       No, not that I know of.
23  Q.       Anything else?  Anything else that you
24  know of or that you had heard of that Madeline
25  Gregory was discriminated against?
```

Page 211

```
 1  A.       No.  The only reason that I know that she
 2  was mistreated was with Pacifico.
 3  Q.       Is that the one you told me about?
 4  A.       Um-hum.  That's the only one I know of.
 5  Q.       Let's go on to Jose Davila.  First of
 6  all, when was the last time you spoke to Jose Davila?
 7  A.       Way before I was terminated.  We never
 8  been close friends or anything like that.
 9  Q.       So you haven't talked to him since you
10  were terminated?
11  A.       Way before that.
12  Q.       And we talked about the incident where
13  Pacifico called him a cockroach?
14  A.       Yes.
15  Q.       Was he -- was there any other
16  discrimination which you're aware of regarding
17  Davila?
18  A.       No.  He was actually a sergeant, so once
19  you have some rank, it's not -- you know, almost
20  nobody messes with you.  If they do, they do it in
21  certain ways.
22         MR. YARNELL:  You only need to answer
23  the questions he's asked you, no more.
24  BY MR. ADAIR:
25  Q.       Isaac Santiago, when was the last time
```

Page 212

```
 1  you spoke to Isaac Santiago?
 2  A.       A few months ago.
 3  Q.       You talk to him over the telephone?
 4  A.       Yes.
 5  Q.       Do you know where Mr. Santiago currently
 6  lives?
 7  A.       He is currently in Florida right now.
 8  Q.       Does he ever come to Pennsylvania?
 9  A.       Not that I know of.  The last time I
10  spoke with him was phone call, that's it.
11  Q.       Did you talk to him about testifying in
12  this case?
13  A.       No.
14  Q.       Do you believe he will testify in this
15  case?
16  A.       Yes.
17  Q.       And why do you believe that?
18  A.       Because he was -- he was one of the
19  discrimination victims.
20  Q.       And was Santiago -- tell me everything
21  that you knew of with respect to -- we've talked
22  about Santiago, and I don't want to go back over it.
23  We talked earlier --
24         MR. YARNELL:  We discussed it twice.
25         MR. ADAIR:  But I want to find out if
```

Page 213

```
 1  there was anything in here.
 2  BY MR. ADAIR:
 3  Q.       Other than what we discussed with
 4  Santiago, do you know any other incidents in which
 5  Santiago was allegedly discriminated against?
 6  A.       No, not that I know of.
 7  Q.       How about Doris Natal?  When was the last
 8  time you spoke with Doris Natal?
 9  A.       Before I got terminated or a little bit
10  after.  I don't recall but that was long ago.
11  Q.       And how was Doris Natal discriminated
12  against?
13  A.       Well, I witness that, the way Pacifico
14  talk to her.  Even though she wasn't doing anything
15  wrong and she was smoothly running the control room,
16  he just came over and let everybody know that he was
17  a sergeant, that he was a supervisor.
18  Q.       What did he say?
19  A.       I don't quite remember, but he scream at
20  her.  And then when I saw that, I just shake my head
21  and went outside the control room because I didn't
22  like the way that he talked to her.
23  Q.       You don't recall what he said to her?
24  A.       No, I don't recall.
25  Q.       How about the general subject of what he
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 214

1 was --
2 A.      No.
3 Q.      Did she say anything back?
4 A.      No, because I went out of the control
5 room right away. I just shook my head and I went
6 outside of the control room very frustrated.
7 Q.      Did you ever talk to Doris about this
8 incident?
9 A.      Not really. Not really.
10 Q.      Did you ever talk to Doris that either
11 you or Doris believed that you were being
12 discriminated against because of your race or
13 nationality?
14 A.      I believe we talk about it after the
15 first write-up. I make a comment to her like a few
16 days after that and we talk about it.
17 Q.      Which is?
18 A.      When I got the first write-up, a few days
19 after that we talk about it; but I don't recall
20 exactly -- I know that she said something about -- we
21 talk about it but I don't recall.
22 Q.      Did she say that she believed she was
23 being discriminated against on the basis of her race
24 or nationality?
25 A.      I believe so. I believe so.

