# Pacifico Deposition

# EXHIBIT C

Page 1

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                     CIVIL DIVISION
                         - - -
3   ALBERT BREWER              :
            Plaintiff,         :
4                             :
            vs.                :   Civil Action No.
5                             :   5:13-cv-5763
    BERKS COUNTY SHERIFF, et al:
6           Defendants.        :
7                         - - -
8                 TUESDAY, JUNE 9, 2015
9                         - - -
10         Oral deposition of VINCENT PACIFICO, taken
11   at the Law Offices of Deasey, Mahoney & Valentini,
12   LTD, 103 Chesley Drive, Suite 101, Media,
13   Pennsylvania 19063, commencing at 9:22 a.m., before
14   Corinne L. Sugalski, Professional Court Reporter and
15   Notary Public.
16
17
18
19
20
21                        - - -
22            VERITEXT LEGAL SOLUTIONS
                MID-ATLANTIC REGION
23         1801 Market Street - Suite 1800
           Philadelphia, Pennsylvania  19103
24
                          - - -
25

Page 2

```
1    A P P E A R A N C E S :
2
3    ZARWIN BAUM DEVITO KAPLAN SCHAER & TODDY, P.C.
     BY:  DAVID F. MCCOMB, ESQUIRE
4    1818 Market Street
     13th Floor
5    Philadelphia, Pennsylvania 19103
     (215)569-2800
6    dfmccomb@zarwin.com
     Representing the Plaintiff
7
8
     DEASEY, MAHONEY & VALENTINI, LTD
9    BY:  ANDREW B. ADAIR, ESQUIRE
     103 Chesley Drive
10   Suite 101
     Media, Pennsylvania 19063
11   (610)892-2732
     abadair@dmvnlaw.com
12   Representing the Defendants
13
14   A L S O   P R E S E N T :
15
     Albert Brewer, Plaintiff
16
17          - - -
18
19
20
21
22
23
24
25
```

Page 3

```
1            I N D E X
2    Testimony of:  Vincent Pacifico
3    By Mr. McComb.........4
4    By Mr. Adair.........100
5            - - -
6        E X H I B I T S
7
8    EXHIBIT NUMBER   DESCRIPTION       PAGE MARKED
9    Pacifico-1   Docket Report For    37
             Case No.
10           5:14-cv-04469-EGS
             (Confidential)
11
     Pacifico-2   Pacifico Complaint   39
12           (Confidential)
13   Pacifico-3   Defendants' Answers  49
             Case No. 14-04469
14           (Confidential)
15   Pacifico-4   Written Warning to   52
             A. Brewer - 10/20/10
16
     Pacifico-5   Suspension Notice to 59
17           A. Brewer - 12/14/10
18   Pacifico-6   Time Clock Violation 69
             to A. Brewer - 1/7/11
19
     Pacifico-7   Termination Notice   72
20           to A. Brewer - 6/10/11
21   Pacifico-8   Harassment Policy    92
22
     PLEASE NOTE THAT THE FOLLOWING EXCERPT WAS MARKED AS
23   CONFIDENTIAL AND CAN BE VIEWED IN THE CONFIDENTIAL
     EXCERPT OF THIS DEPOSITION:
24
     Page 37:5 - Page 52:17
25
```

Page 4

```
1            VINCENT PACIFICO
2               - - -
3        VINCENT PACIFICO, having been first
4    duly sworn, was examined and testified as
5    follows:
6               - - -
7        EXAMINATION
8               - - -
9    BY MR. McCOMB:
10   Q    Good morning, Mr. Pacifico.  We met
11   earlier --
12   A    Good morning.
13   Q    My name is David McComb.  And I'm one of
14   the lawyers representing Mr. Brewer in this lawsuit
15   that's been filed against you and several other
16   defendants.  I'm going to take your deposition this
17   morning and ask you questions about your knowledge
18   of the events that give rise to the lawsuit.  You've
19   been sworn.  You're under oath.
20       The court reporter is taking down
21   stenographically everything you say.  There's
22   several instructions I want to give you.  First, you
23   have to keep your voice up.  The court reporter can
24   only take down stenographically an audible answer,
25   which means you can't nod or shrug because she can't
```

Page 5

```
1            VINCENT PACIFICO
2    take that down.
3        Second, let me finish my question before
4    you answer.  That will assist your counsel, Mr.
5    Adair, who may want to make an objection after the
6    question's been asked.  Also, it's literally
7    impossible for our court reporter to take down
8    stenographically two people speaking at the same
9    time.  So I know that, in most conversations, people
10   tend to trail off and someone interrupts, but this
11   isn't a conversation.  So it's question and the
12   answer.
13       Do you understand that?
14   A    Yes.
15   Q    Have you ever given a deposition before?
16   A    Yes.
17   Q    Can you tell me the first deposition you
18   ever gave?
19   A    I don't remember.
20   Q    Okay.  I'm going to ask you about the
21   depositions.  One other question.  Is there any
22   medical reason, such as taking medication or
23   something, that would prevent you from giving a
24   deposition today or being able to testify?
25   A    No.
```

2 (Pages 2 - 5)

Page 6

VINCENT PACIFICO

1
2    Q   Okay.  Tell me about what deposition you
3  recall giving.
4    A   It was probably 20 years ago or more.
5    Q   What type of case was it?
6    A   I don't even remember.
7    Q   That's fine.
8    A   I don't even remember.
9    Q   Okay.  What was the most recent deposition
10  you gave?
11    A   That I gave?
12    Q   Yeah.  In which you testified in a
13  deposition.
14    A   I think that was it.
15    Q   So you've only given one deposition to the
16  best of your knowledge?
17    A   No, I recall.  It was about six, seven
18  years ago.  Someone had sued the County.  That's
19  what it was.
20    Q   Were you named as a defendant in that
21  action?
22    A   I don't remember.
23    Q   Do you recall giving any other
24  depositions?
25    A   No.  It was about six, seven years ago.

Page 7

VINCENT PACIFICO

1
2  And it went to trial, and it was dismissed.
3    Q   What type of case was it?  Was it brought
4  by an employee or was it a civil rights action or --
5    A   It was a guy that wanted to bring video
6  cameras into the courthouse and the County would not
7  allow him.
8    Q   Prior to this deposition, did you speak to
9  anybody other than your counsel, Mr. Adair?
10    A   Just you and -- I mean, about the case?
11    Q   About the case.
12    A   No.
13    Q   Did you review any documents to prepare
14  for the deposition?
15    A   Yes.
16    Q   What did you review?
17    A   The complaint.
18    Q   Anything else?
19    A   Yeah.  There was some other disciplinary
20  actions that occurred in the past.  I glossed over
21  those.
22    Q   Disciplinary actions as to whom?
23    A   Mr. Brewer.
24    Q   Were they write-ups of Mr. Brewer?
25    A   They were disciplinary actions.

Page 8

VINCENT PACIFICO

1
2    Q   Right, okay.  I may refer to write-ups.
3  That would be something such as a notice that he's
4  being suspended or some sort of disciplinary action
5  is taken against him.  Is that what you reviewed?
6    A   Disciplinary action, yes.
7    Q   Where do you currently live, Mr. Pacifico?
8    A   Key West, Florida.
9    Q   How long have you lived there?
10    A   About -- almost a year.  But full time,
11  six months.
12    Q   Are you employed?
13    A   Yep.
14    Q   What do you do?
15    A   Right now, I'm a tour guide.
16    Q   Who do you work for?
17    A   Land and Sea of America.
18    Q   Are you married?
19    A   Yes.
20    Q   Do you live with your wife?
21    A   Separated.
22    Q   Do you have children?
23    A   Yes.
24    Q   Do they live with you?
25    A   Nope.

Page 9

VINCENT PACIFICO

1
2    Q   When did you move to Florida?  You said
3  you've been there almost a year?
4    A   I went there last July.  I came back for
5  two months, then went back right after Christmas.
6    Q   Where were you working before you moved to
7  Key West?
8    A   The County of Berks and Laureldale Police.
9    Q   And you were a --
10    A   Police officer.
11    Q   -- a sergeant?
12    A   Police officer.
13    Q   Police officer.  How long did you work for
14  Berks County?
15    A   Four years.
16    Q   I'm going to ask you about what you --
17    A   More or less, four years.  It's not
18  exactly four years.
19    Q   I'm going to get back to that.  But before
20  I do, where did you work before you worked at Berks
21  County?
22    A   Phoenixville Police.
23    Q   And what title did you hold at the
24  Phoenixville Police Department?
25    A   Sergeant.

3 (Pages 6 - 9)

VINCENT PACIFICO

1
2   Q   How long did you work there?
3   A   About 20 years.
4   Q   Why did you leave the Phoenixville Police
5   Department?
6   A   Pension.
7   Q   Where did you work prior to Phoenixville
8   Police Department?
9   A   Berks County Sheriff's Department.
10   Q   What did you do there?
11   A   I was a deputy.  And Laureldale Police.
12   Q   So you worked for Berks County and it's --
13   what is it?  Laureldale?
14   A   Laureldale.
15   Q   So you worked for Berks County and
16   Laureldale, then you went to Phoenixville, worked
17   there for 20 years, retired, got a pension, then
18   came back to Berks County?
19   A   Yes.
20   Q   How long did you work at Berks County the
21   first time before going to Phoenixville?
22   A   I don't remember.
23   Q   Was it more than five years?
24   A   I don't remember.  That was quite a few
25   years ago.

VINCENT PACIFICO

1
2   Q   Well, again, I'm just -- was it more than
3   ten years?
4   A   No.  It couldn't have been.
5   Q   Okay.  So was it more than five years?
6   A   I don't think so, but I don't remember the
7   number of years.
8   Q   Okay.  When you came back to Berks County
9   after leaving Phoenixville, did you receive any
10   training?
11   A   After leaving Phoenixville?
12   Q   Yeah.  You left Phoenixville and you came
13   back to Berks County, correct?
14   A   Yes.
15   Q   Did you receive any training your second
16   go-around at Berks County?
17   A   Yeah.
18   Q   On what?
19   A   How to be a deputy.
20   Q   Specifically what?  What --
21   A   What our daily tasks were, how to serve
22   subpoenas, how to work in the courtroom, what was
23   expected of us.
24   Q   Okay.  So you mentioned serving subpoenas.
25   Had you done that before in your law enforcement

VINCENT PACIFICO

1
2   career?
3   A   No.  That's with -- I did not serve civil
4   subpoenas before.
5   Q   How about working in the courtroom, had
6   you done that before in your --
7   A   Oh, yes.
8   Q   -- law enforcement career?
9   A   Yes.
10   Q   Guarding court personnel, things of that
11   sort?
12   A   Yes.
13   Q   What else would your serving in a
14   courtroom involve?
15   A   Protecting the judge, escorting prisoners,
16   courtroom security.
17   Q   Had you done any work escorting prisoners
18   prior to your second go-around at Berks County?
19   A   As a deputy?
20   Q   In any capacity.
21   A   Well, of course.  I was a policeman.
22   Q   Well, I -- okay.
23   A   Yes.
24   Q   So you received training on these tasks at
25   Berks County?