Page 215

1 Q.      And you have here --
2       MR. YARNELL: I'm sorry, can we go off
3 the record for one second?
4       (Discussion held off the record.)
5 BY MR. ADAIR:
6 Q.      You have here in footnote three, it says
7 Ms. Natal was repeatedly subjected to discrimination
8 because of her Hispanic ancestry; and you've given me
9 one example. Do you have any other examples of how
10 she was discriminated against because of her Hispanic
11 ancestry?
12 A.      The best example that I can tell you is
13 the way he talked to her. The ones that I mostly
14 remember was the one that he went inside the control
15 room and basically scream at her. And I don't like
16 to be any -- any woman being disrespected. That's
17 part of my culture. That's the way I am. I just
18 went outside because I couldn't took it.
19 Q.      So that's the one incident that you
20 remember. Would that be accurate?
21 A.      Yes. And there was a few others that I
22 don't quite recall the details, but there was more
23 than that.
24 Q.      Do you remember the details of any of
25 them?

Page 216

1 A.      No, I don't remember any of the details.
2 Q.      And you have here, she is fearful that if
3 she speaks of the discrimination, she will be
4 terminated. Did she tell you that?
5 A.      No, she didn't tell me that. She didn't
6 need to tell me that.
7 Q.      You just assumed that?
8 A.      No, I'm not assuming that. I know that.
9 Q.      How do you know that?
10 A.      Well, because that's actually the way
11 that the sheriff department has been treating certain
12 people. Not everybody though.
13 Q.      So everybody is fearful that they'll be
14 terminated if they speak up?
15 A.      Some of the people that I asked to
16 testify to something, they told me, hey, don't do
17 that, don't put me on that spot.
18 Q.      Who did you ask to testify that said they
19 wouldn't put you in that --
20 A.      If I didn't put them down in the report
21 I'm not going to name any names. I'm sorry. Because
22 I asked them to testify of way more incidents that
23 happened; and they told me, please do not put me on
24 that spot, and I respect that.
25 Q.      Well --

Page 217

1       MR. YARNELL: Can I interrupt one
2 second?
3       MR. ADAIR: Yeah.
4       MR. YARNELL: You have to understand
5 something. He's not asking you now what they said.
6 All he's asking is to give him their names.
7 I understand something, you are under oath. This is as
8 if you are in a courtroom. You brought a lawsuit.
9 You have no choice. You cannot say I'm not going to
10 tell these people because they don't want to be told.
11 You have to tell the names.
12 A.      Write it down. Joseph Garipoli.
13 Q.      And what did you ask him to testify to?
14 A.      That I volunteered to take the prisoner
15 up to the district attorney, if he can volunteer
16 about the jokes, the non-practical jokes that
17 Pacifico did, everything that he knew about Pacifico
18 that he saw, all the incidents about the way that
19 Pacifico treat people, especially Hispanic people,
20 Hispanic deputies.
21       Pete Fox. Deputy Pete Fox.
22 Q.      What did you -- and he told you that he
23 won't testify?
24 A.      No, these people that I'm -- they all
25 tell me the same thing. When I finish my -- list

55 (Pages 214 - 217)

Page 218

1 of names, all they told me was please do not put me
2 on that spot.
3 Q.        Okay.  And let me clarify because I want
4 to do this in the most efficient manner.  I'm going
5 to ask -- you have a list of names of people that you
6 have identified as witnesses.  And I'm going to ask
7 you what you think they're going to testify to.  And
8 Joseph Garipoli is one of them.  Pete Fox is another
9 one.  You've identified all of them.  But my question
10 was who told you that they would not testify in this
11 case?
12 A.        They didn't specifically tell me in that
13 specific words.  They just told me do not put me on
14 that spot.
15 Q.        Okay.  Are we talking about the same
16 people?  So then Joseph Garipoli told you, don't put
17 me in that spot?
18 A.        Yes.
19 Q.        And Pete Fox told you, don't put me in
20 that spot?
21 A.        Yes.
22 Q.        Okay.
23          MR. YARNELL:  It may better be said
24 that these are people who were hesitant to testify
25 because they were worried about the consequences to

Page 219

1 them.
2          MR. ADAIR:  No, I disagree.  I think
3 that you're -- he testified exactly what he said.
4 And, I mean, that's your testimony.  That certainly
5 isn't their testimony.  It's Mr. Brewer's --
6          MR. YARNELL:  I never spoke to them.
7 I don't know what it is they're saying.  You're just
8 saying what I understood Mr. Brewer to say.
9          MR. ADAIR:  With all due respect, I
10 don't want your testimony, I want his words.  So I
11 appreciate that.
12          MR. YARNELL:  It's lovely speaking to
13 you.
14          MR. ADAIR:  I'm sorry?
15          MR. YARNELL:  I said it's been lovely
16 speaking to you.
17          MR. ADAIR:  And I'm sorry, it's
18 getting late and I'm getting testy.  I apologize.
19          MR. YARNELL:  I get testy as well.  Go
20 ahead.
21 BY MR. ADAIR:
22 Q.        You said that Pete Fox didn't want to be
23 put in that spot.  Who else said they didn't want to
24 be put into that spot?
25 A.        Lenny Gravish.