VINCENT PACIFICO

1
2   A   Yes.
3   Q   What did the training consist of?  Was it
4   a classroom?
5   A   There was -- there was training to start
6   off for new qualifications on their weapons, the
7   tools that we use there.  And then I was assigned
8   with different deputies that would show me the
9   proper way to do things.
10   Q   So a sort of on-the-job training?
11   A   Yes.
12   Q   Who were the deputies to whom you were
13   assigned for training during this period?
14   A   I spent a lot of time with Bob Essig.
15   Q   Could you spell that, please?  E-S-S-I-G?
16   A   E-S-S-I-G, I believe so.
17   Q   And was he -- what was his position?
18   A   He was the firearms and self-defense
19   person.
20   Q   And did you do ride-alongs with Mr.
21   Essig or --
22   A   No.  I rode along with --
23   Q   -- what did that training consist of?
24   A   I didn't ride along initially, but I did
25   get courtroom initially and spent time with

4 (Pages 10 - 13)

VINCENT PACIFICO

1
2 different deputies.
3   Q   Who assisted you -- what -- so Bob Essig
4 was the firearms --
5   A   Firearms, yeah.
6   Q   -- instructor.  So you got training from
7 him on --
8   A   Uh-huh.
9   Q   -- whatever firearms were being used by
10 Berks County?
11   A   Correct.
12   Q   So the next person -- someone gave you
13 instruction on courtroom security, correct?
14   A   Yes.
15   Q   Who was that?
16   A   I worked with many different deputies.
17 Actually, one of them was Mr. Brewer that taught me
18 how to work in a courtroom.
19   Q   Mr. Brewer was working at Berks County
20 when you came back?
21   A   Uh-huh.
22   Q   How long had he been there?
23   A   I don't know.
24   Q   Approximate?  Do you have any sense?  Had
25 he been there for ten years?

VINCENT PACIFICO

1
2   A   I didn't -- I would have no way of knowing
3 when he started.  He was one of many deputies that I
4 spent time with.
5   Q   Who were the other deputies you spent time
6 with in a training capacity?
7   A   John Phillips.
8   Q   What training did you receive from Mr.
9 Phillips?
10   A   That was also firearms and defense.
11   Q   When you talk about defense, are you
12 talking about like martial arts self-defense?
13   A   No.  The proper handling of prisoners and
14 cuffing and that type of thing.
15   Q   Anyone else?
16   A   None that stand out.  I know all the new
17 hires, including myself -- I have a memory of
18 gaining different experiences in different
19 courtrooms with different deputies.
20   Q   When you were hired, did other -- were
21 other people hired at the same time?
22   A   Yes.
23   Q   Who else was hired at the same time?
24   A   Couldn't tell you.
25   Q   Okay.  Was it more than one other person?

VINCENT PACIFICO

1
2   A   Actually, I can see his face because he
3 passed away.  I'm trying to think of his name.
4   Q   If it comes to you, you can tell me.  If
5 not, that's okay.
6   A   Dean Raifsnider.
7   Q   Dean --
8   A   Raifsnider.  And I do not know the
9 spelling.
10   Q   Is Raifsnider one word?
11   A   Yes.  He -- he just stands out because he
12 passed away.
13   Q   Okay.  Anyone else you can recall?
14   A   No.
15   Q   So training on firearms, courtroom
16 security, escorting prisoners.  Any other training
17 that you can think of?
18   A   Everything we needed to know on the
19 day-to-day tasks, how to get from here to there, how
20 to use the key cards, how to survive, and how to do
21 the job.
22   Q   Were you given any training on human
23 resource policies at Berks County?
24   A   They had an online system of policies that
25 we had access to.

VINCENT PACIFICO

1
2   Q   When you say you had access to, do you
3 recall actually accessing those HR policies online?
4   A   Policies concerning what?
5   Q   Any HR policy.  My question is, did you --
6 do you have any --
7   A   I know we all did, but I don't have any
8 recollection of it.  Because I know from time to
9 time, we would all have to sign off that we went on
10 and read something, but it was just on scratch
11 paper.  And I don't --
12   Q   Were records kept in terms of what you
13 signed off that you had read?
14   A   When I started there?
15   Q   At any time.
16   A   I wouldn't know what the person did with
17 what I gave -- what I signed.
18   Q   But you have a recollection -- did you
19 sign off online?
20   A   No, I don't think so.
21   Q   You think there was a piece of paper which
22 you acknowledged that you had accessed some human
23 resource policy?
24   A   At some point in time, I recall something
25 that we all had to sign off that we read.  I

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 18

VINCENT PACIFICO

1
2 couldn't tell you what it was.
3     Q    Was there any one requirement that you
4 access Berks County EEO policies online?
5         MR. ADAIR:  Do you understand what he's
6 asking?
7         THE WITNESS:  I don't understand that.
8 BY MR. McCOMB:
9     Q    Okay.  You said there's an online --
10 there's material related to human resources online
11 at Berks County, correct?
12    A    Correct.
13    Q    And that you had accessed it on occasion,
14 you don't recall when or what circumstances.  But
15 you do recall signing something acknowledging you'd
16 accessed it, correct?
17    A    Yes.
18    Q    My question is, were there EEO policies
19 contained in that HR material online?
20    A    I don't know the answer to that because I
21 only recall signing off that we all had to read
22 something.  And as far as I can recall, it could
23 have been the rules on vacations.  I just remember
24 at one point in time, we had to sign something
25 acknowledging that we read something, but I couldn't

Page 19

VINCENT PACIFICO

1
2 tell you what it was.
3     Q    That's fine.  So as we sit here today, you
4 have no recollection of having accessed or
5 acknowledged accessing any EEO policy online?
6     A    I don't understand what you mean by EEO.
7     Q    EEO -- did Berks County have a sexual
8 harassment policy?
9     A    Yes.
10    Q    And where was that contained?
11    A    Same place, online in their policies and
12 procedures.
13    Q    Was there a general policy about not
14 discriminating against persons?
15    A    I would assume there is.
16    Q    I don't want you to assume or guess.  Do
17 you have any recollection of a policy such as that?
18    A    Yes.
19    Q    And what do you recall about that policy?
20    A    That you cannot discriminate against
21 someone because of sex, race, political beliefs, and
22 some other things.
23    Q    National origin?
24    A    Yeah.
25    Q    And it's your recollection that that

Page 20

VINCENT PACIFICO

1
2 material was contained online?
3     A    Yes.
4     Q    In addition to it being available online,
5 was it ever distributed to you in hard copy form?
6     A    Not that I recall.  They did everything
7 they could to not use paper.  I'm not saying it
8 wasn't, but I don't recall that it was.
9     Q    Okay.  You said that Mr. Brewer was
10 working for Berks County when you got there,
11 correct?
12    A    Correct.
13    Q    And do you know what his title was?
14    A    He was a deputy.
15    Q    And when you -- what was your title?
16    A    Deputy.
17    Q    Were you ever in a supervisory
18 relationship with Mr. Brewer?
19    A    Yes.
20    Q    And how did that come about?  You got
21 promoted?
22    A    Yes.
23    Q    When were you promoted?
24    A    I don't remember the dates.
25    Q    Well, was it within the first year that

Page 21

VINCENT PACIFICO

1
2 you were reemployed with Berks County?
3     A    No.  It was within the first two years.
4     Q    How did you learn of the opening for -- I
5 guess it would have been a sergeant position?
6     A    Yes.
7     Q    How did you learn that there was an
8 opening for a sergeant position?
9     A    It was announced in the department that
10 there was a position.
11    Q    Okay.  Now, were you interviewed for that?
12    A    Yep.
13    Q    Do you know who else was interviewed?
14    A    I don't.
15    Q    Who interviewed you?
16    A    I don't recall who was in the interview.
17 I could guess, but you don't want me to guess.
18    Q    No.
19    A    It would have been someone superior to me,
20 but I don't --
21    Q    And those people would have been Anthony
22 Damore?
23    A    I'd have to guess.  I don't know who was
24 in the room during the interview.
25    Q    And is that the correct -- is it Damore or

6 (Pages 18 - 21)

Page 22

VINCENT PACIFICO

1
2   --
3       A   Damore.
4       Q   Damore.  And what title did Mr. Damore
5   have?
6       A   He was the chief deputy.
7       Q   And who was the sheriff?
8       A   Eric Weaknecht.
9       Q   And as we sit here today, do you have any
10   recollection of being interviewed by Mr. Damore or
11   Mr. Weaknecht in connection with the sergeant
12   opening?
13      A   I am certain at some point in time prior
14   to being promoted, the sheriff would have spoken to
15   me.  Do I have a specific recollection of an
16   interview place and date and time?  No.
17      Q   Did you fill out a written application for
18   the sergeant position?
19      A   No.  Letter of interest.
20      Q   Once you were promoted to the sergeant
21   position, did you receive any additional training?
22      A   I've received a lot of training, and I
23   just don't recall what fell into place where
24   throughout my law enforcement career.
25      Q   Prior to being promoted to a sergeant, had

Page 23

VINCENT PACIFICO

1
2   you had supervisory responsibility before?
3       A   Yes.
4       Q   And you'd had that at Phoenixville?
5       A   Yes.
6       Q   What was the highest rank you held at
7   Phoenixville?
8       A   Sergeant.
9       Q   And how long did you serve as a sergeant
10   in Phoenixville?
11      A   I don't remember how many years it was.
12   It was quite a few years.
13      Q   Do you recall receiving any training at
14   Berks County relating to supervisory
15   responsibilities as a sergeant?
16      A   No.  Because the one class that they were
17   sending supervisors to, I had already had.
18      Q   What was the name of that class?
19      A   It was a management -- actually, I had
20   both management classes at Fort Indiantown Gap, and
21   I cannot recall the title.  But I had already gone
22   to them.
23      Q   And do you recall in general terms what
24   the nature of that training was?
25      A   Yes.