Page 220

1 Q.        Let me ask you -- I mean are these all
2 the people that you have --
3          MR. YARNELL:  There's some people who
4 were named in the complaint.  There were other people
5 who were named as potential witnesses.
6          MR. ADAIR:  Yeah, we'll come back to
7 that.
8          MR. YARNELL:  That's all that it is.
9          MR. ADAIR:  That's the best way to
10 handle that.
11 BY MR. ADAIR:
12 Q.        Elvin Ortiz, I believe that you told me
13 earlier -- you told me some incidents with Elvin
14 Ortiz that occurred.  One of them was that Ortiz was
15 asked to testify and be told that, you know, if he
16 didn't cooperate he would put a target on his back.
17 A.        Yes.
18 Q.        You learned about that after you were
19 terminated?
20 A.        Yes.
21 Q.        The other thing you told me about with
22 Ortiz was that Pacifico investigated him as a result
23 of a complaint that was received, and that's also
24 something that you learned about after you were
25 terminated.

Page 221

1 A.        Um-hum.
2 Q.        Was there anything that you knew about,
3 any discrimination that allegedly Ortiz experienced,
4 that you knew about while you were still employed by
5 Berks County?
6 A.        Not that I know of because the time I was
7 employed he was in warrant division, so we didn't
8 have a chance to talk that much about it.
9 Q.        Are there any other incidents that we
10 haven't discussed so far that you believe were part
11 of the hostile work environment?  I'll break that
12 down.  First of all, is there anything else that
13 happened to you that you haven't told me about -- and
14 we've been testifying for a long time -- that you
15 believe was part of the hostile work environment?
16          MR. YARNELL:  You know what he means
17 by hostile?
18 A.        Yes, at this particular moment I don't
19 recall anything else right now.  I know it should be
20 more incidents but I don't recall right now because
21 right now I'm getting really -- I'm having like a
22 flashback from those times, that I don't want to
23 remember.  And right now I don't recall.  There may
24 be more and there are more.
25 Q.        Here's the thing, this is my chance to

56 (Pages 218 - 221)

Page 222

1  ask you questions.  If you'd like to take a break,
2  I'll let you take a break.
3  A.        No, I want to get it over with.
4  Q.        But if you can't answer the questions and
5  you can't remember it and if a break would help you,
6  then I'm going to have to insist that we take a
7  break.
8  A.        Ask me the next question.  If I don't
9  know it, then we take a break.
10        MR. YARNELL:  Can I make a suggestion?
11        MR. ADAIR:  Yeah.
12        MR. YARNELL:  What time is it?
13        MR. ADAIR:  5:15.
14        MR. YARNELL:  How much longer do you
15  expect to have?
16        MR. ADAIR:  I don't know.  Maybe
17  another hour, maybe less.
18        MR. YARNELL:  I have to leave here by
19  no later than 7 -- actually I have to leave before
20  that.  I have to leave by no later than 6:45.
21        MR. ADAIR:  That's not a problem.
22        MR. YARNELL:  Your testimony has to
23  be -- you have to be able to testify without any
24  impairment, and that's just the way it works.  So
25  let's take a short break and we'll come back.

Page 223

1        MR. ADAIR:  Yeah.
2        (A brief recess was taken.)
3        MR. YARNELL:  The parties have
4  determined to conclude the deposition as of this hour
5  due to the length of the deposition to date.  By
6  tentative agreement, the deposition will be continued
7  until 1 p.m. Tuesday, June the 2nd, 2015 to reconvene
8  at Berks Heim in the conference room.
9        MR. ADAIR:  Assuming that we can get
10  the conference room.
11        MR. YARNELL:  Assuming we can get the
12  conference room and assuming that the parties, when
13  they return to their offices, can verify that their
14  schedules are as they perceive them to be.
15        MR. ADAIR:  Agreed.
16        (Deposition concluded at 5:39 p.m.)
17
18
19
20
21
22
23
24
25

Page 224

1
2
3
4        June, 12 2015
5
6
7        I hereby certify that the
8  evidence and proceedings are contained fully and
9  accurately in the notes taken by me of the testimony
10  of the within witness who was duly sworn by me, and
11  that this is a correct transcript of the same.
12
13
14
15
                    _____
16                    Suzanne L. E. Toto
17                    Registered Professional Reporter
18
19
20  The foregoing certification does not apply to any
   reproduction of the same by any means unless under
21  the direct control and/or supervision of the
   certifying reporter.
22
23
24
25

57 (Pages 222 - 224)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830