Page 24

VINCENT PACIFICO

1
2       Q   What was it?
3       A   Management.
4       Q   Did that include performing performance
5   appraisals for subordinates?
6       A   Yes.
7       Q   Did it include discipline of subordinates?
8       A   Yes.
9       Q   What do you recall about that training
10   either as to -- let's start with performance
11   appraisals.  What do you recall about that specific
12   training?
13      A   That actually stands out in my mind fairly
14   clear because it was made clear to make it known
15   what is expected, give the subordinates the
16   opportunity to comply, and embrace them doing a good
17   job.  When it came to performance evaluation time,
18   there should be no surprises because if they're not
19   working to your satisfaction, they should know it.
20      Q   So that would -- that's a concept known as
21   performance management, I take it?
22      A   Yes.
23      Q   So you've heard that phrase before?
24      A   Yes.
25      Q   How about discipline of subordinates?  Do

Page 25

VINCENT PACIFICO

1
2   you recall anything specific about the training --
3       A   There was a motto in -- I'm sorry.  I --
4       Q   Go ahead.
5       A   There was a motto in the class that I
6   lived by, and they actually gave out coffee mugs to
7   help us remember.  And it said:  Catch a cop doing
8   something good.  So if you look for the best in
9   people, the ones that weren't arising to that level
10   would become apparent.  And avoid the "I got you
11   now" scenario.  And that's how I managed.
12      Q   During the time that you served as a
13   sergeant, did you have the opportunity to observe
14   Mr. Brewer's work performance?
15      A   Yes.
16      Q   Did you do performance appraisals for Mr.
17   Brewer?
18      A   I don't recall if I did or I didn't.  I do
19   not -- I don't recall.
20      Q   How long did you serve as Mr. Brewer's
21   supervisor?
22      A   I don't remember.
23      Q   Was there a requirement that performance
24   appraisals be done on an annual basis?
25      A   No.

7 (Pages 22 - 25)

Page 26

VINCENT PACIFICO

1
2  Q   No?
3  A   (Witness nods.)
4  Q   Was there a requirement that the
5  performance appraisals be done at all?
6  A   I can just recall, at some point in time
7  during my time in the Berks County Sheriff's
8  Department, receiving correspondence that it's time
9  for performance evaluations.  I do not know the
10  schedule or the pace at what they were controlled.
11  Q   If performance appraisals were done for
12  you -- by you for Mr. Brewer, would they be
13  contained somewhere?
14  A   I would assume so.
15  Q   Without having them in front of you, are
16  you able to, in a word or two, describe your view of
17  Mr. Brewer's work performance as a deputy?
18  A   In one word?
19  Q   No.  In a couple words, just in your own
20  words.  I'll break it down for you.  How would you
21  describe his work knowledge?
22  A   Knowledge?
23  Q   Yeah, knowledge of the job.
24  A   What scale would you like me to use?
25  Q   Any scale you would like.

Page 27

VINCENT PACIFICO

1
2  A   One to ten?  Fair, good, poor?
3  Q   Fair, good, poor.
4  A   His knowledge of the work that needed to
5  be done; is that the question you're asking?
6  Q   Yes.
7  A   It was good.
8  Q   Was there anything that you recall that
9  was noteworthy about his work knowledge?
10  A   He was very personable.
11  Q   Anything else?
12  A   I think I already summed it up.  He was
13  personable, got along with others.  People liked
14  him.  I liked him.
15  Q   Would you say you had a good
16  relationship -- a good work relationship with Mr.
17  Brewer?
18  A   Yeah.
19  Q   Did you ever comment on Mr. Brewer's
20  national origin?
21  A   No.
22  Q   Did you ever comment on Mr. Brewer's
23  accent?
24  A   No.
25  Q   Did you ever make comments about his hair?

Page 28

VINCENT PACIFICO

1
2  A   No.
3  Q   Did you ever make any comments as to his
4  appearance?
5  A   No.
6  Q   When I say make comments, I'm not talking
7  about just to Mr. Brewer.  Did you ever make
8  comments of any sort concerning Mr. Brewer to anyone
9  else?
10  A   No.
11  Q   Okay.  Let's talk about your assessment of
12  Mr. Brewer's sense of responsibility towards his
13  job.  Was he a responsible employee?
14  A   I don't want to dwell on the negative.
15  There were times that he was someone that I was
16  proud to supervise.  But moments that he let me
17  down.
18  Q   What moments were those?
19  A   When he abandoned his post.
20  Q   When did he abandon his post?
21  A   He was assigned to a courtroom and left
22  the courtroom.  And we had gotten a call that there
23  was no deputy in the courtroom, and they needed a
24  deputy.
25  Q   Do you recall when that was?

Page 29

VINCENT PACIFICO

1
2  A   Don't recall a date or time.
3  Q   Whose courtroom was it?
4  A   Judge Sprecher's.
5  Q   And who notified you that Mr. Brewer had
6  left the courtroom?
7  A   He didn't notify me that he left the
8  courtroom.  He notified that there was no deputy in
9  the courtroom.
10  Q   When you say he, are you talking about
11  Judge Sprecher?
12  A   No.  It was Royal (sic).  That's his first
13  time.  And his last name I believe began with an S.
14  Royal Spatz (sic) or something -- just say Royal
15  (sic) because I'm not sure on his last name.
16  Q   And he notified you that there was no
17  deputy in the courtroom?
18  A   There's no deputy in the courtroom, and we
19  needed a deputy.
20  Q   What was going on in the courtroom at the
21  time?
22  A   The judge was getting ready to come back
23  out.
24  Q   Did you talk to Mr. Brewer about this
25  incident?

8 (Pages 26 - 29)

Page 30

VINCENT PACIFICO

1
2    A    Yes.
3    Q    And what did he say?
4    A    I responded to the courtroom because I had
5  no other deputies available.  I got to the
6  courtroom.  He was not there.  I called him on the
7  radio, asked his location.  He said, I'm in
8  Courtroom 3.  And I said, no, you're not because I'm
9  in Courtroom 3.
10   Q    So your view was that Mr. Brewer was not
11 truthful about his location when you contacted him?
12   A    He lied to me.
13   Q    And he said, I'm in Courtroom 3 right now?
14   A    Yes.
15   Q    Did you discuss that with Mr. Brewer?
16   A    Yes.
17   Q    What did he say?
18   A    A lot was said in between then.
19   Q    Let's walk through what was said.  When
20 did -- how soon after you were advised by
21 Royal-somebody (sic) that there was no deputy there
22 did you talk to Mr. Brewer about it?  Was it like in
23 a matter of minutes or an hour?
24   A    No.  Because I -- I raced up to the
25 courtroom because an empty courtroom falls on the

Page 31

VINCENT PACIFICO

1
2  supervisor's shoulders.  It makes me look bad.  And
3  it would have been that day.  Giving you a time
4  would not be accurate.  I know I spoke to him that
5  day.
6    Q    Again, to the best of your recollection,
7  had Mr. Brewer been assigned to that courtroom,
8  Courtroom 3?
9    A    Yes.
10   Q    So he was assigned to Courtroom 3.  You
11 get a call from Royal-somebody (sic) that there's no
12 deputy in the courtroom.  You go up to the
13 courtroom.
14   A    Correct.
15   Q    And, again, my question -- and you think
16 it was at some point that day that you spoke to Mr.
17 Brewer about his absence from that courtroom?
18   A    Well, I know there was conversation
19 immediately when he returned.  But maybe I'm not
20 clear on your question.
21   Q    Let me back up.  Maybe I wasn't clear.
22 You find out that the courtroom is unattended?
23   A    Uh-huh, yes.
24   Q    You called Mr. Brewer on his radio?
25   A    Correct.

Page 32

VINCENT PACIFICO

1
2    Q    You said we need some -- what --
3    A    I asked him where he was.
4    Q    You asked him where he was.  He said he
5  was in Courtroom 3?
6    A    Correct.
7    Q    You said that's not true because I'm in
8  Courtroom 3 -- or words to that effect?
9    A    Words to that effect.
10   Q    What did he say?
11   A    I'm on my way.
12   Q    Did he say where he was on his way from?
13   A    No.
14   Q    Did he arrive at Courtroom 3?
15   A    Yes.
16   Q    How long after you spoke to him on the
17 radio did he arrive?
18   A    Brief period of time.  I don't remember
19 how many minutes it was.
20   Q    Did you ask him where he was?
21   A    Yes.
22   Q    Where was he?
23   A    He had a coffee in his hand, and he said
24 he went to get a cup of coffee.
25   Q    Did he say anything else?

Page 33

VINCENT PACIFICO

1
2    A    I needed it.
3    Q    Did you have any other conversation with
4  him about it?
5    A    I'm certain I did, but I do not recall it
6  as we sit here -- at that point in time?
7    Q    Yes.
8    A    I don't recall the exact words.  I'm
9  certain there was some conversation about how this
10 is your responsibility, how you need to remain in
11 your courtroom.  And I had this conversation with
12 him and other deputies.  If you ever need a break,
13 just call the control room.  We'll work it out.  You
14 cannot leave without notifying the control room.
15 And that was a -- that was not only that day, but a
16 regular reminder.
17   Q    At the time that no one was -- at the time
18 that Courtroom 3 was unattended, were there court
19 proceedings taking place or was the judge getting
20 ready to come back on the bench?
21   A    There were people in the courtroom when I
22 arrived.  The door was unlocked, but the judge had
23 yet to return to the bench.
24   Q    So the people in the courtroom, were they
25 lawyers and witnesses and so forth or other court

9 (Pages 30 - 33)

Page 34

VINCENT PACIFICO

1
2 personnel?
3     A    It was more than just officers of the
4 court.
5     Q    Were there any other incidents involving
6 Mr. Brewer while you supervised him that caused you
7 concern?
8     A    There was one incident where we needed
9 deputies to go out and serve subpoenas.  And Mr.
10 Brewer was one of the deputies assigned to go out
11 and serve subpoenas -- one of many, and he didn't do
12 his assigned job.
13    Q    What specifically did he not do?
14    A    He didn't serve subpoenas.
15    Q    Did you have a conversation with him about
16 it?
17    A    Yes.
18    Q    What did he say?
19    A    He didn't know his way around the city.
20    Q    Did he have a GPS?
21    A    I don't recall what he had.
22    Q    Were GPSs furnished to deputies?
23    A    And maps.
24    Q    Do you know whether, in fact, Mr. Brewer
25 was furnished with a map and/or a GPS?

Page 35

VINCENT PACIFICO

1
2     A    I think every one of us was issued a map,
3 and there were maps in the cars.  And I had assigned
4 him in the city because that was the area that he
5 trained me how to do subpoenas.
6     Q    Did you ever ride along with Mr. Brewer in
7 a car?
8     A    Yes.
9     Q    Did Mr. Brewer seem to have an
10 understanding as to how to get around Berks County?
11    A    We were in the city when we rode around
12 together, and he was -- very well.  Very, very good.
13    Q    So he knew the city pretty well?
14    A    Very well.
15    Q    Did he know other parts of Berks County as
16 well as he knew the city?
17    A    I didn't observe that.  I don't know what
18 he knew and didn't know.
19    Q    Why did your employment with Berks County
20 end?
21    A    I was terminated.
22    Q    When was that?
23    A    January 2013.
24    Q    What was the basis for the termination?
25         MR. ADAIR:  At this point in time, what

Page 36

VINCENT PACIFICO

1
2 I'm going to do is -- ordinarily, I would
3 object and tell him not to answer these
4 questions because there was a suit that was
5 filed by Mr. Pacifico against the County.
6         MR. McCOMB:  Yeah.  I have the complaint.
7         MR. ADAIR:  That was resolved through a
8 settlement agreement, and part of the
9 settlement agreement was that this was to
10 remain confidential.
11         What I'll do -- because this is -- you
12 know, Mr. Pacifico's up here for his
13 deposition, I'm going to ask that this part of
14 the transcript be maintained separately.
15         MR. McCOMB:  That's fine.
16         MR. ADAIR:  I'll let you ask the
17 questions.
18         MR. McCOMB:  That's fine.
19         MR. ADAIR:  We can file a motion down the
20 line for, you know, a protective order,
21 whatever we need to do to keep it confidential.
22 But that way, you can ask the questions, and
23 we --
24         MR. McCOMB:  That's fine.  Because
25 otherwise, I would --

Page 37

VINCENT PACIFICO

1
2         MR. ADAIR:  You'd go to the judge.
3         MR. McCOMB:  We'd go to the judge.
4         MR. ADAIR:  Correct, correct.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

10 (Pages 34 - 37)

Page 38

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 40

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 39

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 41

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

11 (Pages 38 - 41)

Page 42

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 44

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 45

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12 (Pages 42 - 45)

Page 46

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 48

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 49

VINCENT PACIFICO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

13 (Pages 46 - 49)

Page 50

```
 1              VINCENT PACIFICO
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 51

```
 1              VINCENT PACIFICO
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 52

```
 1              VINCENT PACIFICO
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18         MR. McCOMB:  If we could mark this as
19    Pacifico-4.
20              ---
21         (Whereupon, the document was marked,
22    for identification purposes, as
23    Pacifico-4.)
24              ---
25
```

Page 53

```
 1              VINCENT PACIFICO
 2 BY MR. McCOMB:
 3    Q   It's October 20th.  Mr. Pacifico, I'm
 4 showing you what's been marked for identification
 5 purposes as Pacifico-4.  I'd ask you to review this
 6 to yourself, and when you're done, to look up.
 7    A   (Witness reviews document.)
 8         Okay.
 9    Q   Is this the incident that you testified to
10 earlier involving Judge Sprecher's courtroom?
11    A   Yes.
12    Q   And is the person you've identified
13 earlier, Royce -- is that Royce Spadt, S-P-A-D-T?
14    A   Yes.
15         MR. ADAIR:  For -- it's pronounced Spate
16    (ph), but he's not here to complain.
17         MR. McCOMB:  Right.
18 BY MR. McCOMB:
19    Q   And did you have a conversation in which
20 Mr. Spadt said that you had gone to the bathroom --
21 or that Mr. Brewer said he'd gone to the bathroom?
22    A   Yes.  That's what this says.
23    Q   It says, Royce stated that you went to the
24 bathroom.  He says you.  This is a memo to Mr.
25 Brewer, correct?
```

14 (Pages 50 - 53)

Page 54

VINCENT PACIFICO

1
2   A    This is a written warning filed by Chief
3 Deputy Anthony Damore.  These are his words and his
4 account.
5   Q    Well, did Mr. Damore do any investigation
6 into this incident?
7   A    I don't know what he did.
8   Q    Well --
9   A    I would certainly consider that he did,
10 but I'm not him.
11   Q    Did you relay the facts of the incident to
12 Chief Damore?
13   A    Yes.
14   Q    And did you have a conversation with Chief
15 Damore as to whether there should be a warning
16 issued to Deputy Brewer?
17   A    No.
18   Q    Whose idea was it to issue a warning to
19 Deputy Brewer?
20   A    Not mine.
21   Q    Whose was it to the best of your
22 knowledge?
23   A    Don't know.
24   Q    Your name appears at least a half dozen
25 times in the memo, correct?

Page 55

VINCENT PACIFICO

1
2   A    Correct.
3   Q    So I take it these are facts that you
4 relayed to Chief Damore?
5   A    That's fair to assume.
6   Q    Well, is there any other way he would have
7 gotten the information that's set out in this memo?
8   A    No.
9   Q    How far -- is there a vending area in the
10 courtroom near the bathrooms?
11   A    No.  It's in the other building.
12   Q    The first sentence says -- this is, again,
13 to Deputy Brewer.  On October 7th, you were assigned
14 to Courtroom 3 with Judge Jeffrey Sprecher, period.
15 Judge Sprecher was scheduled to be completed at
16 10:30 a.m. for a video conference.
17       What are you referring to there?
18   A    I didn't write this.
19   Q    Do you know what Chief Damore is referring
20 to?
21   A    I interpret that to read that everyone
22 assumed Sprecher would be occupied in chambers in a
23 video conference.
24   Q    Until 10:30?
25   A    That's my interpretation of what that

Page 56

VINCENT PACIFICO

1
2 says.
3   Q    And where did you get that information?
4   A    You just asked me to read it and tell you
5 what I thought it meant.  That's what I think it
6 means.
7   Q    Okay.  But you don't know whether Chief
8 Damore spoke to Judge Sprecher, do you?
9   A    I don't know.
10   Q    You don't have any knowledge one way or
11 the other?
12   A    I don't know what Chief Damore did.  And
13 it was five years ago.  He obviously did something.
14   Q    Well, he spoke to you obviously?
15   A    Oh, yes.  And he heard it on the radio.
16   Q    What did he hear on the radio?
17   A    Well, anyone that had a radio in their
18 hands would have heard me call him and ask him where
19 he's at and him answer, I'm in Courtroom 3, and
20 heard me say, I'm in Courtroom 3.
21   Q    Do you know whether Chief Damore heard
22 that conversation on his radio?
23   A    Don't know.
24   Q    Did you -- you never discussed it with
25 him?

Page 57

VINCENT PACIFICO

1
2   A    I don't remember if I did or I didn't.
3   Q    Did you inform Deputy Brewer that his
4 actions were unacceptable?
5   A    Yes.
6   Q    And he apologized to you?
7   A    Yes, he did.
8   Q    What did he say?
9   A    He said he was sorry, and I accepted it.
10   Q    Were there any repercussions about not
11 having a deputy in Judge Sprecher's courtroom at
12 10:07 a.m.?
13   A    I don't understand your --
14   Q    Well, did --
15   A    -- question.
16   Q    -- Judge Sprecher file a written complaint
17 with the sheriff's department?
18   A    Not that I'm aware of.
19   Q    Did he complain to the sheriff and say
20 that you're not doing your job?
21   A    Not that I'm aware of.
22   Q    Was there any threat to public safety by
23 not having a deputy in the courtroom at 10:07 on
24 October 7, 2010?
25   A    Of course.

15 (Pages 54 - 57)

1           VINCENT PACIFICO
2    Q   What was the threat to public safety?
3    A   If the courtroom door's open and there's
4 citizens in there and we're not staffing an area
5 that we're required to staff and something should or
6 could happen, we could be held liable.  That's why
7 we're there.
8    Q   So the people in the courtroom were
9 civilians and court staff, correct?
10   A   Correct.
11   Q   What was the threat caused by them being
12 present without a deputy?
13   A   I don't know who they're there for.  I
14 mean, it could have been a divorce case.  There --
15 something could have erupted.  That's our purpose
16 for existence, for being there.
17   Q   But you don't recall any complaints?  No
18 complaints were made to the sheriff's department
19 about this incident?
20   A   I don't know what communication was had
21 between Sprecher and the chief or the sheriff.
22   Q   If Judge Sprecher had complained, do you
23 think that would have been brought to your attention
24 at some point?
25   A   Not necessarily.

1           VINCENT PACIFICO
2    MR. McCOMB:  Let's mark this as
3 Pacifico-5.
4           - - -
5        (Whereupon, the document was marked,
6        for identification purposes, as
7        Pacifico-5.)
8           - - -
9 BY MR. McCOMB:
10   Q   Mr. Pacifico, I'm showing you what's been
11 marked for identification purposes as Pacifico-5.
12 I'll represent it's a memo to Deputy Brewer from
13 Chief Damore dated December 14, 2010.  I'd ask you
14 to look at it and when you're done reviewing it, to
15 look up.
16   A   (Witness reviews document.)
17   Q   Before I ask you about Pacifico-5, looking
18 back at Pacifico-4, do you recall any other deputies
19 being written up for not being in a courtroom where
20 the judge wasn't on the bench?
21   A   Wait a minute.  You said 4?
22   Q   Yeah, look at 4.  We just talked about 4.
23   A   Is this 4?
24   Q   The incident with Judge Sprecher.
25   A   Involving me?

1           VINCENT PACIFICO
2    Q   Yeah.  To the best of your knowledge, was
3 any deputy -- are you aware of any other deputy who
4 was written up for not being present in a courtroom
5 where the judge had not yet come on the bench?
6    A   Ask me that one more time.
7    Q   Okay.  To the best of your knowledge, are
8 you aware of any other deputy written up for not
9 being in a courtroom where the judge had not yet
10 come out to be on the bench?
11   A   A very similar incident with some
12 different facts, yes.
13   Q   Who?
14   A   Peter Fox.
15   Q   What was Peter Fox written up for?
16   A   He was written up for not following an
17 evacuation drill and securing his courtroom and
18 actually not being where he was supposed to be at
19 the same time, and then went back to his courtroom,
20 I believe, before he was supposed to go back to his
21 courtroom.
22   Q   That's a little different, right?
23   A   That's why I asked you to repeat it a few
24 times.  So there's another incident where another
25 deputy was disciplined surrounding being where he

1           VINCENT PACIFICO
2 was supposed to be at the right time involving the
3 courtroom and a judge.
4    Q   But to the best of your knowledge, has any
5 other deputy been written up for not being present
6 in a courtroom where the judge hadn't --
7    A   Not that I recall today.
8    Q   Okay.  Looking at 5, which you just
9 reviewed to yourself, there's a reference here to an
10 incident on December 2, 2010 involving Deputy
11 Brewer?
12   A   Yes.
13   Q   And there was an emergency situation in
14 the Domestic Relations office?
15   A   Yes.
16   Q   Do you recall what that was?
17   A   It says here that staff was unable to
18 locate you during an emergency causing the staff to
19 press the emergency button, which sends a radio
20 broadcast notifying the entire sheriff's department
21 of the situation and calls for assistance.
22   Q   Okay.  What was the emergency situation?
23   A   I wasn't there.  Don't know.
24   Q   Well, have you seen this memo before
25 today?

16 (Pages 58 - 61)

VINCENT PACIFICO

1
2    A    Yes.
3    Q    And did you provide any of the information
4  that's set out in this memo to Deputy Brewer?
5    A    Page two, not page one.
6    Q    Was Deputy Brewer assigned to the Domestic
7  Relations office on December 2, 2010?
8    A    That's what this says.
9    Q    It says --
10    A    Just to be clear, this is not from me.
11  This is from Chief Deputy Anthony Damore.
12    Q    Right.  And I'm asking you what you know
13  about it.  And, again, do you know one way or the
14  other whether Deputy Brewer was assigned to the
15  Domestic Relations office on December 2, 2010?
16    A    Using this to refresh my memory, yes.  And
17  I recall this incident.  But I --
18    Q    What do you recall about it?
19    A    I recall running down the hallways to
20  go -- to see what was going on in Domestic
21  Relations.  Beyond that, I don't know what occurred
22  in Domestic Relations.
23    Q    Do you have any knowledge as to whether or
24  not being assigned to the Domestic Relations office
25  meant that he was physically supposed to be present

VINCENT PACIFICO

1
2  in that office?
3    A    Yes.
4    Q    And when somebody's assigned to a certain
5  location, like there are times where they take
6  a break or get to go to the bathroom, correct?
7    A    Yes.
8    Q    Or they get to go to lunch?
9    A    Yes, upon proper relief.
10    Q    How is that relief handled?
11    A    Call the control room, ask for relief.
12    Q    And so if someone wants to step out for
13  two minutes to go to the men's room, you would --
14  the procedure would be to call the office and ask
15  for someone to cover you during that period of time?
16    A    Under what circumstance?
17    Q    Somebody has to go to the bathroom.
18  Someone's assigned to the Domestic Relations office,
19  and they have to go to the bathroom.  My question
20  is, is the procedure they would have to call and get
21  someone to cover them during the period of time they
22  go out to the bathroom?
23    A    I don't know the answer to that because I
24  believe there's a bathroom there.  In most court
25  cases, if there's two deputies, we generally allowed

VINCENT PACIFICO

1
2  one to step out for a moment to relieve him or
3  herself and return as long as there was coverage.
4  And then --
5    Q    But how about when there's just one?
6    A    No, no.  You have to call to get coverage.
7  You can't abandon a post.
8    Q    Now, I know that Chief Damore wrote the
9  first page of Pacifico-5.  But did you have any
10  involvement in that incident?
11    A    I was one of the people running down the
12  hallways to render assistance as needed and was
13  there when Mr. Brewer came back.  But I was not the
14  person that interacted with him, to my recollection,
15  when he came back with the poinsettia.
16    Q    What assistance did you provide --
17    A    I really didn't provide any assistance
18  because there were more deputies there than were
19  ever needed because they pressed the emergency
20  button.  No one knew what was going on.  My office
21  was all the way in the other building, all the way
22  in the basement, and I was one of the last people to
23  get there.
24    Q    But you --
25    A    But I did get there before Mr. Brewer did.

VINCENT PACIFICO

1
2    Q    There's a reference here saying -- it's to
3  Mr. Brewer, saying you were seen exiting -- I
4  suppose that's supposed to be the elevator, not the
5  evaluator.
6    A    That's what this piece of paper says.
7    Q    -- with a coffee and poinsettia.  Are you
8  talking about the flower?
9    A    Plant.
10    Q    And it says here, you -- Mr. Brewer --
11  failed to respond to the emergency notification
12  returning to the Domestic Relations office after the
13  situation was contained.  How do you know that Mr.
14  Brewer failed to respond to the emergency
15  notification?
16    A    Sir, I don't know.  I didn't write this.
17    Q    Okay.  I'm just -- do you know -- do you
18  have any knowledge as to what -- you said you got
19  there before he did, right?
20    A    I already answered you.
21    Q    But you don't know whether Mr. Brewer
22  failed to respond to the emergency situation, do
23  you?
24    A    Well, to be clear, I didn't write this.
25    Q    Right.

17 (Pages 62 - 65)

Page 66

VINCENT PACIFICO

1
2    A    The rest of us were running, and he was
3  walking off the elevator with poinsettia in one hand
4  and a coffee in the other.  I assume one could draw
5  that conclusion, that we responded and he appeared.
6    Q    Did you ever have a discussion with Mr.
7  Brewer as to whether his radio was working?
8    A    With this incident?
9    Q    Yeah.
10    A    I don't believe so.
11    Q    Did you ever have any discussion with Mr.
12  Brewer as to whether his radio was functioning
13  properly?
14    A    Specifically, no.  But we kept a group of
15  spare radio, spare batteries and spare antennas
16  should such an occasion arise.  And on a regular
17  basis -- I don't recall him specifically coming in
18  and asking for a new antenna or a new battery or a
19  new radio, but it was routine that things wear out
20  and we would replace them.
21    Q    Are you aware of any instances in which
22  deputies for the Berks County Sheriff's Department
23  complained about a malfunctioning radio?
24    A    Yeah.  A deputy would walk in at the
25  beginning of his shift or her shift after making

Page 67

VINCENT PACIFICO

1
2  sure they were properly equipped for the day and
3  say, my antenna's broke.  You got anymore?  I'd open
4  up my drawer, here you go.  My battery's not holding
5  a charge.  Take a new one.  I had a supply of both.
6    Q    Let's look at the second page of
7  Pacifico-5.  Did you have any input into what's
8  contained on the second page?
9    A    I believe I did.
10    Q    Did you provide the facts that are
11  contained in this memo to Chief Damore?
12    A    I believe I did.
13    Q    And was -- does the incident involve Mr.
14  Brewer's not serving a subpoena?
15    A    This reflected that he was assigned to
16  serve subpoenas.  And at 1:30 in the afternoon, he
17  came back to the department and stopped doing what
18  he was assigned and told the control room he was
19  available.
20        And then at the end of the shift, he
21  listed on his daily log that he spent the rest of
22  the afternoon on the cell block.  And then it says
23  that during the investigative interview, by your own
24  admission, you did not complete any work the rest of
25  your shift.

Page 68

VINCENT PACIFICO

1
2    Q    What was he doing on the cell block?
3    A    I can't answer that.
4    Q    Did he say what he -- did anyone ask him
5  what he was doing on the cell block?
6    A    Nothing.
7    Q    My question is, did anyone ask him?  Did
8  you ask him?
9    A    I didn't interview him.
10    Q    Did anybody interview him?
11    A    Somebody did.  It says right here, during
12  the investigative interview.
13    Q    Do you know who did the investigative
14  interview?
15    A    The person that wrote this was Chief
16  Anthony Damore.
17    Q    Are you aware of other deputies being
18  written up for not serving a subpoena?
19    A    For not serving a subpoena?
20    Q    Yeah.
21    A    No.  But that wasn't the characteristic of
22  this.
23    Q    Okay.  But my question is, are you aware
24  of deputies being written up for failure to serve a
25  subpoena?

Page 69

VINCENT PACIFICO

1
2    A    No.  I don't recall any.
3    Q    Are you aware of any deputies ever coming
4  back to you saying they didn't serve a subpoena
5  because they couldn't locate the address?
6    A    Yes.  There are many occasions where it's
7  a bad address or the people moved or any number of
8  reasons a subpoena cannot be served.  But none of
9  those reasons list spending the afternoon in the
10  cell block and not completing the assigned task.
11    Q    But you didn't do the interview for Mr.
12  Brewer, right?
13    A    Not that I recall, no.
14    Q    So you don't know what he was doing in the
15  cell block, do you?
16    A    I do not know what he was doing.
17        MR. McCOMB:  If you could mark this as
18  Pacifico-6?
19            - - -
20        (Whereupon, the document was marked,
21        for identification purposes, as
22        Pacifico-6.)
23            - - -
24  BY MR. McCOMB:
25    Q    Mr. Pacifico, I'm showing you what's been

18 (Pages 66 - 69)

Page 70

VINCENT PACIFICO

1
2 marked for identification purposes as Pacifico-6. I
3 would ask you to review it to yourself, when you're
4 done, to look up.
5     A    (Witness reviews document.)
6     Okay.
7     Q    Have you seen this before today?
8     A    No -- well, obviously on January 7th of
9 2011, I saw it.
10    Q    And that's your signature at the bottom of
11 the page?
12    A    Yes.
13    Q    And did you play any input into the
14 drafting of this report?
15    A    No.
16    Q    Who did?
17    A    Well --
18    Q    Who drafted it?
19    A    I don't know.  It came from the sheriff's
20 office, but my recollection is it was through time
21 management or HR.  I know I didn't type it, but
22 there's no "from" on it.
23    Q    Do you know the source of the information
24 that Mr. Brewer failed to clock in or out for a
25 scheduled shift on December 28, 2010?

Page 71

VINCENT PACIFICO

1
2     A    Our time management program, this appears
3 like, on page two.
4     Q    Did anyone ask Mr. Brewer as to the
5 circumstances of this incident?
6     A    I don't know the answer to that.
7     Q    Are there circumstances in which a deputy
8 may fail to check in or out for circumstances beyond
9 their control?
10    A    Only if they're out of town on an
11 extradition.
12    Q    Are you aware of any deputies being
13 written up for a time clock violation, a failure to
14 clock in or out without notifying a supervisor?
15    A    Yes.  And this is not a write-up.  This is
16 just counseling.  And when this came out, it was
17 widespread.  It was a counseling session to remind
18 all the deputies that were not punching in and out
19 correctly to punch in and out correctly.  So this
20 was not focused on Mr. Brewer.  This was very
21 widespread.
22    Q    So other deputies received a similar first
23 offense --
24    A    Yes.
25    Q    -- memorandum?

Page 72

VINCENT PACIFICO

1
2     A    Yes.
3     Q    Was this put in Mr. Brewer's personnel
4 file?
5     A    I don't have that knowledge.  It's here
6 today.  So it was put somewhere.
7     MR. McCOMB:  Let's mark this as 7.
8          - - -
9          (Whereupon, the document was marked,
10         for identification purposes, as
11         Pacifico-7.)
12          - - -
13 BY MR. McCOMB:
14    Q    Mr. Pacifico, I'm showing you what's been
15 marked for identification purposes as Pacifico-7.
16 I'd ask you to review it to yourself, when you're
17 done, to look up.
18    A    (Witness reviews document.)
19    Okay.
20    Q    Have you seen this before today?
21    A    Yes.
22    Q    When did you see it?
23    A    Yesterday?  Did I see it yesterday?  I
24 think I saw it yesterday.
25    Q    Prior to preparation for your deposition,

Page 73

VINCENT PACIFICO

1
2 do you recall seeing this?
3     A    Yeah.  I believe I saw it yesterday.
4     Q    And this is a memorandum prepared by Chief
5 Damore?
6     A    It says to Albert Brewer, Deputy, from
7 Anthony Damore, Chief Deputy.
8     Q    Did you provide any of the factual
9 material that's set out on Pacifico-7 to Chief
10 Damore?
11    A    Absolutely not.
12    Q    Do you know who did?
13    A    I have no idea.
14    Q    Were you consulted by Chief Damore prior
15 to the decision to terminate Deputy Brewer?
16    A    No.
17    Q    Do you know who made the decision to
18 terminate Deputy Brewer's employment?
19    A    I wasn't consulted.
20    Q    Well, whether you were consulted or not,
21 do you know who made the decision?
22    A    No.
23    Q    When did you first hear that Deputy Brewer
24 had been terminated?
25    A    I don't recall.  But I believe it was

19 (Pages 70 - 73)

Page 74

VINCENT PACIFICO

1
2 after he learned of it.  I had no knowledge that
3 this was occurring.
4      Q    Had you ever made a recommendation that
5 Deputy Brewer's employment should be terminated?
6      A    I have never made specific disciplinary
7 recommendations in any case other than a request for
8 discipline.
9      Q    Did you ever make a request for discipline
10 as to Deputy Brewer?
11     A    I had nothing to do with this.
12     Q    You just said that.  My question is, did
13 you ever make a request for discipline as to Deputy
14 Brewer?
15     A    Yes.
16     Q    When?
17     A    The Courtroom 3 action.
18     Q    What discipline did you request being
19 imposed?
20     A    I requested discipline.  That is my -- the
21 end of the scope of my responsibility.
22     Q    Was there any discussion between you and
23 Chief Damore as to the type of discipline to be
24 imposed?
25     A    No.

Page 75

VINCENT PACIFICO

1
2      Q    How about with the sheriff, did you have
3 any discussion about a request for discipline with
4 Sheriff Weaknecht?
5      A    No.
6      Q    Have you ever had any discussion with
7 Sheriff Weaknecht as to -- in regards to discipline
8 as to any deputy?
9      A    Request for discipline --
10     Q    Yeah.
11     A    -- or the outcome of it?
12     Q    A request for discipline.
13     A    Well, certainly.  If I make a written
14 request for discipline, it would be turned in.  And
15 that's where it ended with me, supply the facts and
16 then my part was done.
17     Q    What deputies do you recall having made a
18 request for discipline as to?
19     A    One that stands out is Peter Fox.
20     Q    What nationality is Mr. Fox?
21     A    He's a White male.  I believe his origin
22 is Italian.  I really didn't focus too much on it.
23 I thought he was -- had some Italian heritage.  I
24 don't know.  I could be wrong.
25     Q    Anyone else that you'd made a request for

Page 76

VINCENT PACIFICO

1
2 discipline to?
3      A    I'm certain there are.  I just do not
4 recall the specifics.
5      Q    Did you ever make a request for discipline
6 as to a minority?
7      A    No.  I requested discipline for deputies.
8      Q    I know.  A member of a minority group --
9      A    Well, of course.
10     Q    -- other than Deputy Brewer?
11     A    I don't recall if I did or I didn't.  I
12 didn't view it that way.
13     Q    How many deputies did you supervise?
14     A    At one point -- well, as a sergeant, 36.
15 And then as a captain, 50-ish.
16     Q    When did you serve as a captain?
17     A    2012, 2013.
18     Q    What was the process by which you were
19 promoted a captain?  Was it similar to being
20 promoted to sergeant?
21     A    Same process.
22     Q    A letter of interest?
23     A    Yes.
24     Q    And who interviewed you?
25     A    The sheriff -- the sheriff and one of the

Page 77

VINCENT PACIFICO

1
2 other captains.
3      Q    How many captains were there?
4      A    Totally, there were four captains.
5      Q    How many deputies were there?
6      A    Around a hundred -- approximately a
7 hundred.  We had a total staff of approximately 110.
8 It was constantly evolving.
9          THE WITNESS:  Can I just use the restroom
10     real quick?
11          MR. McCOMB:  Sure.
12                  - - -
13          (Whereupon, there was a break in the
14          deposition from 10:58 to 11:02.)
15                  - - -
16 BY MR. McCOMB:
17     Q    So a hundred deputies --
18     A    Approximately.
19     Q    -- four captains?
20          Did the captains report to the chief
21 deputy or does he report to a captain?
22     A    The structure when I was there, the
23 captains reported to the chief deputy.
24     Q    How many -- was there just one chief
25 deputy?

20 (Pages 74 - 77)

VINCENT PACIFICO

2   A   Yes.
3   Q   And he reported to the sheriff?
4   A   Yes.
5   Q   So it's sheriff down to chief deputy to
6   the four captains.  How many sergeants were there?
7   A   Approximately eight.  That sort of evolved
8   from time to time.
9   Q   How many of the captains were Hispanic or
10  Latino?
11  A   During my tenure, one.
12  Q   Who was that?
13  A   Sev Berrios.
14  Q   B-A-R-R-I-O-S?
15  A   I think it was B-E.
16  Q   Huh?
17  A   I think it was B-E-R-R-I-O-S.
18  Q   And how long did Captain Berrios serve?
19  A   I don't know.  He was there before I got
20  there and left after I left.
21  Q   How many of the sergeants were Hispanic or
22  Latino?
23  A   One for sure.
24  Q   Who was that?
25  A   Jose Davila.

VINCENT PACIFICO

2   Q   What sort of relationship did you have
3   with Captain Berrios?
4   A   Fine.
5   Q   Did you ever have any conflicts with him?
6   A   Never.
7   Q   How about with Sergeant Davila?
8   A   We had a conflict that was later
9   determined that I had absolutely nothing to do with
10  and he was upset at the wrong person.
11  Q   What was the conflict over?
12  A   That someone taped information to the
13  sergeant's desk in booking, and he got very angry
14  and upset and sent out emails and got way out of
15  control assuming I did it.  And it was later
16  determined I had absolutely nothing to do with it.
17  Q   Did you recommend that Sergeant Davila be
18  disciplined for his response or his email to you
19  regarding the taping?
20  A   I relayed to the chain of command that I
21  was very unhappy with the threatening email that he
22  sent me, and I know nothing about what this man is
23  talking about.  And it was later determined that
24  another sergeant taped it to the desk because he
25  didn't want it to get lost because it was an

VINCENT PACIFICO

2   important piece of material.
3   Q   Do you know why Sergeant Davila assumed it
4   was you who had done the taping?
5   A   I have no idea.
6   Q   Did you ever ask him?
7   A   No, not that I recall.
8   Q   Of the hundred or so deputies, how many
9   were Hispanic or Latino approximately?
10  A   I don't know that answer.  You know, I
11  just don't know that answer.  I look at you, I don't
12  know your heritage.  I can't assume those things.
13  And quite honestly, it didn't make a difference.  A
14  deputy was a deputy was a deputy.
15  Q   So the answer is you don't know how many?
16  A   I don't know.  We had people from all
17  walks of life.
18  Q   Did you ever refer to Jose Davila as a
19  Puerto Rican cockroach?
20  A   Absolutely not.
21  Q   Did you ever say that you would crush him?
22  A   Jose Davila was my supervisor, and the
23  answer is no.
24  Q   Well, he was -- he was a sergeant,
25  correct?

VINCENT PACIFICO

2   A   He was a senior sergeant to me, and that
3   would have been insubordination, and I did not say
4   that.
5   Q   Did you ever say it to anyone else?
6   A   No.
7   Q   Did you ever say to Deputy Brewer, take
8   your hat off, and then say, oh, never mind, that is
9   your hair?
10  A   No.
11  Q   Are you aware of whether Deputy Brewer
12  speaks languages other than English?
13  A   I was aware that he spoke Spanish because
14  I speak Spanish, very little, and from time to time,
15  we would sit and talk and he would help me with
16  Spanish.  As far as other languages go, I have no
17  knowledge of that.
18  Q   Did you ever say to Deputy Brewer, quote,
19  how many fucking languages do you know?
20  A   I do not have any recollection of saying
21  that.  And if I would have asked him if he spoke
22  another language, it would have been a positive
23  thing, not a negative thing.
24  Q   Do you know a deputy by the name of Isaac
25  Santiago?

21 (Pages 78 - 81)

VINCENT PACIFICO

1
2     A    Yes.
3     Q    What was your relationship like with
4  Deputy Santiago?
5     A    Very limited.
6     Q    What do you -- in what -- did you ever
7  have any conflict with Deputy Santiago?
8     A    I did.
9     Q    What was it?
10     A    He had requested to come out of his
11  assignment in Domestic Relations, and I honored that
12  request and brought him down and put him on the
13  transport team.  And at some point in time, he had a
14  medical emergency or became quickly ill and went
15  home ill.  Upon returning, I asked him how he was,
16  and he lost it, just went off on me for asking him
17  how he was.
18     Q    What was the follow-up to that?
19     A    It was quite a lengthy incident because he
20  went into an area he was not authorized to go into,
21  and I repeatedly ordered him and asked him to leave
22  the area.  Eventually, he left the area.  He wanted
23  to speak to HR.  He wanted to speak to his union.
24  Everything was a big problem.  And I said, fine.  Do
25  all of that outside of the control room.  You are

VINCENT PACIFICO

1
2  disrupting the operations.  He eventually did.
3     Q    Did he speak to HR?
4     A    Yes.
5     Q    Did HR do anything?
6     A    He wound up getting disciplined.
7     Q    Santiago ended up being disciplined?
8     A    Yes.
9     Q    Did Santiago file an HR complaint about
10  you?
11     A    I don't know that he did or didn't.
12     Q    Do you know if any of the deputies or
13  employees of Berks County ever filed complaints
14  about you?
15     A    I was never brought up to HR to answer to
16  a complaint from a deputy.
17     Q    Well, that's not my question.  My question
18  is whether anyone ever filed a complaint about you.
19     A    I don't know.
20     Q    Were you ever told that someone had filed
21  a complaint about you?
22     A    No.
23     Q    Who was in charge of HR?
24     A    I don't remember his name.  I might
25  recognize it if I saw it or heard it.

VINCENT PACIFICO

1
2     MR. ADAIR:  Let's go off the record for a
3  minute.
4     MR. McCOMB:  Sure.
5     - - -
6     (Whereupon, there was a discussion
7  held off the record.)
8     - - -
9  BY MR. McCOMB:
10     Q    Was Sheriff Weaknecht related to anybody
11  serving in HR in Berks County?
12     A    His wife.
13     Q    His wife.  What was her name?
14     A    Jessica Weaknecht.
15     Q    What position did she hold?
16     A    I don't know, but I do know that she
17  worked off campus.  She did not work downtown.
18     Q    Were you friendly with Jessica Weaknecht?
19     A    I wasn't unfriendly with her, but I --
20     Q    Was Jessica Weaknecht ever asked to look
21  into allegations of HR issues involving the
22  sheriff's department?
23     A    I wouldn't have that knowledge.  And she
24  didn't work downtown.
25     Q    My question was whether she ever got

VINCENT PACIFICO

1
2  involved in HR issues?
3     A    I wouldn't have that knowledge.
4     Q    Okay.  So you don't know?
5     A    (Witness nods.)
6     Q    Do you know Elvin Ortiz?
7     A    Yes.
8     Q    Who's Mr. Ortiz?
9     A    He was a deputy that worked in Warrants.
10     Q    Did you ever have any conflicts with
11  Deputy Ortiz?
12     A    I had an investigation that was -- he was
13  the focus of.
14     Q    What was the investigation about?
15     A    Someone complained that when he was in
16  Warrants, they broke his door.  And I investigated
17  it and upheld that he was acting properly.
18     Q    Did Deputy Ortiz ever tell you that he was
19  going to file a complaint of discrimination?
20     A    No.  I supported him.  He did his job
21  well.
22     Q    So my question is, did he ever file a
23  complaint of discrimination against you?
24     A    No.
25     Q    Did you ever direct Deputy Santiago to

22 (Pages 82 - 85)

VINCENT PACIFICO

2 transport a prisoner by himself in violation of
3 procedure?
4    A   In violation of procedure?
5    Q   Yeah.
6    A   No.
7    Q   Did you ever ask him to transport a
8 prisoner by himself?
9    A   Yes.
10    Q   Did you ever ask any non-Hispanic deputies
11 to transport prisoners by themselves?
12    A   Yes.
13    Q   Who?
14    A   Vince Martello.
15    Q   When was that?
16    A   It happened on a regular basis.
17    Q   What prisoners was he asked to transport?
18 Anything unique about them?
19    A   No.
20    Q   Was there a policy requiring more than one
21 deputy to transport a prisoner?
22    A   The policy was that it was preferred when
23 practicable to have two deputies.
24    Q   Why was that?
25    A   Safer.

VINCENT PACIFICO

2    Q   What would be the factors that would enter
3 into whether it was acceptable to have a single
4 deputy transport a prisoner?
5    A   The medical condition of the prisoner and
6 the ability to thwart an escape.
7    Q   So if a prisoner's lying on a cot with an
8 IV on him, he's less of a risk of escape than
9 someone who's --
10    A   No.  But if he's a paraplegic or has a
11 broken leg or is of advanced age or in poor
12 health -- by all means, we tried to utilize staff as
13 best as possible.
14    Q   What were the circumstances under which
15 Deputy Martello was regularly asked to transport
16 someone by himself -- a prisoner by himself?
17    A   It was normally a new arrest, someone that
18 he just recently arrested.
19    Q   And what was unusual about those
20 circumstances?
21    A   Nothing unusual.
22    Q   Were other deputies asked to transport a
23 new arrest by themselves?
24    A   Some of them did from time to time, but
25 the one that stands out in my mind is Vince

VINCENT PACIFICO

2 Martello.  He was very active, and that scenario
3 occurred more often with him than with others.
4    Q   Okay.  Let's go back to Pacifico-7 that's
5 in front of you.  Did you play any part in the
6 preparation of Pacifico-7, either by drafting part
7 of it or supplying information to Chief Damore?
8    A   To my recollection, I have absolutely
9 nothing to do with this.
10    Q   Do you know who did the investigation of
11 the incident described in Pacifico-7?
12    A   Same answer.  To my recollection, I have
13 absolutely nothing to do with this.  I can't answer
14 those questions.
15    Q   Well, whether you did it or not, you may
16 have information as to who did the investigation.
17 My question is, do you know who did the
18 investigation?
19    A   This is from Anthony Damore, Chief Deputy.
20 That would lead me to believe that he would have
21 been someone that had something to do with it.
22    Q   Do you know if Detective Martinez was
23 interviewed?
24    A   I don't know.  If I believe everything I
25 read in here, it says that he was involved in it.

VINCENT PACIFICO

2    Q   Well, his name appears in the memo.
3 There's no doubt about that.  We can read that.  My
4 question is, do you know anything about whether he
5 was interviewed?
6    A   Don't know.
7    Q   If you look at the second page of
8 Pacifico-7, it says disciplinary history.  Did the
9 sheriff's department have a policy of progressive
10 discipline?
11    A   Yes.
12    Q   If the disciplinary history for Deputy
13 Brewer had been different than what is set out on
14 the second page, would the incident described on the
15 first page, if true, had resulted in his
16 termination?
17    A   I don't think that's a question I'm
18 qualified to answer.  If you're asking for my
19 opinion, I'll give it to you.
20    Q   Well, I'm not asking you to make a guess.
21 I'm asking you based on your experience -- a
22 considerable amount of experience as a deputy, as a
23 sergeant, as a captain, as to what the policies were
24 in Berks County and whether based on that
25 experience, in your personal view, the termination

23 (Pages 86 - 89)

1          VINCENT PACIFICO
2  of the deputy -- of Deputy Brewer would have taken
3  place if he'd had no other prior disciplinary
4  history?
5      A   You're asking me what I think?
6      Q   Yeah.
7      A   I think the result would have been the
8  same.
9      Q   Why?
10     A   He left the prisoner alone, unguarded, in
11  an unsecured area after being told not to.
12     Q   And you're basing that based on the memo,
13  right?
14     A   On what I'm reading.
15     Q   Right.  And you have no firsthand
16  knowledge of any of the facts set out in this memo,
17  right?
18     A   No.  I made that very clear.
19     Q   So --
20     A   I'm reading this just as you are.
21     Q   Right.
22     A   And you're asking me to form an opinion
23  off of what I've read.
24     Q   So your opinion is based on the
25  facts set out in the memo.  If true, that would have

1          VINCENT PACIFICO
2  supported the termination without regard to the
3  disciplinary history noted on the second page,
4  correct?
5      A   It wouldn't seem unreasonable.
6      Q   Now, I know you don't have any firsthand
7  knowledge of the incident set out on Pacifico-7.
8  But do you have knowledge of what people, in fact,
9  do have knowledge of these facts or is everything
10  you're going to testify to based solely on what's
11  set out in the memo?
12     A   I don't have any direct knowledge of
13  anything surrounding this incident.
14     Q   That wasn't my question, sir.  I'm not
15  asking whether you have direct knowledge or were a
16  participant.  I'm asking whether you have any
17  knowledge based on something you may have heard, for
18  example, a conversation --
19     A   No.
20     Q   -- with one of the participants?
21     A   No.
22     Q   So you didn't have a conversation with
23  Detective Martinez at some point?
24     A   Nope.
25     Q   You didn't have a conversation about this

1          VINCENT PACIFICO
2  incident with Chief Damore?
3      A   No.
4      Q   You didn't have a conversation about this
5  incident with Sheriff Weaknecht?
6      A   No.
7      MR. McCOMB:  Let's mark this as 8.
8                     - - -
9          (Whereupon, the document was marked,
10      for identification purposes, as
11      Pacifico-8.)
12                     - - -
13  BY MR. McCOMB:
14     Q   Mr. Pacifico, I'm showing you what's been
15  marked for identification purposes as Pacifico-8.
16  And I'd ask you to review this silently to yourself.
17  When you're done, look up.
18     A   (Witness reviews document.)
19     Q   Have you seen this before today?
20     A   Yes.
21     Q   Do you recall the last time you saw this?
22     MR. McCOMB:  And, again, I'm going to note
23      for the record that Pacifico-8 is a document
24      produced by Berks County.  It's a harassment
25      policy with a revised date of May 10, 2010.

1          VINCENT PACIFICO
2  BY MR. McCOMB:
3      Q   I'm sorry, go ahead.  You were getting
4  ready to answer.
5      A   I was still reading it.
6          (Witness reviews document.)
7          I've reviewed it.
8      Q   Have you seen this before today?
9      A   I have seen something similar to this, but
10  this was revised in 2010 after I was originally
11  hired.  So I have seen something very similar to
12  this.
13     Q   Do you recall when you first saw it?
14     A   It would have been when I was hired -- the
15  very first day I was hired, something similar to
16  this -- but this is the revision after that.
17     Q   Have you ever discussed this policy with
18  anyone other than your counsel, Mr. Adair?
19     A   It was discussed in the workplace.
20     Q   Who do you recall discussing it with in
21  the workplace?
22     A   Whoever did orientation.
23     Q   Would that have been someone from HR?
24     A   Yes.
25     Q   Do you recall the names of any of the

24 (Pages 90 - 93)

Page 94

VINCENT PACIFICO

1
2 people who conducted orientation?
3     A   No.
4     Q   Since orientation, have you had any
5 discussions about this policy with anyone from HR?
6     A   From HR?
7     Q   Yeah.  Let's start with HR.
8     A   Not that I recall.
9     Q   Since orientation, have you had any
10 discussions about this policy with anyone other than
11 HR?
12    A   Yes.
13    Q   Who?
14    A   The sheriff, Adam Fehl, John Stanton, Eric
15 Diggan, and Counsel.
16    Q   Okay.  None of my questions are intended
17 to elicit information you may have discussed with
18 your counsel.  Other than --
19        MR. ADAIR:  Just for the record.  Eric
20    Diggan was your attorney as well, wasn't he?
21        THE WITNESS:  Yes.
22        MR. McCOMB:  All right.
23 BY MR. McCOMB:
24    Q   So he was counsel in the -- yeah.
25    A   Yes.

Page 95

VINCENT PACIFICO

1
2     Q   -- in the Family Medical Leave --
3     A   Yes.
4     Q   Okay.  So I want to put Eric Diggan in the
5 category of someone I don't want you to disclose
6 anything discussed.  What do you recall discussing
7 with Sheriff Weaknecht about this policy?
8     A   When he terminated me for violating this
9 policy, I asked him to point out where I violated
10 it, what specifically I violated because Terry Eli
11 did not fit into the categories as defined in here.
12    Q   Well, let's look at the definition section
13 where it says, number one, harassment -- and I'm
14 just going to read it in the record.  It's short.
15        Harassment:  Any physical, verbal or
16 non-verbal conduct that shows hostility or disdain
17 toward an individual based on race, color, religion,
18 sex, sexual preference, national origin, age,
19 disability, veteran's status, mental status, or
20 political affiliation.
21        Did I read that correctly?
22    A   Yes.
23    Q   And am I correct that you were terminated
24 by Berks County for violation of the harassment
25 policy?

Page 96

VINCENT PACIFICO

1
2     A   Correct.
3     Q   Was there a discussion as to whether your
4 conduct met the definition of harassment set out in
5 paragraph one as I said?
6     A   Yes.
7     Q   What, if anything, did Sheriff Weaknecht,
8 Adam Fehl or John Stanton say about that?
9     A   They did not answer my question.  I
10 repeatedly asked them which one of the categories
11 here that are listed, that are required to be a
12 violation of this harassment, does he fall into
13 because he didn't fall into any of them.  This was
14 not based on any of these reasons.  Our disagreement
15 was financial.
16    Q   Did Sheriff Weaknecht, Adam Fehl or John
17 Stanton state that you had harassed anyone other
18 than John Eli (sic)?
19    A   I don't recall at my termination -- the
20 purpose was Terry Eli.
21    Q   I'm sorry, Terry Eli.
22    A   Terry Eli.  They didn't say anything about
23 any other reasons that we're here today, if that
24 answers your question.
25    Q   Well, you said at -- they said at the

Page 97

VINCENT PACIFICO

1
2 termination meeting.  Have you ever had any
3 discussions at any time with Sheriff Weaknecht, Adam
4 Fehl or John Stanton as to whether you had violated
5 the harassment policy with respect to someone other
6 than Terry Eli?
7     A   In the -- we had a sit-down meeting with
8 Isaac Santiago.  He alleged he was being harassed
9 because he was also one of the deputies that
10 received a notification about punching in and
11 punching out correctly.
12        And HR strongly told him that this was not
13 Vince Pacifico's decision.  This was the County's
14 decision to issue these notices, and that this is
15 not harassment, this is county wide, all employees.
16 And that's the only other time I can recall that
17 becoming an issue.
18        MR. McCOMB:  Well, could you read back my
19    question?
20        - - -
21        (Whereupon, the record was read back
22        as requested.)
23        - - -
24 BY MR. McCOMB:
25    Q   And I'm going to ask that again because I

25 (Pages 94 - 97)

Page 98

VINCENT PACIFICO

1
2 don't think you've answered my question.
3     A   I think I misunderstood it.
4     Q   Okay.  Have you ever had a discussion with
5 Sheriff Weaknecht, Adam Fehl, John Stanton or anyone
6 else affiliated with Berks County as to whether you
7 had violated the harassment policy with respect to
8 someone other than Terry Eli?
9     A   No.
10    Q   Did Isaac Santiago make an allegation that
11 he was harassed because of his national origin?
12    A   No.  He just said he was being harassed.
13    Q   Who did he say he was being harassed by?
14    A   In the meeting concerning the punching in
15 and punching out, that I harassed him.  But it had
16 nothing to do with national origin.  That was never
17 raised.  It was just that he was being harassed.
18    Q   Well, let me rephrase the question then.
19 Were there any employees that have alleged that you
20 harassed them other than Terry Eli?
21    A   Not that I'm aware of.
22    Q   So you've never had any conversation with
23 anyone at Berks County in which there's been a
24 discussion of allegations of harassment by you
25 towards a Berks County employee?

Page 99

VINCENT PACIFICO

1
2     A   I do not recall any such meeting
3 occurring.
4     Q   Well, whether it was at a meeting, whether
5 it was an email, whether it was a telephone
6 conversation, my question is whether there was any
7 communication, any discussion, any sort of exchange
8 of information between you and anyone associated
9 with Berks County which has been an allegation that
10 you harassed somebody?
11    A   I can't think of anything.
12        MR. McCOMB:  Let's take a two-minute
13    break.  I may be close to being done.
14                  - - -
15        (Whereupon, there was a break in the
16    deposition from 11:34 to 11:40.)
17                  - - -
18 BY MR. McCOMB:
19    Q   Do you know an individual by the name of
20 Angel Cabrera?
21    A   I know the name and that's it.
22    Q   Did you ever have any conflict with Mr.
23 Cabrera?
24    A   No.
25    Q   Do you know --

Page 100

VINCENT PACIFICO

1
2     A   I wouldn't know him if he walked in the
3 door.
4     Q   Do you know what position Mr. Cabrera
5 held?
6     A   No.  Was he a county detective or --
7     Q   Well, I --
8     A   I don't know.
9     Q   I'm not answering questions.  So --
10        MR. ADAIR:  I can't answer questions for
11    you either.
12        THE WITNESS:  I don't know.  Law
13    enforcement -- something law enforcement,
14    that's all I know.
15        MR. McCOMB:  That's all I have, Mr.
16    Pacifico.  Thanks.
17        MR. ADAIR:  I actually just have a
18    question or two.
19        MR. McCOMB:  Okay.
20                  - - -
21 BY MR. ADAIR:
22    Q   Did you ever have -- did you ever write up
23 Peter Fox -- Deputy Peter Fox for not calling
24 Control when a judge left the bench?
25    A   You mean when court was closed?

Page 101

VINCENT PACIFICO

1
2     Q   Correct.
3     A   Oh, yeah.
4     Q   Tell me what happened in that incident.
5     A   Peter Fox and Deputy Peter Gravish were in a
6 courtroom that I believe was the emergency motions
7 judge, and someone had turned themselves in, and I
8 tried to run the guy up to the courtroom to catch
9 him so that the guy could see the judge and get
10 re-released.
11        And I got up to Courtroom -- I think it
12 was 9, all the way on the top floor in the main
13 building where Judge Keller was at, and the doors
14 were locked.  And I radioed the deputy.  And here,
15 they were inside and the judge had already left.
16    Q   Who was inside?
17    A   Peter Fox and Deputy Leonard Gravish.
18    Q   Did you -- do you know whether any
19 discipline was issued as a result of that?
20    A   I don't know what it was.  Something
21 occurred, but I don't know what the outcome was.
22    Q   Was that a violation --
23    A   I know I requested discipline.
24    Q   Was that a violation of policy --
25    A   Yes.

Page 102

```
1              VINCENT PACIFICO
2    Q   -- in your opinion?
3    A   Yes.
4        MR. ADAIR:  I don't have any other
5    questions.
6        MR. McCOMB:  I don't have anything
7    further.  Thanks.
8            - - -
9        (Witness excused.)
10           - - -
11       (Deposition concluded at 11:43 a.m.)
12           - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 103

```
1    C E R T I F I C A T E
2

COMMONWEALTH OF PENNSYLVANIA:
3

COUNTY OF PHILADELPHIA:
4

         I hereby certify that I am a Notary Public
5    in good standing, that the aforesaid testimony was
     taken before me, pursuant to notice, at the time and
6    place indicated; that said deponent was by me duly
     sworn to tell the truth, the whole truth, and
7    nothing but the truth; that the testimony of said
     deponent was correctly recorded in machine shorthand
8    by me and thereafter transcribed under my
     supervision with computer-aided transcription; that
9    the deposition is a true record of the testimony
     given by the witness; and that I am neither of
10   counsel nor kin to any party in said action, nor
     interested in the outcome thereof.
11
         WITNESS my hand and official seal this
12   18th day of June, 2015.
13
14
15
16
     _____
     Corinne L. Sugalski
17   Professional Court Reporter
     Notary Public
18
19
20
21
22
23
24
25
```

27 (Pages 102 - 103)